**ROSE HALL, LTD., Plaintiff,**

v.

**CHASE MANHATTAN OVERSEAS BANKING CORPORATION and Holiday Inns, Inc., Defendants.**

Civ. A. No. 79–182.

United States District Court,
D. Delaware.

Aug. 19, 1983.
As Amended Sept. 6, 1983.

114

Andrew B. Kirkpatrick, Jr., Paul P. Welsh, Thomas Reed Hunt, Jr., Francis S. Babiarz, and Denison H. Hatch, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff.

Charles S. Crompton, Jr., David B. Brown, and Gregory A. Inskip, Potter, Anderson & Corroon, Wilmington, Del., of counsel: Milbank, Tweed, Hadley & McCloy, New York City, for Chase Manhattan Overseas Banking Corp.

Henry N. Herndon, Jr., Morris, James, Hitchens & Williams, Wilmington, Del., of counsel, Ronald L. Reid, and Peter Q. Bassett, of Alston, & Bird, Atlanta, Ga., for defendant Holiday Inns, Inc.

---

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Introduction | | 117 |
| I. | Background Facts | 118 |
| II. | Legal Standards Applicable to the Parties' Post-Judgment Motions | 123 |
| | A. Motions for Judgment Notwithstanding the Verdict | 123 |
| | B. Motions for a New Trial | 124 |
| | C. Standards Under Fed. R. Civ. P. 63 | 125 |
| III. | Liability of CMOBC — Deception of the Jamaican Court | 126 |
| | A. Motion for Judgment Notwithstanding the Verdict | 126 |
| | 1. Legal Sufficiency of the Special Verdict So as to Permit the Separate Existence of CMOBC to Be Ignored | 126 |
| | 2. The Existence of a Cause of Action for False Testimony in the Jamaican Court | 126 |
| | a. Choice of Law | 127 |
| | b. Jamaican Law | 128 |
| | c. American Law | 131 |
| | (1) Deceit on the Jamaican Court as Pivotal | 132 |
| | (2) The American Rule of Witness Immunity as Precluding Suit | 133 |
| | 3. Was a Fraud Established | 135 |
| | 4. Did CMOBC Control the Fraud | 137 |
| | B. CMOBC's Alternative Motion for New Trial | 140 |
| | 1. Prejudice to CMOBC From the Court's Grant of Plaintiff's Paragraph 54 "Fraud on the Court" Amendment | 140 |
| | 2. Admission of Justice Rowe's Notes | 141 |
| | 3. Admission of Evidence Relating to the Stay Proceedings | 142 |
| | 4. The Purported Ambiguity in Special Interrogatory No. 4 and Allegedly Erroneous Instructions | 142 |
| | 5. Jury Findings Against Clear Weight of Evidence as to CMOBC's Control of the Fraud | 143 |
| IV. | Liability of CMOBC — Interference Claim | 144 |
| | A. Motion for Judgment Notwithstanding the Verdict or New Trial | 144 |
| | 1. Chase Jamaica's Duty to Act in Good Faith When Foreclosing on Collateral — Lawsuit Against Holiday Inns | 144 |
| | 2. Res Judicata Effect of Certain Statement in Justice Rowe's Opinion | 145 |
| | 3. Chase Jamaica's Legitimate Interest in Avoiding Litigation Between Rose Hall (H.I.) and Holiday Inns | 145 |
| | 4. Consummation of the Proposed $13 Million Transaction | 146 |

**116**

| | | Page |
|---|---|---|
| Introduction | | |
| IV. | Liability of CMOBC — Interference Claim—Continued | |
| | B. Motion for New Trial | |
| | 1. Evidentiary Rulings Concerning the Jamaican Cabinet's Approval of the Proposed $13 Million Sale of the Hotel | 146 |
| | 2. Jury Finding of $4,500,000 in Damages Resulting From Chase Jamaica's Failure to Permit Interference Lawsuit | 148 |
| | a. The Jamaican Government Debentures | 148 |
| | b. Consummation of the Proposed $13 Million Transaction | 149 |
| | c. Lawfulness of Holiday Inns' Conduct | 149 |
| | 3. New Trial Under Rule 63 | 150 |
| | 4. Jury Instructions on the Interference Claim | 150 |
| V. | Liability of Defendant — Cheap Sale | 151 |
| | A. Motion for Judgment Notwithstanding the Verdict | 151 |
| | 1. Competency of Evidence of Sale of Land by Lots | 151 |
| | a. Duty to Sell Land by Lots | 151 |
| | b. Timing of Sale | 152 |
| | c. Financing of the Sale | 152 |
| | d. Sufficiency of the $1 Million that McDaniel's Plan Would Have Produced | 153 |
| | e. Chase Jamaica Being Advised to Subdivide | 153 |
| | 2. Competency of Evidence on Sale of Land as a Block | 153 |
| | 3. Competency of Other Evidence on Best Available Price of the Land | 154 |
| | B. Motion for New Trial | 154 |
| | 1. The Jury's Answers to Interrogatory Nos. 1(a) and 6(a) as Against the Clear Weight of the Evidence | 155 |
| | 2. New Trial on Cheap Sale Under Fed. R. Civ. P. 63 | 155 |
| | 3. Evidentiary Rulings Relating to the Cheap Sale | 156 |
| | a. Evidence Regarding Land Value | 156 |
| | b. Evidence Regarding the Prior Criminal Conviction of a Non-witness Appraiser | 156 |
| | c. Prohibition of Question on Cross-examination Regarding the Location of the Water System in Relation to the Boundaries of the Property | 157 |
| | d. Evidence Regarding the Extent of White Sand Beach | 158 |
| | 4. Jury Instruction as to the Value of the Land | 158 |
| | 5. CMOBC's Miscellaneous Grounds for a New Trial | 159 |
| VI. | Rose Hall's Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, for New Trial | 160 |
| | A. Control as a Matter of Law: Rose Hall's Edge Act Theory | 161 |
| | B. The Presumption of Control Under the Edge Act | 166 |
| | C. Control Independent of the Edge Act | 169 |
| VII. | Rose Hall's Conditional New Trial Issues | 172 |
| | A. Rose Hall's Amendment to Allege Certain Jamaican Tort Claims Against Holiday Inns | 172 |
| | B. Rose Hall's Dissatisfaction With the Jury Instruction Relating to Damages for the Sale of the 3000 Acres of Land | 174 |
| VIII. | Costs | 175 |
| IX. | Conclusion | 176 |

OPINION

MURRAY M. SCHWARTZ, District Judge.

*Introduction*

After 81 jury trial days spanning over five months and generating over 15,500 pages of trial transcript followed by seven and one-half days of deliberations, the jury returned its special verdict, consisting of answers to six interrogatories. (Docket Item "Dkt." 756). Before judgment was entered on the special verdict, the presiding trial judge, the Honorable Edwin D. Steel, Jr., became seriously ill and unable to discharge his judicial duties. On May 5, 1983, pursuant to Fed.R.Civ.P. 63, the case was assigned to Judge Murray M. Schwartz. Thereafter, the Court heard argument on the parties' proposed forms of judgment. Because of scheduling constraints, the Court instructed the parties to begin briefing their post-judgment motions prior to the entry of judgment on the assumption that judgment would be entered adverse to each in all respects. Plaintiff, Rose Hall Ltd. ("Rose Hall" or "plaintiff"), and defendants, Chase Manhattan Overseas Banking Corporation ("CMOBC") and Holiday Inns, Inc. ("Holiday Inns"), filed their opening briefs on post-trial motions on June 6, 1983.[1] On June 10, 1983, the Court entered judgment on the verdict for plaintiff against CMOBC in the amount of six million dollars plus prejudgment interest, and for Holiday Inns against plaintiff. *Rose Hall v. Chase Manhattan Overseas Banking Corp.*, 566 F.Supp. 1558 (D.Del. 1983) [hereinafter cited as "Judgment Opinion" or "Dkt. 773"]. Briefing on the post-judgment motions as originally instructed by the Court was completed on July 11, 1983, and hearing was held on July 15, 1983.

As a result of the briefing of post-judgment motions prior to entry of judgment, the Court is in the unusual position of having before it motions from both plaintiff and CMOBC for judgment notwithstanding the verdict or, in the alternative, a new trial.[2] On July 5, 1983, Rose Hall amended its motion for judgment notwithstanding the verdict or alternatively for a new trial to seek such relief only if the Court grants CMOBC any of the relief sought in its motion for judgment notwithstanding the verdict or new trial. (Dkt. 869).

The Court first considers CMOBC's post-judgment motions. The Court has determined that CMOBC's request for judgment notwithstanding the verdict on the only issue upon which judgment was granted to plaintiff, deceit on the court, must be granted. Applying Fed.R.Civ.P. 50(c)(1), the Court is instructed to rule on defendant's new trial motion; that ruling forms the next portion of the opinion. Plaintiff's motion for judgment notwithstanding the verdict or, in the alternative, a new trial is addressed in the next portion of this opinion as if it had been filed pursuant to Fed.R.Civ.P. 50(c)(2). The Court concludes that plaintiff's motion for judgment notwithstanding the verdict or, alternatively, new trial should not be granted. Finally, the opinion addresses the issue of costs deferred by the Judgment Opinion.

The Court has attempted to treat the significant issues presented by the parties. Due to the enormity of the post-judgment briefing, totaling over 550 pages not including the incorporation by reference of several earlier briefs and letters encompassing hundreds of pages, the Court's treatment of these issues has resulted in an opinion of inordinate length. Any issue not specifically addressed may be assumed to have been resolved against the moving party.

The background facts have been set forth at length in the Judgment Opinion. In order to clarify the complex history of this case, a largely verbatim recitation of the facts from the Judgment Opinion will be set forth. In addition, relevant facts are

---

1. Dkt. 770, 771, 772.

2. The plaintiff has also made a conditional motion that if the Court grants a new trial of any other issue, it should grant a new trial on the issue of Holiday Inns' liability. Holiday Inns opposes this motion. *See* Dkt. 771, 772, 866.

stated in more detail as required in the various sections of the opinion.

## I. *Background Facts*

Plaintiff, Rose Hall, is a Cayman Islands corporation whose ultimate principal and controlling stockholder is John W. Rollins, Sr. Rose Hall owned approximately 5500 acres of land on the north coast of Jamaica near Montego Bay. In the late 1960's, Rose Hall organized a wholly owned subsidiary company named Rose Hall (H.I.) Ltd. ("Rose Hall (H.I.)") for the purpose of owning a hotel in Jamaica to be known as the Rose Hall Holiday Inn. The hotel property owned by Rose Hall (H.I.) consisted of the hotel building and an 11 acre tract of land cut out from the Rose Hall acreage. The hotel was financed by a $6,250,000[3] loan from the Bank of Nova Scotia ("BNS") to Rose Hall (H.I.) and leased to a subsidiary of Holiday Inns for a twenty year term but guaranteed by defendant Holiday Inns.

Chase Merchant Bankers Jamaica, Ltd. ("Chase Jamaica") is a wholly owned subsidiary of the only "Chase" defendant in this action, Chase Manhattan Overseas Banking Corporation, which in turn is a wholly owned subsidiary of Chase Manhattan Bank, N.A. ("CMB"), a wholly owned subsidiary of the Chase Manhattan Corporation. Chase Manhattan Overseas Corporation ("CMOC") is another wholly owned subsidiary of the Chase Manhattan Bank, N.A.

On June 3, 1974, Rose Hall borrowed $3,000,000 from Chase Jamaica. As security for the loan, Rose Hall gave Chase Jamaica a first mortgage on approximately 3000 acres of Rose Hall's land, lying largely in the middle of the 5500 acre assemblage and a pledge of all the shares of Rose Hall (H.I.) and caused Rose Hall (H.I.) to give a second mortgage on the Rose Hall Holiday Inn.

Rose Hall quickly went into default on its loan from Chase Jamaica. By mid-1975, Rose Hall (H.I.) had entered into negotiations for the sale of the hotel to the Urban Development Corporation ("U.D.C."), a corporation owned by the Jamaican government. By May or June 1976, those negotiations had crystallized into a tentative arrangement with the Jamaican government. The hotel and the 11 acres on which it was situated would be sold to the U.D.C. for $13,000,000, payable in $10,000,000 cash and $3,000,000 in long-term Jamaican government guaranteed debentures.

As the sale negotiations continued, Rose Hall fell further behind in payments due under the Chase Jamaica loan. In early 1976, Chase Jamaica, as pledgee of the shares, registered the stock of Rose Hall (H.I.) in its name and became involved in the sale negotiations.

Holiday Inns learned of the sale negotiations in approximately April 1976, and, desiring to modify the terms of the lease with Rose Hall (H.I.) which it considered oppressive, held discussions with John Rollins and Jamaican government representatives. Plaintiff contended that these discussions embodied: first, threats to breach its lease unless it was granted concessions; second, false and malicious statements that Rose Hall (H.I.) had misrepresented its earnings to the government; and third, assertion of a false claim that Rose Hall (H.I.) owed Holiday Inns approximately $4 million previously spent by the lessee for maintenance and repair of the hotel. Without specifying which allegation formed the basis for its finding, the jury implicitly concluded that Holiday Inns wrongfully interfered with the Rollins negotiated proposed $13,000,000 sale to U.D.C. and thereby caused Rose Hall $4,500,000 in damages.[4]

In early August, 1976, Chase Jamaica informed Holiday Inns that the Rose Hall (H.I.) shares were in its name and arranged a meeting for August 20, 1976 in Miami,

---

**3.** Since both Jamaican and United States currencies are relevant to the transaction and underlying facts, Jamaican currency will be referred to as "$J." All other currency figures may be assumed to be in United States currency.

**4.** *See* Interrogatory Nos. 2 and 6, *infra* p. 121.

Florida. This meeting formed the basis of conspiracy claims by plaintiff against the defendant Holiday Inns. Rose Hall alleged that Chase Jamaica and Holiday Inns conspired to frustrate the consummation of the $13,000,000 arrangement and replace it with a sale at a drastically reduced price, thereby accomplishing objectives beneficial to themselves without regard to Rose Hall's interests. The jury, however, found that there was no such conspiracy.[5]

In late August, 1976, the U.D.C. formally notified Rose Hall (H.I.) that it was no longer interested in pursuing the $13,000,-000 negotiations. On September 14, 1976, Chase Jamaica made a proposal far more attractive to the U.D.C. Instead of $13 million for the hotel only, Chase Jamaica offered to sell to the U.D.C. all of the Rose Hall collateral for approximately $9.5 million, consisting of $8.5 million for the shares of stock of Rose Hall (H.I.) and $1 million for the 3000 acres of mortgaged land. The U.D.C. accepted the offer in late September or early October, 1976, with closing taking place on November 18, 1977. In this action, plaintiff alleged and the jury found that this sale was unreasonably "cheap"[6] and in violation of Chase Jamaica's mortgagee duties, determining that, as a result, plaintiff was damaged in the amount of $1,500,000 for the cheap sale of the land and $0 for the shares of Rose Hall (H.I.).[7]

On September 21, 1976, Rose Hall representatives requested Chase Jamaica to permit Rose Hall (H.I.) to bring a lawsuit in Georgia against Holiday Inns for interference with the $13,000,000 arrangement. Rose Hall representatives also requested that Chase Jamaica withdraw its offer of sale to the U.D.C. In December, 1976, a lawyer for the Jamaican government requested that Chase Jamaica sell the assets of Rose Hall (H.I.) instead of its shares. Chase Jamaica refused these proposed

courses of action and subsequently consummated its $9.5 million sale to the U.D.C. of Rose Hall (H.I.) stock and 3000 acres of land. By selling stock rather than the hotel asset, Chase Jamaica effectively made the interference claim against Holiday Inns unavailable to plaintiff. Rose Hall sued Holiday Inns in Georgia for wrongful interference with the $13,000,000 sale negotiations on September 30, 1976. The Georgia court held, without determining the merits of the interference claim, that such a suit could only be brought by Rose Hall (H.I.). *Rose Hall, Ltd. v. Holiday Inns, Inc.*, C.A. No. C227–30 (Ga.Super.Ct., Fulton Cty., filed Sept. 30, 1976), *aff'd*, 146 Ga.App. 709, 247 S.E.2d ·173, *cert. denied*, No. 55491 (Ga. Oct. 3, 1978). In effect, the Georgia court confirmed the unavailability of the interference claim. The jury found that Chase Jamaica wrongfully prevented Rose Hall from suing Holiday Inns in the Georgia action, and as a result plaintiff suffered $4,500,000 in damages.[8]

On October 4, 1976, Rose Hall filed an action in the Supreme Court of Judicature of Jamaica to enjoin the sale of stock and land by Chase Jamaica to the U.D.C. and, alternatively, for damages. The Jamaican court refused to enjoin the sale on the ground that monetary damages would be an adequate remedy if Rose Hall succeeded in proving its case at trial. *Rose Hall Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.*, Suit No. E–211 of 1976 (Sup.Ct. of Judicature of Jam., Jan. 17, 1977). (Plaintiff's Exhibit "PX" 140). In the instant action, the plaintiff contended, and the jury found, that the defeat of the injunction was caused by misrepresentations to the Jamaican court made by representatives of Chase Jamaica to the effect that it would be financially able to meet any damage liability in view of the perma-

**5.** *See* Interrogatory No. 5, *infra* p. 121.

**6.** Throughout the course of this litigation, the colloquialism "cheap" has been used to describe the sale of the land at less than the best available price.

**7.** *See* Interrogatory Nos. 1 and 6, *infra* p. 121.

**8.** *See* Interrogatory Nos. 2 and 6, *infra* p. 121.

nence of its Jamaican operation and its affiliation with the other Chase entities. There was evidence that at the time these representations were being made, actual undisclosed plans to close down Chase Jamaica's operation existed.[9] By February 1978, Chase Jamaica's office closed and ceased active business.

In mid-1980, the Jamaican court listed the Jamaican action for trial in January, 1981. Rose Hall moved to stay the Jamaican action pending resolution of the Delaware action. CMOBC opposed the stay and offered to pay any final judgment that might be entered against Chase Jamaica to the extent of J$10,000,000, subject to certain conditions. The Jamaican court, noting that CMOBC's offer was so conditional as to be "worthless," granted the stay of the proceedings. *Rose Hall Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.*, Suit No. E–211 of 1976 (Sup.Ct. of Judicature of Jam., Feb. 12, 1981) (PX 141,

p. 21). On Chase Jamaica's appeal, the Court of Appeal of Jamaica affirmed the granting of the stay. *Chase Merchant Bankers Jamaica Ltd., et al. v. Rose Hall Ltd., et al.*, Sup.Ct. Civil Appeal No. 78/80, (Ct. of Appeal, Jam., June 23, 1982) (PX 641). Chase Jamaica then appealed the decision to the Privy Council in London. This appeal has apparently been abandoned. (Dkt. 868, p. 77 n. *).

On April 11, 1979, Rose Hall filed the instant action against CMOBC, the parent corporation of Chase Jamaica, and against Holiday Inns. One of the alternative grounds advanced by plaintiff for imposing liability on the parent, CMOBC, for Chase Jamaica's wrongs is embodied in Paragraph 54 which was added to the Second Amended Complaint by amendment on September 30, 1982.[10] After extensive discovery, a jury trial was held from October 12, 1982 to March 8, 1983. The jury re-

---

9. *See* Interrogatory No. 4, *infra* p. 121.

10. Paragraph 54 reads as follows:

54. In addition to its liability under the Federal Reserve Act, referred to in paragraphs 2, 3 and 5 hereof, Chase Overseas [CMOBC] is liable for, and should be regarded in law and in fact as a party to, all the wrongful acts and omissions of Chase Jamaica or "Chase" alleged in this complaint, because Chase Overseas' power of control over Chase Jamaica and Chase Jamaica's status as a purportedly separate entity, have been used, to plaintiff's injury, to justify wrong and to perpetrate and protect fraud, and to attempt further frauds. The fraud commenced in the early proceedings in the Supreme Court of Judicature of Jamaica in *Rose Hall Limited, et al. v. Chase Merchant Bankers Jamaica Limited, et al.*, Suit No. E–211 of 1976 ("The Jamaican action"). Rose Hall's attempt to enjoin the reasonably [sic] cheap sale of the Rose Hall (H.I.) shares and 3,000 ± acres of land was defeated by false representations to the Jamaican Court that Chase Jamaica had substantial assets, would continue to do business in Jamaica, and was and would be in a position to pay whatever damages might be awarded to Rose Hall. The Jamaican Court believed these misrepresentations and denied the injunction for those express reasons. When these representations were made, Chase had already decided, as alleged in paragraph 16, above, to close down its Jamaican operation and liquidate as

quickly as possible all of its loans in Jamaica, and the plans had already been made whereby "we should be out of Jamaica next year around the end of June"—*i.e.*, by June, 1977, well before the Jamaican action would be expected to reach trial. Chase thereafter carried these plans out as promptly as it deemed prudent, completing them in approximately February, 1978. More recently, Chase Overseas manipulated Chase Jamaica's defense of the Jamaican action, which remained pending as a damage action against the emptied shell of Chase Jamaica, seeking unfair litigation advantage to itself in this case. By such manipulation, Chase Overseas attempted to bring the Jamaican action to trial before this case, hoping to render this action moot and to avoid a trial here "involving the extensive pretrial discovery and trial practices attendant on the Delaware action" (which were later to reveal important additional documents damaging to Chase). For these purposes, Chase Overseas openly took part in the Jamaican action (in part purportedly through Chase Jamaica) and even attempted to bargain directly with the Jamaican court by offering, in the light of Chase Jamaica's having been stripped of assets, Chase Overseas' undertaking to "pay any final judgment that may be entered against Chase [Jamaica] in [the Jamaican action] up to the extent of [devalued] Jamaican dlrs ten million" if the Jamaican court would rule in favor of Chase Jamaica on the disputed issue whether an early trial of the Jamaican action should be had.

turned the "Special Verdict Accompanied By Interrogatories to the Jury Under Rule 49(a)" on March 17, 1983. It reads as follows:

## SPECIAL VERDICT ACCOMPANIED BY INTERROGATORIES TO THE JURY UNDER RULE 49(a)

1. In selling (a) the 3,000+ acres of land and (b) the shares of Rose Hall (H.I.) Ltd. did Chase Jamaica breach its duty to act in good faith, without reckless disregard for the interests of the mortgagor, taking reasonable precautions to obtain the best available price and to avoid an unreasonable sale of excess collateral? Yes x No___

2. Did Chase Jamaica wrongfully prevent plaintiff from suing Holiday Inns in Georgia for alleged interference with the US$13 million sale either by Chase Jamaica selling to UDC shares instead of assets of Rose Hall (H.I.) or by refusing to take other action which would have permitted Rose Hall (H.I.) to join in the Georgia lawsuit? Yes x No___

3. Did CMOBC control Chase Jamaica's major decisions and actions relating to its actions under Question 1. or its actions under Question 2.?

As to Question 1.

 (a) because of the Edge Act theory and/or Yes___ No x

 (b) independently of the Edge Act Yes___ No x

As to Question 2.

 (a) because of the Edge Act theory and/or Yes___ No x

 (b) independently of the Edge Act Yes___ No x

4. Did Chase Jamaica, through its representations, as a result of its control by CMOBC, deceive the Jamaican court into not enjoining the sale of the collateral? Yes x No___

5. Did Holiday Inns wrongfully conspire with Chase Jamaica in (a) selling the land, or (b) the shares under Question 1. or in taking its actions under Question 2.?

 A. As to the sale of the land—Question 1.(a) Yes___ No x

 B. As to the sale of the shares of Rose Hall (H.I.)— Question 1.(b) Yes___ No x

 C. As to Question 2. Yes___ No x

6. If the answer to Question 1. is "Yes", what damages, if any, did plaintiff suffer as a result:

 (a) for the land $ 1,500,000

 (b) for the shares $ 0

If the answer to Question 2. is "Yes", what damages, if any, did plaintiff suffer as a result: $ 4,500,000

NOTE: Answer Questions 3., 4., 5., and 6. only if Question 1. or Question 2. is answered "Yes." Regardless of your answer to Question 3., 4., or 5., answer Question 6.

---

The Special Interrogatories were formulated so that Interrogatory Nos. 1 and 2 posed the question of whether Chase Jamaica, a nonparty to this action, committed any wrong with respect to the sale of the land and Rose Hall (H.I.) shares or wrongfully prevented plaintiff from suing Holiday Inns in Georgia. Interrogatory Nos. 3, 4 and 5 sought to determine who was liable if Interrogatory Nos. 1 and/or 2 were answered in the affirmative. Interrogatory Nos. 3 and 4 inquired whether CMOBC was liable. Interrogatory No. 3 centered on liability by reason of control of Chase Jamaica under plaintiff's Edge Act theory [11]

**11.** The Edge Act, 12 U.S.C. §§ 611–632 ("Edge Act"), allows banks to carry on foreign or international banking through the agency, ownership, or control of branches or local institutions. For a discussion of plaintiff's Edge Act theory see *infra* pp. 161–166 and *Rose Hall, Ltd. v.*

or independently of the Edge Act while Interrogatory No. 4 sought to have the jury determine on an alternative theory of liability whether Chase Jamaica deceived the Jamaican court into not issuing an injunction and whether that deception resulted by reason of control by CMOBC. Interrogatory No. 5 sought to determine whether Holiday Inns was liable to plaintiff for wrongfully conspiring with Chase Jamaica. Finally, Interrogatory No. 6 sought to have the jury's assessment of damages if Chase Jamaica did commit any of the wrongs set forth in Interrogatory Nos. 1 and 2. An assessment of damages in answer to Interrogatory No. 6 does not necessarily mean Rose Hall is entitled to judgment. The jury was instructed to assess plaintiff's damages in Interrogatory No. 6 even if it found none of the named defendants in the lawsuit responsible for the wrongs committed by Chase Jamaica. This instruction by Judge Steel to the jury on the special verdict sheet was done over objection of CMOBC at the behest of plaintiff. Plaintiff consistently maintained before Judge Steel that CMOBC is liable for Chase Jamaica's breaches of duty under the Edge Act as a matter of law. As a consequence, plaintiff asserted prior to verdict, and continues to assert that the jury's answers to Interrogatory Nos. 3, 4 and 5 are irrelevant, *i.e.*, who is liable and on what theory is unimportant because CMOBC is liable as a matter of law. While ruling against plaintiff on its theory under the Edge Act, Judge Steel was obviously persuaded by plaintiff that if he were in error, a lengthy

retrial could be avoided by obtaining the jury's assessment of plaintiff's damages without regard to who was liable.[12]

In answer to Interrogatory No. 1, the jury determined that Chase Jamaica, a non-party in this action, wrongfully failed to realize the best available price for the land and shares of Rose Hall (H.I.) Ltd. in its sale to the U.D.C. In answer to Interrogatory No. 6, the jury found plaintiff was damaged in the amount of $1,500,000 for the land and $0 for the shares. Therefore, the jury necessarily concluded that at the time of the sale, the Rose Hall (H.I.) shares were worth no more to the U.D.C. than the $8,500,000 sale price it paid and the 3000 acres were worth $2,500,000, or $1,500,000 more than the $1,000,000 sale price paid by the U.D.C.

By its affirmative answer to Interrogatory No. 2, the jury determined that Chase Jamaica wrongfully prevented Rose Hall from suing Holiday Inns for interference in the $13,000,000 sale negotiations between John Rollins and the U.D.C. In answer to Interrogatory No. 6, the jury found that as a result plaintiff suffered damages in the amount of $4,500,000. As indicated in the instructions, for the jury to arrive at this conclusion, it must have determined that in fact Holiday Inns did interfere, and that if Rose Hall had been able to sue Holiday Inns, it would have been awarded $4,500,-000 in damages.[13]

In this action, however, Holiday Inns could not be sued directly for the interference since only Rose Hall (H.I.) was pos-

---

*Chase Manhattan Overseas Banking Corp.,* 494 F.Supp. 1139, 1154–56 (D.Del.1980).

**12.** Plaintiff's position was memorialized in a letter to Judge Steel:

We respectfully request that the jury be asked to determine the amount of plaintiff's damages, regardless of the answers to questions 3, 4 and 5. Plaintiff claims that, as a matter of law, CMOBC is liable for Chase Jamaica's breaches under the Edge Act, regardless of what answers the jury might give to questions 3, 4, and 5. If plaintiff later prevails on that point, but no verdict on the amount of damages had been rendered, a retrial would be necessary. That risk can be avoided, simply by taking a verdict on the

amount of Rose Hall's damages regardless of the answers to questions 3, 4, and 5.
Letter from Paul P. Welsh, Esq. to Honorable Edwin D. Steel, Jr., March 4, 1983.

**13.** The following figures illustrate the amount of damages:

| ROLLINS' DEAL | CHASE JAMAICA'S SALE |
|---|---|
| $13,000,000 sale price for hotel | $9,505,000 sale price for hotel shares and land |
| –6,250,000 BNS first mortgage | –6,250,000 BNS first mortgage |
| $ 6,750,000 equity in hotel | 3,255,000 |
| | –1,000,000 land price |
| | $2,255,000 equity in hotel |

$4,495,000 difference in equity in hotel.

sessed of that chose in action; rather it was sued only on a conspiracy theory of liability. In order to impose liability on Holiday Inns, plaintiff was required to prove Holiday Inns conspired with Chase Jamaica in committing the wrongs described in Interrogatory No. 1 or Interrogatory No. 2. In answer to Interrogatory Nos. 5(A), (B) and (C), the jury found no conspiracy on the part of Holiday Inns. Therefore, judgment was entered in favor of Holiday Inns and against plaintiff on all claims.

Several possible bases for imposing liability on CMOBC for Chase Jamaica's wrongs were submitted to the jury in Interrogatory Nos. 3 and 4. The jury determined that CMOBC did not control Chase Jamaica's major policy decisions and actions relating to the events described in Interrogatory Nos. 1 and 2.[14] In addition, the jury found that CMOBC rebutted the presumption of control under the Edge Act,[15] established by Judge Steel in *Rose Hall Ltd. v. Chase Manhattan Overseas Banking Corp.*, 494 F.Supp. at 1154–56.[16]

The only basis found by the jury for holding defendant CMOBC liable for the wrongs of its subsidiary, Chase Jamaica, is embodied in Interrogatory No. 4. An affirmative answer to that question constitutes a factual finding by the jury that during the injunction proceeding in Jamaica, Chase Jamaica made false representations to the Jamaican court which induced that court to defeat Rose Hall's attempts to enjoin the sale of collateral. The jury found that the Jamaican court was deceived by Chase Jamaica to believe there

was no intention to close its operations and that it would remain in Jamaica with access to sufficient funds to satisfy any money judgment against it, when actual undisclosed plans to the contrary existed. The jury also found that this deception of the Jamaican court was controlled by CMOBC.

Based on the jury's answers to Special Interrogatories, the Court entered judgment for Holiday Inns against plaintiff on all claims and for plaintiff against CMOBC in the amount of six million dollars plus prejudgment interest. (Dkt. 773). Presently, the Court turns to the resolution of the parties' motions for judgment notwithstanding the verdict, or, in the alternative, for a new trial.

## II. *Legal Standards Applicable to the Parties' Post-Judgment Motions*

### A. *Motions for Judgment Notwithstanding the Verdict*

■ This opinion addresses both plaintiff's and defendant CMOBC's motions for judgment notwithstanding the verdict under Fed.R.Civ.P. 50(b).[17] Both parties agree that "[t]he standards for granting a motion for judgment n.o.v. . . . are the same as those governing the direction of a verdict." 5A J. Moore, *Moore's Federal Practice* ¶ 50.07[2] (2d ed. 1981). A court should grant the motion "if, without weighing the credibility of the evidence, there can only be one conclusion as to the proper judgment, and it is contrary to the verdict." *Kerry Coal Co. v. United Mine Workers*, 488 F.Supp. 1080, 1094–95 (W.D.Pa.1980),

**14.** Interrogatory Nos. 3(1)(b) and 3(2)(b), *supra* p. 121.

**15.** For a more complete discussion see *infra* pp. 166–172.

**16.** Interrogatory Nos. 3(1)(a) and 3(2)(a), *supra* p. 121.

**17.** Fed.R.Civ.P. 50(b) provides in pertinent part:
(b) Motion for Judgment Notwithstanding the Verdict. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determina-

tion of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; . . . . A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. . . .

*aff'd,* 637 F.2d 957 (3d Cir.1981), *cert. denied,* 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981). The Court is not free to "weigh the evidence, pass on the credibility of witnesses, or substitute its own judgment of facts for that of the jury." 488 F.Supp. at 1095 (citing 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2524 at 541–544 (1971)). The Court may overturn a jury verdict only where the facts and all inferences, drawn in the non-moving party's favor, would not permit a reasonable man to come to the conclusion the jury reached. *Kerry Coal,* 488 F.Supp. at 1095 (citations omitted).

### B. *Motions for a New Trial*

█ Rose Hall and CMOBC have also moved for a new trial on various grounds. Although Fed.R.Civ.P. 59 does not enumerate the grounds for a new trial,[18] the following have been recognized as general grounds for a new trial: the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and that substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions. 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2805 at 37–38 (1973). A new trial motion on the ground that the verdict is against the weight of the evidence is to be distinguished from a motion for a directed verdict or for a judgment notwithstanding the verdict which raises the legal sufficiency of the evidence. In cases where a directed verdict or judgment notwithstanding the verdict would not be justified, the trial court may set aside the verdict as contrary to the clear weight of the evidence and grant a new trial. 6A J. Moore, *Moore's Federal Practice,* § 59.08[5] (2d ed. 1983). However, the Court should not set the verdict aside as against the clear weight of the evidence solely because it would have reached a different result as the trier of fact. *Id.* The Third Circuit

Court of Appeals enunciated the test as follows:

> [S]ince the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict. The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts, and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

*Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 89 (3d Cir.1960), *cert. denied,* 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960) (quoting 6 J. Moore, *Moore's Federal Practice,* (2d ed.) p. 3819).

█ The modern trend has been for courts to exercise a more limited judicial discretion in determining whether to set aside a verdict as against the clear weight of the evidence. *Schreffler v. Board of Education,* 506 F.Supp. 1300, 1306 (D.Del. 1981). The Third Circuit appellate court has distinguished new trials granted on this ground from those granted because of claimed errors or defects in the conduct of the trial, such as evidence improperly admitted or prejudicial statements by counsel. New trials granted because of the court's finding that the verdict was against the clear weight of the evidence will receive closer scrutiny on review. *Hourston v. Harvlan, Inc.,* 457 F.2d 1105, 1107 (3d Cir. 1972) (citing *Lind v. Schenley Industries, Inc.,* 278 F.2d at 90); *Schreffler v. Board of Education,* 506 F.Supp. at 1306.

---

18. Fed.R.Civ.P. 59 provides in pertinent part:
 (a) *Grounds.* A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

## C. Standards Under Fed.R.Civ.P. 63

Rule 63 provides for reassignment of a case upon the disability of the presiding trial judge, and states that if the successor judge "is satisfied that he cannot perform [the] duties [to be performed by the court after a verdict is returned] because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial." Fed.R.Civ.P. 63. If the trial judge is disabled after the jury returns a verdict but before motions for judgment notwithstanding the verdict or new trial are heard or decided, the successor judge may pass on these motions. "The latter then becomes vested with the same broad discretion to grant or deny such motions as was the trial judge." *Miller v. Pennsylvania Railroad Co.*, 161 F.Supp. 633, 636 (D.D.C.1958), *rev'd on other grounds*, 272 F.2d 545 (D.C.Cir.1959).

The parties agree there is no impediment to the determination of their judgment notwithstanding the verdict motions by the successor judge in this case. Complications arise, however, when new trial motions are based, as some of the present ones are, on the ground that the verdict is contrary to the clear weight of the evidence. In this situation, the court might itself have to weigh the evidence. Although determination of the "credibility of witnesses is peculiarly for the jury," 6A J. Moore, *Moore's Federal Practice*, § 59.-08[5] (2d ed. 1983), a judge may be required to pass on the credibility of witnesses in determining whether the verdict is against the clear weight of the evidence. *Ruggieri v. Beauregard*, 110 R.I. 197, 291 A.2d 413, 414 (Sup.Ct.R.I.1972).[19] "It is difficult to perceive the propriety of an exercise of such power where credibility is involved, the successor judge having neither seen nor heard the witnesses as they testified." 291 A.2d at 414. In some instances, scrutiny of the relevant transcript portions and documents may indicate that no credibility determinations are involved. Then, the successor judge can clearly rule on the new trial motions. *See e.g., Miller v. Pennsylvania Railroad Co.*, 161 F.Supp. 633, 642 (D.D.C.1958), *rev'd on other grounds*, 272 F.2d 545 (D.C.Cir.1959). However, if the successor judge finds that determining whether the verdict is contrary to the clear weight of the evidence involves questions of credibility which he should determine, he should, in his discretion, grant a new trial. *Ruggieri*, 291 A.2d at 414–15.

Several cases requiring a new trial because of the successor judge's inability to make credibility determinations involved bench trials where the presiding judge became disabled before making findings of fact. *See e.g., Brennan v. Grisso*, 198 F.2d 532 (D.C.Cir.1952); *Federal Deposit Insurance Corp. v. Siraco*, 174 F.2d 360 (2d Cir.1949). These cases are distinguishable from the present one in which the Court's function is to review the jury findings to determine if they are against the clear weight of the evidence. Rule 63 cannot be read to require a new trial in every case in which the presiding trial judge becomes disabled before passing on post-judgment motions and a non-prevailing litigant thereafter urges that the existence of credibility issues fairly resolved by the jury nonetheless entitle it to a new trial. Rather, it provides the successor judge with discretion to grant a new trial if he feels it is necessary in light of the entire record and nature of the credibility issue.

Finally, in considering the motions for judgment notwithstanding the verdict and new trial, the parties have urged the successor judge to revisit certain rulings of Judge Steel. The general rule in this circuit and elsewhere is that "judges of coordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other." *TCF Film Corp. v. Gourley*, 240 F.2d 711, 713 (3d Cir.1957). This is regarded as a "necessary rule of judicial comity to preserve the orderly functioning of the judicial process."

---

19. The Supreme Court of Rhode Island was applying a state rule of civil procedure patterned after Rule 63.

*Id.* at 714. This rule, however, "is not absolute and all-embracing in its scope." *United States v. Mathies,* 350 F.2d 963, 964 (3d Cir.1965). There are "exceptional circumstances," such as when the judge who made the original decision is, by death, resignation or disability, not available to reconsider his decision. In such a case, the successor judge is empowered to reconsider the previous ruling and reverse it if necessary. *TCF Film,* 240 F.2d at 714; *see also, Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 168–70 (3d Cir.1982); *United States Gypsum Co. v. Schiavo Brothers Inc.,* 668 F.2d 172, 177 (3d Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982).

This Court will be guided by these general principles in reviewing rulings made by Judge Steel. Such rulings will not be disturbed unless this Court is satisfied that they were erroneous and are material to the issues currently at hand.

### III. *Liability of CMOBC—Deception of the Jamaican Court*

#### A. *Motion for Judgment Notwithstanding the Verdict*

CMOBC has moved for judgment notwithstanding the verdict on several grounds related to Interrogatory No. 4. First, defendant urges that the only permissible construction of the Special Verdict precludes a holding that separate corporate entities should be disregarded. Second, CMOBC contends that under Jamaican law, "no civil theory of recovery may be predicated in whole or in part upon allegedly false testimony in another judicial proceeding." Third, CMOBC claims that it cannot reasonably be concluded from all the evidence that plaintiff established fraud by clear and convincing proof. Fourth, CMOBC contends that plaintiff's proof is insufficient as a matter of law to support a finding that CMOBC controlled the alleged fraud on the court. These issues will be considered seriatim.

#### 1. *Legal Sufficiency of the Special Verdict So As to Permit the Separate Existence of CMOBC to Be Ignored*

Defendant restates its argument that since the jury found in Interrogatory No. 3 that CMOBC did not control Chase Jamaica's wrongs referenced in Interrogatory Nos. 1 and 2, there can be no liability of CMOBC based on these wrongs. In essence, CMOBC contends that the jury's affirmative answer to Interrogatory No. 4 is insufficient to justify disregarding the separate corporate entities and to hold CMOBC liable for the six million dollars in damages assessed by the jury.

This argument was treated in this Court's Judgment Opinion. The Court concluded that an affirmative answer to Interrogatory No. 4, encompassing as it does the fact that a misrepresentation occurred that deceived the Jamaican court into not issuing the injunction and that CMOBC controlled the making of that misrepresentation requires disregard of the separate corporate entities. Moreover, the Court held CMOBC would be liable for the full amount of damages, regardless of the jury's finding of no control in Interrogatory No. 3. CMOBC is not entitled to judgment notwithstanding the verdict on this ground. If the jury's findings in Interrogatory No. 4 are supported in the record, there is no reason to upset that determination. Conversely, if there has been a failure of proof, the verdict cannot stand.

#### 2. *The Existence of a Cause of Action for False Testimony in the Jamaican Court*

CMOBC asserts that since under Jamaican law no civil theory of recovery can be predicated upon allegedly false testimony in another judicial proceeding, plaintiff's paragraph 54 claim must fail. CMOBC did not raise this issue in its September 13, 1982 Answering Brief in Opposition to Plaintiff's Proposal to Amend the Second Amended Complaint by Adding a New Paragraph 54 Thereto (Dkt. 524). As a result the question was not treated by

Judge Steel in the opinion allowing Rose Hall's amendment. (Dkt. 568, 9/30/82). Defendant first raised the issue on October 5, 1982, in its Motion to Dismiss Paragraph 54 Pursuant to Rule 12(b)(6) on the ground that it fails to state a claim upon which relief can be granted. (Dkt. 602). Hearing was held on October 7, 1982, and Judge Steel orally ordered "that the hearing [and] determination thereof be deferred until trial pursuant to Rule 12(d)." (Dkt. 663, p. 14). The ruling was formalized in an order dated October 8, 1982 (Dkt. 654) and trial commenced on October 12, 1982.

CMOBC again raised the issue in its November 30, 1982 Motion for a Directed Verdict and the accompanying briefs. (Dkt. 693, 694, 696, 697). Judge Steel again in effect deferred ruling on the issue by stating: "the motions will not be granted, but I can assure the litigants that when their motions for judgment N.O.V. [arise], if that should ever be required, very serious consideration will be given to those motions." (Dkt. 809, Tr. 6442–43). Presently, the Court undertakes the promised serious consideration of CMOBC's contention.

### a. *Choice of Law*

As a preliminary matter, it must be determined which law governs the claim that Chase Jamaica, as a result of its control by CMOBC, perpetrated a fraud upon the Jamaican court. In a previous opinion in this case, Judge Steel held that Jamaican law governs the question of whether Chase Jamaica committed a fraud on the Jamaican court. (Dkt. 568, p. 7).

Plaintiff now asserts that the tort law of some unspecified jurisdiction within the United States governs the liability of CMOBC. Plaintiff relies upon Judge Steel's statement that the liability of CMOBC, as a stockholder, for the wrongs of its subsidiary is governed by the laws of the United States. (Dkt. 568, p. 8). In response, defendant correctly maintains that Judge Steel concluded, in his previous opinion, that under the *Restatement (Second) of Conflict of Laws* § 145 (1971) or the Delaware common law choice of law rule Jamaican law would govern the question of whether Chase Jamaica committed a fraud on the Jamaican court. Judge Steel further held that whether CMOBC, as a parent Edge Act corporation, should be liable for the wrongs of Chase Jamaica would be governed by the laws of the United States. (Dkt. 568, p. 7–8). This Court subscribes to Judge Steel's holdings and further finds that even if plaintiff were attempting to hold CMOBC liable for the fraud upon the Jamaican court as a tortfeasor and not as the parent of Chase Jamaica, Jamaican law would govern.

All of the events at issue with regard to the fraud took place in Jamaica. Under section 145 of the *Restatement (Second)*,[20] Jamaican law would clearly apply. The injury and the conduct causing the injury occurred in Jamaica. The relationship between Rose Hall and Chase Jamaica centered in Jamaica and Rose Hall never had any formal relationship with defendant CMOBC. The contacts of the parties with jurisdictions other than Jamaica are insufficient to warrant the application of their laws.

Jamaican law would apply under the common law rule in Delaware as well. In the case of intentional torts, such as fraud, the *lex loci delicti* rule requires a court to apply the substantive law of the state or, in this case, country where the

---

**20.** Section 145 provides:
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

defendant's wrongful conduct primarily occurred. *See Johnston Associates, Inc. v. Rohm and Haas Co.*, 560 F.Supp. 916, 918 (D.Del.1983). It is beyond dispute that the fraud upon the Jamaican court occurred primarily, if not exclusively, in Jamaica.

### b. *Jamaican Law*

Having determined that Jamaican law governs the plaintiff's claim of fraud upon the court, the issue then becomes whether CMOBC can be held liable for the alleged fraud. This issue involves two questions: first, whether a cause of action against Edward C. Brown, Managing Director of Chase Jamaica,[21] Chase Jamaica or CMOBC in tort for civil damages arising from the perjured testimony is recognized under Jamaican law, and, second, whether CMOBC could be liable, under a disregard of corporate entity theory, for the wrongs of Chase Jamaica. If the first question is answered in the negative, one theoretically cannot reach the second question.

CMOBC argues that under Jamaican law no civil tort claim may be predicated in whole or in part upon allegedly false testimony in a judicial proceeding. Defendant asserts that Jamaican law forecloses a cause of action against a witness which is premised upon his statements made in court. Jamaican law, defendant also claims, forecloses holding anyone liable for the alleged perjury of another. Defendant concludes that even if Brown lied to the Jamaican court to the plaintiff's prejudice, Jamaican law is clear that no civil tort liability can be based thereon against Brown, Chase Jamaica or CMOBC.

In response, plaintiff maintains, without citing any authority, that "we doubt that [Jamaican law] goes as far as CMOBC suggests." (Dkt. 696, p. 16). In addition, plaintiff argues that the non-final nature of the Jamaican court's denial of the plaintiff's motion to enjoin the sale at issue precludes operation of Jamaican law prohibiting civil suits for damages arising from perjury.

■ Upon review of the authorities cited by the defendant and independent examination of English and Jamaican law, the Court holds that under Jamaican law the plaintiff's claim against CMOBC for fraud upon the court fails to state a valid cause of action. Under Jamaican law, allegations of false testimony in a prior proceeding cannot be made part of any cause of action against a witness, a party, or a non-party, such as CMOBC.

The law in Jamaica and England [22] is that the testimony of a witness in a judicial proceeding is absolutely privileged from any subsequent civil action for damages.

> A witness is protected from civil proceedings in respect of the evidence which he gives in judicial proceedings, and in respect of things said or done in the course of preparing evidence for such proceedings. The protection is against actions of any sort, and is not limited to actions for libel and slander.

17 *Halsbury's Laws of England*, Evidence, ¶ 261 at 182 (4th ed. 1976) (footnotes omitted) (Dkt. 770A, Ex. N); *see Trapp v. Mackie*, [1979] 1 All E.R. 489, 490–91, 497 (House of Lords) (Dkt. 694, Ex. K); *Marrinan v. Vibart*, [1962] 1 All E.R. 869, 871 (Queen's Bench), *opinion adopted and aff'd*, [1962] 3 All E.R. 380 (Court of Appeal) (Dkt. 694, Ex. G); *Hargreaves v. Bretherton*, [1958] 3 All E.R. 122, 123, 125 (Queen's Bench) (Dkt. 694, Ex. G); *Watson v. McEwan, Watson v. Jones*, [1905] AC 480, 486 (House of Lords) (Dkt. 694, Ex. L). Recently, the Court of Appeal in Jamaica reaffirmed this fundamental rule:

> The rule of law is that what is said in the course of the administration of the law is privileged; and the reason of the rule covers counsel, judge, parties and witnesses who in this respect are all equally protected.

---

**21.** Brown, on cross-examination, made the critical representation to the Jamaican court which plaintiff contends constituted a fraud or deception. *See infra* pp. 135–136.

**22.** Jamaican courts accord precedential weight to the decisions of the English courts. *See* Judgment Opinion, p. 22 n. 37.

*Bodden v. Brandon,* [1965] Gleaner Law Reports 199, 203 (citation omitted). (Dkt. 694, Ex. C).

 One of the principal purposes of the rule is to prevent disgruntled litigants from bringing vexatious suits against witnesses. As one court stated:

> The rule of law exists, not because the conduct of those persons ought not of itself to be actionable, but because if their conduct was actionable, actions would be brought against judges and witnesses in cases in which they had not spoken with malice, in which they had not spoken with falsehood. It is not a desire to prevent actions from being brought in cases where they ought to be maintained that has led to the adoption of the present rule of law; but it is the fear that if the rule were otherwise, numerous actions would be brought against persons who were merely discharging their duty. It must always be borne in mind that it is not intended to protect malicious and untruthful persons, but that it is intended to protect persons acting bona fide, who under a different rule would not be liable, not perhaps to verdicts and judgments against them, but to the vexation of defending actions.

*Marrinan v. Vibart,* [1962] 3 All E.R. at 382 (quoting *Munster v. Lamb,* [1883] 11 Q.B.D. 588, 607). The rule also serves to avoid a multiplicity of actions in which the value or truth of the evidence would be tried over again. *Trapp v. Mackie,* [1979] 1 All E.R. at 497. Thus, it is clear that under Jamaican law, a civil damage action for perjury could not be brought against Brown.[23]

This immunity would clearly extend to Brown's employer, Chase Jamaica. Brown was not testifying in a personal capacity but as a representative of Chase Jamaica. Interrogatory No. 4 asks whether Chase Jamaica, not Brown, deceived the Jamaican court into not enjoining the sale of the collateral. A corporate entity can only speak through a representative. To hold that a witness testifying on behalf of a corporation is immune but that the corporation he represents may be liable would render the witness immunity rule meaningless in any case involving an entity rather than an individual. As stated above, one of the articulated current principal purposes of the rule is·to protect witnesses from the vexation of defending actions brought by disappointed litigants. Any corporation who sent a representative to testify at a judicial proceeding would be subject to suit if the immunity of its witness-representative did not extend to the corporation itself. *See Evans v. London Hospital Medical College,* [1981] 1 All E.R. at 721 (Court found that witnesses and their employer enjoyed absolute immunity from suit in action for negligence and malicious prosecution premised upon statements made in preparation for criminal prosecution).

Having held that a cause of action against Brown and Chase Jamaica for perjury would not be valid under Jamaican law, the question remains whether CMOBC could be held liable for the alleged fraud on the court. This question requires a determination of whether the immunity enjoyed by an actual witness extends to third parties who did not testify at trial but who are alleged to have been involved in a scheme to perpetrate a fraud upon a court by procuring the false testimony of a witness. The parties have not cited nor has the Court found a Jamaican or English case that directly addresses this issue. An examination of the relevant authorities, however, indicates that a cause of action for fraud upon a court which is brought against a non-testifying third party would not be recognized under Jamaican law.

In *Marrinan v. Vibart,* [1962] 1 All E.R. at 871, the Court held that a plaintiff's claim for conspiracy to make false and

---

**23.** In England, the absolute immunity of witnesses extends not only to those who actually testify at trial but to those who make statements prior to the commencement of proceedings, if the statements were made in the preparation of evidence for trial. *See Evans v. London Hospital Medical College* [1981] 1 All E.R. 715, 719–20 (Queens Bench) (Dkt. 694, Ex. F); *Marrinan v. Vibart* [1962] 3 All E.R. 380 at 383.

defamatory statements was invalid where the claim was premised in part upon the statements made by the defendants in preparation for and at trial. The defendants were two police officers who were alleged to have conspired with another person to injure the plaintiff's reputation by making false and defamatory statements which were incorporated in evidence introduced at trial.

While the Court did not address the issue of the liability of a non-witness, the reasoning of the Court supports the conclusion that a cause of action against a non-participant, such as CMOBC, could not be premised upon a witness's statements introduced at trial. The Court found that the immunity rule could not be circumvented where the plaintiff's cause of action was premised in part upon the witnesses' allegedly perjured testimony. The Court stated that:

> The main contention on behalf of the plaintiff is that the gist of this action is not the defamatory statements made to the Director of Public Prosecutions, nor their repetition in evidence, but the antecedent combination or agreements to defame. It is argued that there is no authority for extending any immunity to such an agreement or combination. If, contrary to my judgment, the contention were correct that the gist of the tort of conspiracy is the conspiratorial agreement alone, it may be that the plaintiff would be entitled to succeed on this preliminary issue. In my view, however, this contention is plainly wrong; the gist of the tort of conspiracy is not the conspiratorial agreement alone, but that agreement plus the overt act causing damage. It is true that the crime of conspiracy is the very agreement of two or more persons to effect an unlawful purpose, and any overt acts done in pursuance of the agreement are merely evidence to prove the fact of the agreement. The tort of conspiracy, however, is complete only if the agreement is carried into effect so as to damage the plaintiff. Accordingly, the acts done in pursuance of the agreement are an integral part of the

tort: *Crofter Hand Woven Harris Tweed Co., Ltd. v. Veitch.* It follows, therefore, that the plaintiff relies for part of his cause of action on the report of the defendants to the Director of Public Prosecutions and the evidence which they subsequently gave. These matters, by reason of the principles laid down in the authorities to which I have referred, cannot properly be made part of any cause of action.

*Id.* at 871 (citation omitted).

In the instant case, plaintiff's cause of action against CMOBC, set forth in Interrogatory No. 4, is based upon Brown's testimony given before the Jamaican court. The wrong alleged in the plaintiff's cause of action could only have been completed upon Brown's testifying. Since the plaintiff's cause of action set forth in Interrogatory No. 4 is premised on the fraud upon the court, it is unlikely that a Jamaican court would permit such a claim even though CMOBC was not a witness at trial.

The purposes underlying the rule warrant its application to non-participants as well as to participants at trial. If causes of action against non-participants were recognized, then disgruntled litigants would merely sue non-participants who had some relationship to the witness who allegedly testified falsely. Witnesses would be faced with the prospect that their testimony would form the basis of vexatious litigation directed against parties related to them who did not participate at the trial. Moreover, the purpose of avoiding multiplicity of actions in which the value or truth of evidence would be tried over again would be substantially diminished if the immunity rule could be circumvented merely by alleging that non-participants at trial were somehow involved in the witness's fraudulent conduct before a court.

█ Finally, logic dictates that if a subsidiary cannot be held liable for a fraud on a court, the parent similarly cannot be liable. The inquiry must always turn on the reason and facts for which the separate corporate entities are sought to be ignored.

If the underlying reason or facts are not actionable against the subsidiary, they likewise cannot be actionable against the parent through the device of ignoring the existence of separate corporate entities. Disregard of the corporate entity simply constitutes a method to hold a parent liable for the acts of its subsidiary. The theory does not, in and of itself, confer any additional substantive rights upon a plaintiff.

### c. *American Law*

■ Having held Jamaican law governs the issue as presented to the jury in Interrogatory No. 4[24] and Jamaican law precludes liability by reason of immunized testimony, the inquiry is theoretically at an end. However, plaintiff contends the question presented to the jury in Interrogatory No. 4 was not an action based upon perjured testimony but upon the question of whether the corporate entities should be disregarded. Rose Hall claims that this issue is controlled by United States law. Specifically, Rose Hall asserts that defendant's characterization of plaintiff's theory is unduly restrictive. Plaintiff argues that its theory of alternative liability had its genesis in paragraph 54 of the Second Amended Complaint[25] and is not based upon false testimony in the Jamaican action, but rather simply established the false testimony as a predicate for disregard of the corporate entity. Plaintiff urges a "broad fraud" theory that:

> under all the circumstances, the defeat of Rose Hall's injunction by representations which (whatever the subjective intent with which they were made) were false in fact, combined with the subsequent stripping of Chase Jamaica, and the attempt to defeat Rose Hall's claims for damages by asserting Chase Jamaica's purported separateness here, *taken together*, constitute a fraud or injustice by

means of the corporate entity which equity will prevent by disregarding the corporate entity.

(Dkt. 868, pp. 15–16) (emphasis in original).

Plaintiff's paragraph 54 "broad fraud" theory is composed of the following five elements: first, Chase Jamaica's cheap sale of the land and shares (Interrogatory No. 1) and refusal to cooperate in the lawsuit against Holiday Inns for interference (Interrogatory No. 2); second, false representations to the Jamaican court during the injunction proceedings that Chase Jamaica had substantial assets, would continue to do business in Jamaica and would be in a position to pay whatever damages might be awarded to Rose Hall; third, the Jamaican court's reliance on these representations in denying the plaintiff's petition to enjoin the sale; fourth, the closing and "stripping" of Chase Jamaica pursuant to plans in existence prior to the injunction hearings; fifth, CMOBC's manipulation of Chase Jamaica's defense of the Jamaican damage action in resisting plaintiff's attempt to stay that action pending resolution of the Delaware litigation. Rose Hall contends that these separate events, when aggregated, constitute fraud or injustice by means of purported separate corporate entities which equity will not allow.[26]

Even if one started with Rose Hall's statement of the issue, plaintiff could not prevail for two independent reasons: first, examination of the trial record demonstrates unequivocally that plaintiff's characterization is erroneous in that the deceit on the Jamaican court was considered pivotal by all concerned; and second, given the central and critical nature of the false testimony to the Jamaican court, the American rule on witness immunity precludes this suit as presented.

---

24. *See supra* p. 121.

25. *See supra* note 10.

26. The plaintiff went so far at oral argument as to assert that even without any misrepresentation to the court by Chase Jamaica and even

assuming CMOBC stripped and emptied Chase Jamaica innocently, there would be sufficient unfairness to plaintiff to require ignoring separate corporate entities to provide a remedy. (Dkt. 871, Tr. 53–54). Plaintiff's theory as applied finds no support in reported cases.

### (1) *Deceit on the Jamaican Court as Pivotal*

In allowing amendment of the complaint to add paragraph 54 on September 30, 1982, Judge Steel characterized the amendment as embodying plaintiff's "alternative fraud theory." (Dkt. 568, p. 2). As of the date of amendment, the fraud on the Jamaican court had become central. Judge Steel characterized plaintiff's position as "plaintiff's theory that the relationship between Chase Jamaica and its parent, [CMOBC], was such that this fraud, if proven, was relevant when considered with other evidence to render [CMOBC] liable...." (Dkt. 568, p. 1). At the time of allowance of the amendment, less than two weeks before trial commenced, it is fair to say that Judge Steel and the parties were already proceeding on the premise that plaintiff's alternative theory of liability was not viable but for the deceit on the Jamaican court.

This was confirmed by plaintiff during its day and a half summation to the jury. Plaintiff, in addressing the alternative theory of liability contained in Interrogatory No. 4, argued the deceit on the Jamaican court without referencing other aspects of paragraph 54, much less the theory now urged upon the Court. (Dkt. 853, Tr. 14,-900–905; Dkt. 856, Tr. 15,388).

Moreover, plaintiff's request for charge on Interrogatory No. 4,[27] adopted almost verbatim by Judge Steel[28] with the addi-

---

27. Plaintiff's request for charge on Interrogatory No. 4 reads:

Independently of the above matters, Rose Hall contends CMOBC can be held liable for wrongs of Chase Jamaica on another ground. You have heard of the Jamaican action in which Rose Hall attempted to stop the sale of the Rose Hall (H.I.) shares and the land by an injunction. Chase Jamaica defeated Rose Hall's effort to get that injunction, on the basis that, if the land and shares were sold and the court later determined that the sale was wrongful, no ultimate harm would be done because, in that case, Rose Hall could recover money damages from Chase Jamaica. If you find that the Jamaican court was misled to believe there was no intention to close Chase Jamaica and that it would remain in Jamaica with ongoing access to sufficient assets to satisfy a money judgment, when actual undisclosed plans and intentions to the contrary existed, then you should disregard the separate corporate entity of Chase Jamaica and find that CMOBC is liable for the wrongs of Chase Jamaica. It does not matter whether the Jamaican court was misled deliberately, or only because those in actual control of CMOBC had formed decisions or intentions unknown to the lawyers and witnesses who spoke for Chase Jamaica. In either case, it would accomplish a wrong or inequity which the law does not allow if, after the defeat of the injunction on that basis, the corporate separateness of the no longer financially substantial subsidiary could be used to defeat Rose Hall's claim.

(Dkt. 764, p. 49).

28. The jury instruction on Interrogatory No. 4 as given by Judge Steel reads:

The fourth question reads as follows:

Did Chase Jamaica, through its representations, as a result of its control by CMOBC, deceive the Jamaican Court into not enjoining the sale of the collateral?

And you will answer yes or no to that question.

Independently of the above matters, Rose Hall contends CMOBC can be held liable for wrongs of Chase Jamaica on another ground. You have heard of the Jamaican action in which Rose Hall attempted to stop the sale of the Rose Hall (H.I.) shares and the land by an injunction. Chase Jamaica defeated Rose Hall's effort to get that injunction, on the basis that, if the land and shares were sold and the Court later determined that the sale was wrongful, no ultimate harm would be done because, in that case, Rose Hall could recover money damages from Chase Jamaica.

If you find that the Jamaican Court was deceived by Chase Jamaica to believe there was no intention to close Chase Jamaica and that it would remain in Jamaica with ongoing access to sufficient assets to satisfy a money judgment, when actual undisclosed plans and intentions to the contrary existed, and if you find that its action was controlled by CMOBC, then you should disregard the separate corporate entity of Chase Jamaica and find that CMOBC is liable for the wrongs of Chase Jamaica.

In such a case, it would accomplish a wrong, fraud, or inequity which the law does not allow if, after the defeat of the injunction because of the Court's deception, the corporate separateness of the no longer financially substantial subsidiary could be used to defeat Rose Hall's claim.

Generally, plaintiff must prove its claims against the defendants and each element of those claims by a preponderance of the evidence. However, as to this claim by plaintiff that Chase Jamaica committed a deception or fraud, plaintiff must meet a higher standard

tion of a requirement of control by CMOBC, trains exclusively upon the deception of the Jamaican court. Finally, Interrogatory No. 4 inquired of the jury: "4. Did Chase Jamaica, through its representations, as a result of its control by CMOBC, deceive the Jamaican court into not enjoining the sale of the collateral?" *Supra* p. 121. Since this interrogatory embodied plaintiff's theory of liability contained in paragraph 54 as presented to the jury, it is not surprising that plaintiff never objected to the form of Interrogatory No. 4 other than to the imposition of the control requirement. Accordingly, given its request for instruction on Interrogatory No. 4, there has been a waiver of the characterization of the theory it now vehemently asserts. *Cf. Reiner v. Bankers Security Corp.*, 305 F.2d 189 (3d Cir.1962); *Halprin v. Mora*, 231 F.2d 197 (3d Cir.1956).

Based upon the early characterization by Judge Steel, plaintiff's request for charge, plaintiff's summation and plaintiff's failure to object to the form of Interrogatory No. 4, the Court concludes that defendant's characterization of the issue as tried and presented to the jury is far more accurate than that urged by plaintiff. Notwithstanding plaintiff's protestations, it is inescapable that deceit on the Jamaican court was pivotal to plaintiff's formulation and ultimate jury presentation. Actionability of deceit on the Jamaican court is controlled by Jamaican law, *supra* pp. 127–128, and that law would preclude the cause of action as tried to the jury and

embodied in Interrogatory No. 4, *supra* pp. 128–130.

Thus far, the Court has held Jamaican law controls the existence of the cause of action embodied in Interrogatory No. 4 and the competing characterizations of the cause of action must be resolved in favor of defendant. However, even if American law controlled, the outcome would be the same because of plaintiff's inability to surmount the American rule of witness immunity.

#### (2) *The American Rule of Witness Immunity as Precluding Suit*

The Supreme Court has very recently articulated its recognition that "[t]he immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law." *Briscoe v. Lahue*, —— U.S. ——, 103 S.Ct. 1108, 1113, 75 L.Ed.2d 96 (1983) (footnote omitted). The Supreme Court held that this rule has been imported into the American common law. *Id.* at 1113–15. Since the rationale for the American rule is largely the same as that for the English rule,[29] the Court assumes the American rule would be applicable to third parties such as CMOBC.[30] Unlike their English counterpart, some American jurisdictions have recognized an exception to the rule that perjury is non-actionable in a subsequent suit for money damages.[31] The exception to the rule is where perjury is merely a means to the

---

and prove that claim by clear and convincing evidence.
(Dkt. 858, Tr. 15, 538–40).

**29.** *See supra* pp. 128–130; *see generally* Annot. 31 A.L.R. 1423 (1970); Annot. 54 A.L.R.2d 1298 (1957).

**30.** *See supra* pp. 130–131.

**31.** Plaintiff's citation of *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *Mas v. Coca Cola Co.*, 163 F.2d 505 (4th Cir.1947); *Rixon Inc. v. Racal-Milgo, Inc.*, 551 F.Supp. 163 (D.Del.1982); *Kirkland v. Mannis*, 55 Or.App. 613, 639 P.2d 671, *rev. denied*, 292 Or. 863, 648 P.2d 850 (1982); *Pappas v. Pappas*, 164 Conn. 242, 320 A.2d 809 (1973), to demonstrate the non-existence of a

hard and fast rule which CMOBC never asserted ("the privilege must preclude judicial cognizance of perjury in prior proceedings, broadly and without exception,") (Dkt. 868 p. 18) is not helpful. Those cases all involve plaintiffs in a second proceeding who, notwithstanding their commission of some type of perjury in a prior proceeding, sought affirmative relief in the form of monetary damages or otherwise in a second proceeding involving at least some of the same issues as the tainted first proceeding. There is no relationship between barring a party seeking affirmative relief in the form of monetary damages by reason of unclean hands and determining whether false testimony can serve as a predicate for a second lawsuit.

accomplishment of a larger conspiracy or fraudulent scheme.[32]

Assuming without deciding that the minority exception to the American witness immunity rule would be applicable, Rose Hall fails to come within the exception because as pleaded and presented there was no larger fraudulent scheme other than that factually asserted before the Jamaican court. The "cheap" sale and a significant portion of the interference claim were factually presented to the Jamaican court in the injunction proceeding. (PX 140, pp. 4–6, 10–13). The false representation on cross-examination was made to the Jamaican court during the injunction proceeding and the Jamaican court relied upon the same in denying the preliminary injunction. With regard to the alleged manipulation of the stay proceeding in Jamaica, Judge Steel had previously ruled:

> I do not find that the action which Chase Overseas [CMOBC] is alleged to have taken in the appellate court in Jamaica constitutes fraud. It was nothing more than [an] attempt to have the action tried in Jamaica rather than in Delaware. Plaintiff has made efforts in Delaware to have the action tried here rather than Jamaica. I do not consider the actions by either of the parties as to jurisdiction choice to be fraudulent.

(Dkt. 652, p. 1). There has been no demonstration that this ruling should be disturbed.

Only Rose Hall's assertion that Chase Jamaica somehow did something wrong when it sold its assets following its closing remains. Plaintiff's inflammatory label of "stripping the assets" obscures reality. Plaintiff does not dispute that CMOBC did not in any way profit or receive any assets from the "stripping" which in reality consisted of selling off Chase Jamaica's loan portfolio and paying off its non-contingent creditors, including other Chase entities. There is nothing remotely approaching fraud in a wholly owned subsidiary paying off creditors upon closing its business even though there is outstanding a contingent claim to be resolved at some future time via the vagaries of the litigation process.

Plaintiff has failed to establish a larger fraudulent scheme of which the perjury was only a part. Given the jury's answers to all other interrogatories, Rose Hall's tenuous claim to recovery from CMOBC rests entirely upon the misrepresentation to the Jamaican court and that court's denial of the preliminary injunction based upon that misrepresentation. Having failed to come within the exception to the American witness immunity rule, the Court concludes Rose Hall's cause of action embodied in Interrogatory No. 4 would be barred.

In summary, the Court concludes that the deception found by the jury in its affirmative answer to Interrogatory No. 4 is not actionable. The gravamen underlying Interrogatory No. 4 is properly characterized as seeking monetary damages by reason of a false representation made in a prior Jamaican judicial proceeding. Such a misrepresentation cannot serve as a basis for a

---

**32.** *See Alberta Gas Chemicals, Ltd. v. Celanese Corporation,* 497 F.Supp. 637 (S.D.N.Y.1980), *rev'd on other grounds,* 650 F.2d 9 (2d Cir.1981) (not part of a larger fraudulent scheme); *Woods Exploration & Producing Co. v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir.1971) (alleged perjury part of a broader antitrust conspiracy), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *Morgan v. Graham,* 228 F.2d 625 (10th Cir.1956) (alleged perjury by insurance company president claiming non-existence of insurance policy caused judgment plaintiff to be unable to recover on insurance policy); *Robinson v. Missouri Pacific Transp. Co.,* 85 F.Supp. 235 (D.Ark.1949) (perjury merely part of larger conspiracy between employer and union to get employee plaintiff fired); *Alex-* *ander v. Peekskill,* 80 App.Div.2d 626, 436 N.Y. S.2d 327 (1981) (refusal to apply exception of broader fraudulent scheme on facts); *Newin Corp. v. Hartford Accident & Indemnity Co.,* 37 N.Y.2d 211, 333 N.E.2d 163, 371 N.Y.S.2d 884 (1975) (part of a larger fraudulent scheme); *Burbrooke Manuf. Co. v. St. George Textile Corp.,* 283 App.Div. 640, 129 N.Y.S.2d 588 (1954) (on facts stated in complaint held not part of larger fraudulent scheme); *see also Dixon v. Bowen,* 85 Colo. 194, 274 P. 824 (1929); *cf. Bethea v. Reid,* 445 F.2d 1163 (3d Cir.1971) (conspiracy to violate civil and constitutional rights by use of perjured testimony held actionable without any discussion of witness immunity), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972).

cause of action under Jamaican, English or American law including the exception to the American rule. As a consequence, CMOBC is entitled to entry of judgment notwithstanding the verdict. Nonetheless, the Court will consider CMOBC's other arguments for judgment notwithstanding the verdict with respect to Interrogatory No. 4.

### 3. *Was a Fraud Established*

Plaintiff alleges that the deception on the Court included Brown's false representation to the effect that Chase Jamaica would be continuing in business as well as statements by counsel for Chase Jamaica, Norman Hill, to the effect that Chase Jamaica would be ready and able to respond in damages to any subsequent finding of liability resulting from the sale. Plaintiff, however, has failed to present any authority for the proposition that counsel's arguments to the court can be considered evidence on which to base a fraud on the court claim. In addition, there is no evidence of record linking Hill's statements to the Jamaican court with CMOBC. Therefore, the court's examination of the fraud claim focuses on Brown's representation to the Jamaican court.

The evidence of the specific content of Brown's statement is surprisingly scarce and contradictory. The parties agree that the statement was made in answer to a single question on cross-examination of Brown by Dr. Lloyd Barnett, Rose Hall's counsel in the Jamaican proceeding. The issue then in essence is whether plaintiff has proved deception of the Jamaican court, under either the clear and convincing evidence standard or the preponderance of the evidence standard.[33] Stated differently, the issue is whether one answer, the precise content of which is unknown, to one question on cross-examination where the precise formulation of the question is unknown can constitute a misrepresentation to the Jamaican court sufficient to "deceive the Jamaican court into not enjoining the sale of the collateral." (Interrogatory No. 4).

Dr. Barnett testified before this Court that he did not recall the exact question he asked Brown six years before. "But I suggested to him that there was a danger of Chase reducing its operations or closing its business in Jamaica .... I don't think I asked him if the decision had been made [to close the Chase Jamaica operation]. I don't think I put it as precisely as that...." (Dkt. 799, Tr. 4273–74). Brown, on the other hand, seemed to vividly recall Barnett's question and his own reply thereto: "I was asked by Dr. Barnett, if, had Chase Jamaica made a decision to close, and I said no." (Dkt. 813, Tr. 7324).

Contemporaneous notes taken by presiding Justice Rowe and Norman Hill, counsel for Chase Jamaica, reveal different formulations of the exchange. Justice Rowe, following the practice of presiding judges in Jamaica who do not usually have the benefit of the transcription of proceedings by court reporters, took copious notes of the injunction hearings. These notes of Brown's statement on cross-examination contain the notation: "Chase has no intention of closing in Jamaica." (PX 629, p. 54).[34] Norman Hill's notes contain the

---

**33.** The Court instructed the jury that the plaintiff had the burden of proving the falsity of the representation by clear and convincing evidence. (Dkt. 858, Tr. 15,540). Plaintiff disputes this higher burden of proof and contends that it is sufficient to prove fraud by a preponderance of the evidence. To arrive at this conclusion, plaintiff applies Delaware law by means of convoluted choice of law analysis. *See* Dkt. 868, pp. 61–65. As this Court reaffirmed above, the question of whether a fraud was committed on the Jamiacan court is governed by Jamaican law. *See supra* pp. 127–128. The plaintiff does not dispute that under Jamaican law, the clear and convincing standard of proof applies to this issue. *See,* IX Wigmore *Evidence* § 2498, p. 424 (Chadbourn Rev.1981); *Bater v. Bater,* [1950] 2 All E.R. 458, 459. However, this Court has examined the record under both standards and would arrive at the same conclusion under either standard of proof.

**34.** CMOBC continues to press its objection to the admission of Justice Rowe's notes, and currently asserts this was prejudicial error, requiring a new trial. (Dkt. 770, pp. 53–57). For treatment of this issue, see *infra* p. 141.

phrase "not closing down." (Ct.Ex. 29; Dkt. 824, Tr. 9122).

On January 27, 1977, Justice Rowe issued his written opinion denying the injunction requested by plaintiff. In support of his conclusion that "the first defendant [Chase Jamaica] is in a position to pay whatever damages might be awarded to the plaintiffs in this action," Justice Rowe noted "[t]he first defendant stated that it proposes to continue in business in Jamaica." *Rose Hall Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.,* Suit No. E–211 of 1976 (Sup.Ct. of Judicature of Jam. Jan. 17, 1977). (PX 140 at 15). Brown reiterated this formulation in a December 2, 1981 affidavit filed in the stay proceedings in the Court of Appeal in Jamaica. He stated: "when I gave evidence in the proceedings below, I truthfully represented that Chase Jamaica proposed to continue in business in Jamaica." (PX 638, ¶ 4(b)).

After Justice Rowe denied plaintiff's request for an injunction from the bench on November 22, 1976 and memorialized the same in his January 17, 1977 written opinion, the sale of the Rose Hall (H.I.) shares and 3000 acres of land was closed on November 18, 1977. The formal decision to close Chase Jamaica is noted in minutes of the Chase Jamaica board dated November 4, 1977 (PX 779) and the office was closed in February, 1978. (Dkt. 664, p. III–2).

Plaintiff contends that Brown's representation constituted a fraud on the Jamaican court because at the time Brown allegedly knew or must have known there was an intent to close Chase Jamaica. One of Brown's superiors, Francis Mason, Senior Vice President of CMB and Director of CMOBC, testified before this Court that "in late 1976 there was an intention to close Chase Jamaica if the environment in Jamaica did not change for the better." (Dkt. 836, Tr. 11,597). Although there is no evidence that Brown was privy to this intention, Brown did testify that before the Jamaican hearings he had known that the closing of Chase Jamaica "was one of the possibilities" and therefore he asked Ulises Giberga, a Chase Jamaica director and an officer of CMOC, if any decision had been made in that regard. Brown testified that Giberga assured him that no such decision had been made. (Dkt. 816, Tr. 7815). In addition, Brown stated in his affidavit to the Jamaican Court of Appeal that "[b]eginning several months prior to October 1976, the Directors of Chase Jamaica had under consideration, in view of the deteriorating economy of Jamaica, the question of the profitability, present and projected, of Chase Jamaica's operations." (PX 638, ¶ 4(b)).

In the current posture of this case, the Court must assume that the jury found Brown was asked whether Chase Jamaica intended to remain in business as opposed to whether a decision had been made to close Chase Jamaica. As recapitulated above there was ample evidence from which the jury could conclude that the question put to Brown was phrased in terms of "intention" rather than "decision" to close. Brown's response was just plain wrong as to Chase Jamaica's intentions. As noted, at the time Brown testified in Jamaica, the evidence suggests at a minimum that Brown knew that Chase Jamaica might close if the deteriorating situation in Jamaica failed to improve. Moreover, the jury had before it PX 151, written by a Chase Jamaica director mere days after completion of the injunction proceedings referencing "plans for the eventual closing" of Chase Jamaica and establishing June of 1977 as the target date by which it should be accomplished.[35]

Stripped of all its verbiage, the simple facts are: first, Brown apparently testified that there was no intention to close; second, Brown conceded that he was aware that closing was one of the possibilities if conditions did not improve; third, as early as one week later, a memorandum was written referring to an intent to close; and fourth, Chase Jamaica did in fact close. As such, a reasonable juror had ample basis to

35. *See infra* pp. 138–139.

conclude there was clear and convincing proof, and, *a fortiori,* proof by a preponderance of the evidence, that a misrepresentation had occurred in the Jamaican proceedings.

There is one disquieting note, however. Assuming an intent to defraud the court, presumably the strategy before Justice Rowe would have been to affirmatively proclaim Chase Jamaica's intent to remain in operation. Rather than pursue such a course of action consistent with an intent to deceive the court, Chase Jamaica did not make such an affirmative representation. Chase Jamaica presented its balance sheets and then, in answer to one question on cross-examination, Brown gave an erroneous answer. Whether such a situation constitutes a fraud or deception is a close legal question. The operative finding must be an intent on the part of someone, whether Brown, Chase Jamaica, or Brown's supervisor, to deceive the court. Such a deception would be more likely to appear in the guise of affirmative testimony on direct examination or by affidavit rather than as an answer to one question on cross-examination. If the question had not been asked, the deception would never have occurred. On the other hand, since the issue of Chase Jamaica's continued operation was central to the necessity of preliminary injunctive relief, it was likely to assume that this would be the subject of inquiry. Any distinction between direct and cross-examination, therefore, is irrelevant in this context.

 Since this Court has concluded that there is ample support for the jury's finding that Chase Jamaica committed a fraud, the Court now turns to the question of whether the jury's conclusion that CMOBC controlled the fraud is supported by the evidence.

### 4. *Did CMOBC Control the Fraud*

In this section, the Court considers the evidence relating to whether CMOBC controlled Brown's representation in the Jamaican court. Even though the Court has determined that the evidence supports a finding that Chase Jamaica deceived the Jamaican court,[36] no liability can be imposed on CMOBC if the jury's finding of control by CMOBC in this matter lacks support in the record.

The plaintiff concedes that "there is no direct testimony" linking CMOBC with the events occurring in the Jamaican court. (Dkt. 868, p. 39). Plaintiff argues, however, that "the circumstantial evidence powerfully shows that the relevant aspect of Chase Jamaica's defense before Justice Rowe must have been ultimately determined by Francis Mason, a CMOBC director." *Id.* To arrive at this conclusion, plaintiff begins by noting that Brown testified before this Court that in preparing the defense of the injunction suit, Chase Jamaica's attorneys sought information about the bank's future plans for continuing in business. (Dkt. 816, Tr. 7815). In response, Brown asked Giberga, Chairman of the Board of Chase Jamaica and a Vice President of both CMOC and CMB, a question to the effect of whether "any decision had been made regarding the closing of [Chase Jamaica]." *Id.* Brown claimed that Giberga "advised [him] that no decision had been made." *Id.*[37] Plaintiff next points to the "hierarchical character of the 'chain of command' from Mason to Giberga to Brown"[38] (Dkt. 868, p. 43), and the centralized administrative control of Chase Jamaica. This, together with Giberga's testimony that if a decision had been made by November 4, 1976 by an officer of CMB that Chase Jamaica should be closed, Giberga would have known about it (Dkt. 809, Tr. 6570), leads plaintiff to the conclusion that Giberga must have consulted with Ma-

---

**36.** The Court engages in this inquiry even though it has previously held that CMOBC is entitled to judgment notwithstanding the verdict because no cause of action can be based on the deception of the Jamaican court.

**37.** Giberga testified that he did not recall the conversation, but had no reason to doubt that it occurred. (Dkt. 810, Tr. 6685).

**38.** *See* testimony of Warren Leonard, president of CMOBC at Dkt. 794, Tr. 3325.

son before giving Brown his answer. Plaintiff makes this purely speculative assumption, not upon evidence of record, but because Mason was Giberga's boss and the ultimate decision-maker on the closing of Chase Jamaica. Plaintiff asserts that the jury "had the right to infer that when Brown consulted Giberga, he learned what Mason's real position was [that there was an intention to close Chase Jamaica if the environment did not improve (Dkt. 836, Tr. 11,597)] ... and that Mason and Giberga had consulted together and decided what positions Brown and the lawyers should take." (Dkt. 868, p. 44).

The jury could not make such an inference, unsupported by even a shred of evidence. The clear weight of the evidence indicates that this consultation up the ladder is pure speculation on plaintiff's part. In fact, plaintiff never even argued this theory before the jury. In addition, there is uncontradicted testimony by Mason that he played no part whatsoever in the defense of the Jamaican action (Dkt. 836, Tr. 11,544) and that he never heard of the existence of the Jamaican lawsuit until questioned about it on his deposition in this action in 1981. (Dkt. 836, Tr. 11,599). Therefore, any jury finding of CMOBC's control of the alleged deception in the Jamaican court could not stand on this ground.

Rose Hall also contends that the jury finding of control by CMOBC is supported by memoranda which indicate that the closing of Chase Jamaica was planned at the time Brown was assuring Justice Rowe of the contrary. However, close scrutiny of these memoranda indicates that although they do reveal an earlier intent to close the bank, they fail to provide the crucial link between CMOBC and the fraud on the court.

A memorandum by Augusto Sigarreta, director of Chase Jamaica and vice president of CMOC, to John Pershing, vice president of CMOC, written on December 3, 1976, just days after the completion of the injunction proceedings, indicates that CMOC had "plans for the eventual closing of the Merchant Bank in Jamaica." (PX 151). It further provides: "As for the timing of the closing is concerned, I feel that we should be out of Jamaica next year around the end of June." *Id.*[39] This memorandum fails to provide any support for a conclusion that CMOBC was aware of this or had any such plans of its own. A subsequent letter to Sigarreta from Mary Ellen Collins, second vice president of CMB, dated April 20, 1977, refers to plans to "liquidate the Merchant Bank." (PX 220). Again, this memo, written months after the Jamaican proceeding, fails to implicate CMOBC in any way.

Warren Leonard, the current president of CMOBC, testified that he received a January 24, 1978 memorandum from David Whitaker, vice president of CMOC. (Dkt. 794, Tr. 3178–80). The memorandum includes the following information: "The main objective of Chase Merchant Bankers Jamaica, Ltd. (CMBJ) for the last two years has been to dispose of its assets without incurring further losses." (PX 182).[40] Although the statement would indicate that a decision to close the bank was taken in early 1976, it does not serve as evidence that CMOBC made the decision or was aware of it prior to the injunction proceedings. Equally important, it fails to show any control by CMOBC of the representations made to the Jamaican court.

Finally, a January 5, 1978, CMOBC file memo by James P. Hansen, second vice president of CMOBC, recording a conversation with Dave Whitaker, vice president of CMOC, notes: "Decision to close office was made about a year and a half ago." (PX 177)[41] This memorandum could be read by the jury as indicating that the decision to close the subsidiary was made around June of 1976, and that CMOBC, or at least

---

**39.** Contrary to CMOBC's counsel's recollection at oral argument, this memorandum, as well as subsequent ones, was admitted without objection on November 8, 1982. (Dkt. 794, Tr. 3196).

**40.** *Id.,* Tr. 3178.

**41.** *Id.,* Tr. 3190.

CMOC, was aware of it. However, it again fails to provide any evidence of the essential element, that is, CMOBC's involvement in or control of the proceedings before the Jamaican court.

 The jury could fairly conclude from these memoranda that CMOC had made a decision, or had knowledge of a decision to close Chase Jamaica prior to the Jamaican injunction proceedings. It could also conclude that CMOC was involved in a deception on the Jamaican court through Giberga who, it will be remembered, talked to Brown. Therefore, the jury might have had a sufficient basis for concluding that CMOC defrauded the Jamaican court by misinforming Brown. However, CMOBC, and not CMOC, is the defendant in this action. The record does not provide a sufficient basis for a finding that CMOBC was involved in the fraud.[42] Plaintiff introduced no evidence of CMOBC's direct control of Chase Jamaica in this representation nor of indirect control in this matter through CMOC.

The Court instructed the jury that for purposes of finding control of CMOBC in Interrogatory No. 3,[43] "it would not matter whether CMOBC exercised control over Chase Jamaica directly by CMOBC itself or indirectly by Chase Manhattan Bank N.A.

and/or CMOC." (Dkt. 858, Tr. 15,537). As evidence of this indirect control, plaintiff introduced two manuals, the Credit Policy Guide (PX 323) and the Organization & Policy Guide (PX 324), and testimony of various officers from Chase entities pertaining to these guides.[44] These manuals provide some evidence that would be relevant to the question of general control of Chase Jamaica by CMOBC through CMOC.[45] There are strong indications that the jury considered general control with respect to question 3.[46] However, the jury concluded that there was insufficient evidence to find that CMOBC, either directly or through CMB and/or CMOC, controlled the specific Rose Hall transactions at issue in Interrogatory No. 3.[47]

There is markedly less evidence in the record to support a finding that CMOBC indirectly controlled the fraud on the Jamaican court through CMOC. The policy manuals, relating to loan policy and administration, offer no guidance on control of testimony before a tribunal in an injunction proceeding. They do not in any way support a finding that CMOBC delegated any control to CMOC in this regard. Therefore, the jury could not have reasonably concluded on the basis of the policy manuals that CMOBC directly or indirectly con-

---

**42.** The Court notes that Mason was on the boards of both CMOBC and CMOC. (Dkt. 836, Tr. 11,524–25). Mason admits that he knew of the possibility that Chase Jamaica would close. (Dkt. 836, Tr. 11,597). There is still, however, no link between CMOBC and the proceedings in the Jamaican court. *See supra* p. 138.

**43.** Interrogatory No. 3 reads as follows:
 Did CMOBC control Chase Jamaica's major decisions and actions relating to its actions under Question 1. or its actions under Question 2.?
 As to Question 1.
 (a) because of the Edge Act theory Yes___No___
 and/or
 (b) independently of the Edge Act Yes___No___
 As to Question 2.
 (a) because of the Edge Act theory Yes___No___
 and/or
 (b) independently of the Edge Act Yes___No___

**44.** This evidence is summarized in plaintiff's November 30, 1982 letter to the Court.

**45.** *See* discussion *infra* pp. 168–169.

**46.** During its deliberations the jury sent the following inquiry to the Court:
 Question 3:
 Do you mean control of Chase Jamaica in the general (overall) sense or do you mean control of the Rose Hall transaction only. (Ct.Ex. 75).
 The Court replied as follows:
 Question 3. inquires about CMOBC's control, if any, over Chase Jamaica's major policy decisions and actions involved in Question 1. and/or Question 2. of the interrogatories. In short, the control inquired about in Question 3. is limited to the major policy decisions and actions involved in Question 1. and/or Question 2; however, control in the general (or overall) sense may be, but is not necessarily, relevant to your consideration of Question 3. (Ct.Ex. 76).

**47.** *See* discussion *infra* pp. 170–172.

trolled the alleged deception of the Jamaican court.

During the July 15, 1983 hearing on CMOBC's motion for judgment notwithstanding the verdict, Rose Hall made additional arguments, which are not included in its massive brief, to support the jury's finding that CMOBC controlled the alleged fraud on the court. Plaintiff claims that Brown himself embodied CMOBC's presence in the Jamaican courtroom. In support, plaintiff points to a line in Justice Rowe's notes (PX 629, p. 45) indicating that Brown testified he was sent to Jamaica by CMOBC, and to a letter in evidence (PX 202) which plaintiff claims shows that CMOBC paid Brown's salary. Plaintiff seems to be making a novel argument that because Brown was sent to Jamaica by CMOBC and CMOBC paid his salary, he was CMOBC's agent in Jamaica. Plaintiff never argued this theory to the jury. Moreover, Brown testified in this Court that the line in Justice Rowe's notes was erroneous. He was sent to Jamaica by Chase Manhattan Bank and recalls testifying to that effect before the Jamaican court. (Dkt. 816, Tr. 7779). Brown also explained in great detail the complex pay system referred to in PX 202. (Dkt. 816, Tr. 7780–89). He stated in essence that although from PX 202 it appeared that CMOBC was paying his salary, it actually was not. The system was established to protect Chase Jamaica employees against fluctuations in the rate of currency exchange. (Dkt. 816, Tr. 7785). Even if the jury disbelieved Brown's testimony explaining these exhibits, there would not be sufficient record support for a finding that CMOBC controlled the specific acts constituting a fraud on the Jamaican court. For all of these reasons, the Court concludes that the jury could not reasonably find that CMOBC controlled the fraud on the Jamaican court. This lack of control would by itself suffice to grant CMOBC's motion for judgment notwithstanding the verdict.

In summary, while rejecting some of defendant's grounds for judgment notwithstanding the verdict, the Court has found defendant is entitled to entry of judgment on two separate independent grounds: first, under the applicable Jamaican and American law, no independent cause of action against a third party can be based upon perjury in a prior judicial proceeding; and second, the record is completely devoid of any evidence that the fraud on the Jamaican court was committed as a result of control of Chase Jamaica by defendant CMOBC. Therefore, plaintiff's paragraph 54 claim fails for these reasons and CMOBC's motion for judgment notwithstanding the verdict is granted.

### B. *CMOBC's Alternative Motion for New Trial*

CMOBC asserts several grounds for a new trial as alternative relief if the Court denies its motions for judgment notwithstanding the verdict. Although the Court has granted CMOBC's judgment notwithstanding the verdict motions, it must also rule on the new trial motions and determine "whether [they] should be granted if the judgment is thereafter vacated or reversed, and ... specify the grounds for granting or denying the motion[s] for new trial." Fed.R.Civ.P. 50(c)(1).

### 1. *Prejudice to CMOBC From the Court's Grant of Plaintiff's Paragraph 54 "Fraud on the Court" Amendment*

CMOBC urges that it is entitled to a new trial because it was severely prejudiced by the Court's allowance of plaintiff's amendment on the "eve of trial." In addition, CMOBC argues that allowance of the amendment amounted to an abuse of discretion because of plaintiff's inexcusable delay in asserting the new claim. Defendant asserted identical arguments in its briefs in opposition to the proposed amendment. (Dkt. 502, 524). These arguments were fully considered by Judge Steel and are treated in some detail in his September 30, 1982 opinion allowing the amendment. (Dkt. 568).

It is well established that the allowance of amendments under Fed.R.

Civ.P. 15(a) lies in the discretion of the trial judge, and is not subject to review on appeal except for abuse of discretion. 3 J. Moore, *Moore's Federal Practice* ¶ 15.08[4] (2d ed. 1982). Under the terms of the rule itself, the district court is to allow such amendments "freely." In making its determination, the Court is to consider prejudice to the other party and undue delay or bad faith on the part of the movant. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The Supreme Court has forcefully stated:

> the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Id.*

Judge Steel was guided by these considerations in his opinion. (Dkt. 568). The Court does not find that Judge Steel's decision to allow the amendment amounts to an abuse of discretion and therefore holds that CMOBC would not be entitled to a new trial on this ground.

■ CMOBC further contends that the Court's refusal to grant a continuance requested in part for discovery on the new claim (Dkt. 603, 636) was prejudicial error. Judge Steel's denial does not amount to an abuse of discretion requiring a new trial. There are some indications that facts relevant to the fraud issue had been pursued prior to the date of the amendment.[48] In addition, the Delaware action began on October 12, 1982 and was tried four days a week. CMOBC was free to use the remaining time to conduct any interviews or depositions it deemed necessary. Other discovery was conducted during the trial in that fashion.

### 2. *Admission of Justice Rowe's Notes*

■ CMOBC contends that the admission of Justice Rowe's notes of the Jamaican injunction proceeding (PX 629)[49] was prejudicial error, requiring a new trial. Plaintiff offered the notes in evidence primarily to prove the content of Brown's representation to the Jamaican court about Chase Jamaica's plans for continuing in business. The critical phrase recording Brown's testimony on cross-examination reads: "Chase has no intention of closing in Jamaica." (PX 629, p. 54). This evidence constituted part of plaintiff's proof of the alleged fraud on the Jamaican court committed by Chase Jamaica through Brown.

CMOBC objected to the notes on grounds of inadmissible hearsay and improper authentication under Fed.R.Evid. 902(3). Judge Steel originally excluded the notes from evidence (Dkt. 797, Tr. 3779–82), but after hearing testimony from plaintiff's witness, Justice Robinson, admitted them provisionally subject to final certification being obtained by plaintiff. (Dkt. 806, Tr. 5733–37). CMOBC's motion to strike the notes from evidence was subsequently denied. (Dkt. 715).

Other evidence was also introduced bearing on the content of Brown's testimony before the Jamaican court. This included: contemporaneous notes taken by Chase Jamaica's counsel, Norman Hill (Ct.Ex. 29; Dkt. 824, Tr. 9122); Justice Rowe's January 27, 1977 written opinion denying the injunction (PX 140 at 15); Brown's December 2, 1981 affidavit filed in the Court of Appeal in Jamaica (PX 638, ¶ 4(b)); and testimony by Brown and Dr. Barrett, Rose Hall's counsel who conducted the cross-examination. (Dkt. 799, Tr. 4273; Dkt. 813, Tr. 7234).[50] The memorialization was formulated differently in each piece of evi-

---

**48.** CMOBC itself refers to the "full record plaintiff made before [Jamaica's Court of Appeal] of the claim that Chase Jamaica had committed a fraud." (Dkt. 770, p. 53 n. *). The appeal of the stay proceeding before that court took place in November and December 1981, and February, 1982.

**49.** *See supra* p. 135.

**50.** For a more extensive discussion of the content of each item, see *supra* pp. 135–136.

dence, but as CMOBC itself notes, "the difference between the two (or more) versions of what Brown said seven years ago is largely one of emphasis." (Dkt. 770, p. 54). Even if Justice Rowe's notes had been excluded from evidence, the record was replete with sufficient evidence for the jury to conclude Brown represented to the Jamaican court that Chase Jamaica proposed to continue in business. Therefore, CMOBC has failed to show that if any error were made in the admission of PX 629, such error affected its "substantial rights." Fed.R.Civ.P. 61.[51] CMOBC is not entitled to a new trial on this ground.

### 3. Admission of Evidence Relating to the Stay Proceedings

■ CMOBC asserts that the admission of Justice Parnell's opinion granting Rose Hall a stay of the Jamaican damage action pending resolution of the Delaware action (PX 141) and the opinion of the Court of Appeals affirming that decision (PX 641) was erroneous and prejudicial, entitling CMOBC to a new trial. These opinions contain material on the issue of CMOBC's involvement in the stay proceedings. Judge Steel had previously ruled that the portions of paragraph 54 alleging that CMOBC "manipulated Chase Jamaica's defense of the Jamaican action ... seeking unfair litigation advantage to itself in this case"[52] did not state a claim for fraud but were relevant to the issue of whether CMOBC should be held liable for Chase Jamaica's wrongs. (Dkt. 652). It was on this basis that Judge Steel admitted PX 141 and pages 31–32 of PX 641. (Dkt. 779, Tr. 161; Dkt. 799, Tr. 4264–66). CMOBC did not make a Fed.R.Evid. 403 prejudice objec-

tion at trial nor has it made a convincing argument that admission of these exhibits was erroneous. Moreover, defendant has again failed to meet its burden of showing that if any error were made in the admission of these opinions, it affected "substantial rights" of the parties. Fed.R.Civ.P. 61. Therefore, the order of a new trial on this ground is not warranted.

### 4. The Purported Ambiguity in Special Interrogatory No. 4 and Allegedly Erroneous Instructions

CMOBC argues that Special Interrogatory No. 4 was ambiguously worded so that the issue of CMOBC's control of Chase Jamaica was predetermined by the Court. This Court treated this claim fully in its Judgment Opinion and concluded that under all of the circumstances, Interrogatory No. 4 was not ambiguous, and the issue of control was determined by the jury. (566 F.Supp. at 1567–70). In the Judgment Opinion, this Court also disposed of defendant's contention that the cheap sale and loss of interference claim damages, which the jury found totaled six million dollars, did not flow from the fraud on the Jamaican court. The Court's reasoning and finding that the damages did flow from the alleged fraud are set out at pages 1570–74 of that opinion. *Id.* There is no reason to disturb those rulings. Therefore, CMOBC would not be entitled to a new trial on either of these grounds.

■ CMOBC also asserts that the jury instructions on this issue were erroneous, and that the Court's refusal to give a certain instruction proposed by CMOBC was error entitling it to a new trial.[53] Specif-

---

51. Fed.R.Civ.P. 61 provides:
 Rule 61. Harmless Error
 No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect

in the proceeding which does not affect the substantial rights of the parties.

52. For the full text of paragraph 54, see *supra* note 10.

53. CMOBC's proposed instruction reads as follows: "I instruct you that CMOBC cannot be held liable for any alleged fraud or other alleged acts by Chase Jamaica unless that fraud was controlled or committed by CMOBC itself, through the manipulation of the separate existence of Chase Jamaica." (Dkt. 751, p. 10).

ically, CMOBC points out the contrast between the brief instruction on control under Interrogatory No. 4 and the more lengthy one on control under Interrogatory No. 3. Although the instruction under Interrogatory No. 4 was brief, it was obvious that the definition of control which was read to the jury with reference to Interrogatory No. 3 was to apply to control in Interrogatory No. 4 as well. Such a reading is consistent with the following instruction to the jury: "You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole." (Dkt. 858, Tr. 15,484). The jury was instructed in relation to Interrogatory No. 3, in pertinent part, as follows:

A parent corporation may be liable for the wrongs of its subsidiary if it controls the subsidiary in the commission of those wrongs or if it causes that subsidiary to be controlled from outside itself, as to major policy decisions and actions as to those wrongs, and without regard to the subsidiary's corporate offices and structure.

This outside control must amount to complete domination of the subsidiary's major policy decisions and actions so that the subsidiary at the time had no separate mind, will, or existence of its own.

For purposes of this principle, it would not matter whether CMOBC exercised control over Chase Jamaica directly by CMOBC itself, or indirectly by Chase Manhattan Bank, N.A., and/or CMOC. In either event, if you find that CMOBC controlled Chase Jamaica in a way that disregarded the subsidiary's corporate offices and structure, and that Chase Jamaica's major policy decisions and actions involved in this lawsuit were thus taken in disregard of Chase Jamaica's corporate offices and structure, then you should find CMOBC liable for the wrongs of Chase Jamaica.

(Dkt. 858, Tr. 15,536–37). It cannot be said that Judge Steel committed clear error requiring a new trial because he failed to repeat this explanation of the control concept with reference to Interrogatory No. 4, a mere two pages later. Neither CMOBC nor plaintiff requested repetition of the definition of control instruction. Moreover, plaintiff offered no additional definition of control to be included in the instructions on Interrogatory No. 4, while the additional charge proposed by CMOBC not only would not be correct or adequate, but also fails to define control.

■ CMOBC also asserts a novel theory which it claims justifies the grant of a new trial. Defendant claims that the "erroneous instruction under Special Interrogatory No. 3 as to the *presumption* of control of Chase Jamaica by CMOBC purportedly mandated by the Edge Act" [Dkt. 858, Tr. 15,537–38] confused the jury and suggested "that CMOBC *presumably* controlled Chase Jamaica's actions in the Jamaican injunction proceeding (and that CMOBC had the burden to prove otherwise)...." (Dkt. 770, pp. 59–60).

The short answer to this new claim is that the Court repeatedly charged the jury that plaintiff had the burden of proving its claims by a preponderance of the evidence unless otherwise specifically noted. (Dkt. 858, Tr. 15,501–02, 15,515, 15,540). The Edge Act presumption was referenced only under part of Interrogatory No. 3. Judge Steel was careful to differentiate between the two theories of control. This control under the Edge Act was inquired about in Interrogatory No. 3(a), and control independent of the Edge Act was referenced in Interrogatory No. 3(b). The jury was instructed as to each theory separately. (Dkt. 858, Tr. 15,535–38). In addition, CMOBC at no time objected to the instructions on the ground that language excluding the Edge Act presumption was needed in the Interrogatory No. 4 instruction. For these reasons, no new trial is warranted on this ground.

5. *Jury Findings Against Clear Weight of Evidence as to CMOBC's Control of the Fraud*

Finally as to the fraud issue, CMOBC asserts that the Court must order a new trial because the jury's conclusion that any

false testimony was given is against the clear weight of the evidence. Furthermore, defendant claims that credibility issues are raised under the fraud claim such that a successor judge must grant a new trial under Fed.R.Civ.P. 63.

As one ground for granting judgment notwithstanding the verdict for CMOBC on the fraud claim, the Court determined that no reasonable person could conclude that fraud was controlled by CMOBC.[54] If the grant of judgment notwithstanding the verdict should be reversed on appeal, there would have to be a new trial limited to the issue of CMOBC's control of the fraud presented by Interrogatory No. 4. The jury's finding in Interrogatory No. 4 is against the clear weight of the evidence for the reasons discussed in holding that the misrepresentation of Chase Jamaica was not controlled by CMOBC.

IV. *Liability of CMOBC—Interference Claim*

A. *Motion for Judgment Notwithstanding the Verdict or New Trial*

CMOBC attacks the jury's finding that Chase Jamaica (and therefore CMOBC) is liable to plaintiff in the amount of 4.5 million dollars for its refusal to cooperate in the interference lawsuit against Holiday Inns. (Interrogatory Nos. 2 and 6). Defendant asserts several grounds which it claims justify judgment notwithstanding the verdict in its favor or, alternatively, a new trial on this issue. The Court has already determined that CMOBC is entitled to judgment notwithstanding the verdict on the deceit on the court claim and therefore cannot be held responsible for any of Chase Jamaica's wrongs found by the jury in Interrogatory Nos. 1 and 2. Therefore, consideration of the interference issue is not necessary to the present judgment. However, under Fed.R.Civ.P. 50(c), the Court must rule on new trial motions in the event that the judgment is vacated or reversed on appeal.[55] It would seem to be within the spirit of this rule to also determine the remaining grounds of defendant's judgment notwithstanding the verdict motion. Each ground will be addressed separately.

1. *Chase Jamaica's Duty to Act in Good Faith When Foreclosing on Collateral—Lawsuit Against Holiday Inns*

CMOBC contends that as a matter of law, Chase Jamaica owed no duty to plaintiff to assist in a lawsuit against Holiday Inns either by itself instituting suit, by restructuring its sale to the U.D.C. to a sale of assets rather than a sale of the shares of Rose Hall (H.I.), or by assigning the claim to Rose Hall before transferring the stock to the U.D.C. None of these actions, defendant maintains, would be required of Chase Jamaica which, as pledgee of the shares, had the right to sell the collateral upon plaintiff's default on the loan. Defendant points to the share hypothecation agreement (PX 473E), which provides that if plaintiff defaulted on the loan, Chase Jamaica could "sell by public or private sale or otherwise deal with the securities in such manner as it [saw] fit." (*Id.*, ¶ 2).

▬▬▬ As CMOBC notes, the applicable common law requires the pledgee to dispose of the collateral in "good faith." The jury was instructed, "[i]n exercising its power of sale, a bank owes a duty to its borrower to act in good faith, and not in reckless disregard of the borrower's interests, and to take reasonable precautions to obtain the best available price for the collateral on the date of sale." (Dkt. 858, Tr. 15,519). The jury was further instructed: [i]f the bank's interests, as it sees them, conflict with those of the borrower, the bank is entitled to give preference to its own interests provided it does so in good faith." (Dkt. 858, Tr. 15,521). Nothing has been proffered to indicate this statement of Jamaican law was incorrect. In light of these controlling principles of Jamaican law, Judge Steel properly left to the

---

54. *See supra* pp. 137–140.

55. *See supra* p. 140.

jury the question of whether Chase Jamaica should have assisted Rose Hall in the lawsuit against Holiday Inns. While defendant is correct in asserting that a bank has no absolute duty to aid a defaulting borrower in a lawsuit, it does have a duty to act in good faith and not in reckless disregard of its borrower's interests in pursuing the lawsuit if this would not have interfered with its attempt to conclude a legitimate sale with the U.D.C. (Dkt. 858, Tr. 15,525). The issue was properly submitted to the jury. Accordingly, CMOBC is not entitled to judgment notwithstanding the verdict on this issue.

### 2. Res Judicata Effect of Certain Statements in Justice Rowe's Opinion

CMOBC currently seeks to inject a new theory as a ground for overturning the jury's finding that Chase Jamaica wrongfully prevented plaintiff from suing Holiday Inns for interference. See Interrogatory No. 2, *supra* p. 9. Defendant points to the following language in Justice Rowe's written opinion denying the injunction:

> Complaint is made by the plaintiffs that the [first] defendant [Chase Jamaica] refused permission for the plaintiffs to bring an action against Holiday Inns in the name of the second defendant [Rose Hall (H.I.)], for unlawful interference in the plaintiffs' negotiations with the Urban Development Corporation. That refusal, taken by itself, or cumulatively with the plaintiffs other complaints is in my view no evidence of bad faith on the part of the defendants. The defendants must perforce continue to do business with Holiday Inns and it would be inimical to the defendants interests to be engaged in a lawsuit against Holiday Inns.

*Rose Hall, Ltd., et al. v. Chase Merchant Bankers Jamaica Ltd., et al.,* Suit No. E–211 of 1976 (Sup.Ct. of Judicature of Jam., Jan. 17, 1977) (PX 140, pp. 12–13). Defendant claims that this statement by Justice Rowe should be accorded *res judicata* effect so as to preclude any claim by

plaintiff that Chase Jamaica had a duty to assist in a lawsuit against Holiday Inns.

This Court does not agree that this dictum in the opinion denying the preliminary injunction should be accorded *res judicata* effect. First, an expression of opinion on a component of "probability of success" in a preliminary injunction context is just that, *i.e.*, a preliminary determination subject to revision in the final merits determination. Second, the primary issue resolved by Justice Rowe's disposition of the case was whether "the first defendant [was] in a position to pay whatever damages might be awarded to the plaintiffs in this action." *Id.* at 15. Consequently, the question of whether Chase Jamaica should have made the lawsuit available to Rose Hall was properly submitted to the jury. Defendant's theory of *res judicata* cannot serve as a basis for grant of judgment notwithstanding the verdict or new trial.

### 3. Chase Jamaica's Legitimate Interest in Avoiding Litigation Between Rose Hall (H.I.) and Holiday Inns

The Court instructed the jury that Chase Jamaica had no duty to make the interference claim against Holiday Inns available to plaintiff if it "believed in good faith that a lawsuit might interfere with its attempt to conclude a legitimate sale with the UDC." (Dkt. 858, Tr. 15,525). CMOBC contends that even if the claim were correctly submitted to the jury, there was no evidence to support the jury's finding that Chase Jamaica "wrongfully" refused to aid in the lawsuit. (Interrogatory No. 2). CMOBC points to the "uncontradicted testimony" of Chris Brown, Douglas Judah (counsel for Chase Jamaica) and Moses Matalon (Chairman of the U.D.C. and negotiator for the purchases) to the effect that Matalon did not want to "purchase litigation." This, defendant claims, justified Chase Jamaica's refusal to facilitate the lawsuit. Claiming there is no evidence to support a finding that Chase Jamaica acted in bad faith, CMOBC requests judgment notwithstanding the verdict.

CMOBC ignores, however, the substantial evidence presented by plaintiff from which the jury could and did reasonably conclude that Chase Jamaica wrongfully refused to cooperate in the lawsuit. The record contains testimony by Matalon that the U.D.C. would not have been concerned if the sale were structured so that Rollins could retain control of claims that Rose Hall (H.I.) had against Holiday Inns. (Dkt. 801, Tr. 4655). In addition, Douglas Judah testified that after Jonathan Golden, an Atlanta lawyer representing Rose Hall, requested Chase Jamaica's assistance in the interference suit, Judah did not ask the government its reaction in this regard. (Dkt. 827, Tr. 9721). In fact, Judah, on behalf of Chase Jamaica, denied Golden's request just two days after it was made. (PX 132). There is also some evidence that the U.D.C.'s counsel, Ian Phillipson, later tried to change the transaction from a share sale to an asset sale (PX 154; PX 157), although CMOBC presented testimony by Matalon that he disapproved of Phillipson's pursuit of the asset sale. (Dkt. 834, Tr. 11,186).

On the basis of this record, there was sufficient evidence to support the jury's finding in Interrogatory No. 2 and neither judgment notwithstanding the verdict nor a new trial is warranted.

### 4. Consummation of the Proposed $13 Million Transaction

■ The jury was instructed that in order to assess the damages flowing to plaintiff from Chase Jamaica's wrongfully preventing Rose Hall from suing Holiday Inns for interference, it had to first determine the value of the interference claim. (Dkt. 858, Tr. 15,526). The critical element of this value was "whether Rose Hall (H.I.)'s proposed sale for $13 million would otherwise have been consummated." (Dkt. 858, Tr. 15,534).

CMOBC contends that Chase Jamaica's consent to the proposed $13 million transaction was necessary because it held a second mortgage on the hotel and a pledge of the Rose Hall (H.I.) shares. (PX 473(D), (E)).

Out of the sale price, plaintiff proposed to pay Chase Jamaica $1,125,000 cash and to secure the balance of the $3,255,000 loan by pledging to Chase Jamaica the $3 million in ten year debentures to be issued by the Jamaican government as part of the purchase price. Although Chase Jamaica agreed to the cash payment, defendant contends that Chase Jamaica refused to accept the debentures as collateral if their term exceeded three years. Since plaintiff was negotiating debentures with a ten-year term, CMOBC argues that Chase Jamaica would not have consented to the debentures in the form proposed. Since the debentures were for an unacceptably long term, CMOBC concludes the jury had no basis for finding that the $13 million transaction would have been consummated.

Plaintiff counters by pointing to abundant evidence in the record supporting the implicit jury finding that Chase Jamaica would have closed the sale notwithstanding its preference for debentures with a shorter term. Brown testified that although Chase Jamaica was not "content about the debentures, ... [it] hadn't rejected them." (Dkt. 817, Tr. 8027). Plaintiff also introduced several memoranda indicating that Chase Jamaica was urging prompt execution of the agreement of sale. (PX 53; PX 66; PX 524; PX 526; DXC 1082).

The jury had sufficient evidence before it from which to conclude that the $13 million transaction would have been consummated but for the interference. Therefore, judgment notwithstanding the verdict and new trial, if requested, would not be appropriate on this ground.

### B. Motion for New Trial

### 1. Evidentiary Rulings Concerning the Jamaican Cabinet's Approval of the Proposed $13 Million Sale of the Hotel

Together with Chase Jamaica's consent, discussed *supra* p. 146, Jamaica cabinet approval of the proposed $13 million sale of the Rose Hall Holiday Inn was required. This cabinet approval in the spring or sum-

mer of 1976 was a necessary predicate to the jury's finding that the $13 million sale would have been consummated, but for Holiday Inns' interference. (Interrogatory No. 2). Rose Hall attempted to prove the Jamaican cabinet had approved the deal by proffering the Milner certificate. (PX 726). CMOBC unsuccessfully countered by seeking to admit the Patterson affidavit (Ct.Ex. 60), and the testimony, by deposition or at trial, of Patterson (*id.*), and by seeking to strike the Milner certificate. Judge Steel admitted the Milner certificate in evidence (Dkt. 806, Tr. 5733), refused to admit the Patterson affidavit or testimony (Ct.Ex. 60), and refused to strike the Milner certificate. (Dkt. 747). CMOBC contends that these rulings were erroneous and prejudicial, requiring a new trial.

On November 30, 1982, Rose Hall introduced the certificate of Harold Milner, Deputy Financial Secretary of the Jamaican Ministry of Finance and Planning, which contained information about cabinet approval of the $13 million sale. Judge Steel admitted this certificate (PX 726) under Fed.R.Evid. 803(24) over defendants' objections, stating "[a]ll of the conditions specified in the Rule as a prerequisite to a hearsay exception are satisfied. The duration of the trial, at least another two or three weeks, is sufficient for both defendants to have a fair opportunity to meet the facts which are certified to by Milner." (Dkt. 806, Tr. 5733). Milner certified

> that the acquisition of the Rose Hall Holiday Inn Hotel by National Hotels and Properties Limited [a subsidiary of the U.D.C.] at a cost of U.S. $13 million was approved by the Government on the 26th of April, 1976. The terms of the sale were subsequently modified by the government on the 27th of September, 1976 and accordingly the cost of the stock of Rose Hall H.I. Limited to National Hotels and Properties Limited was U.S. $3.25 million.

(PX 726).

■ Subsequently, on February 24, 1983, on the eve of close of trial, not two or three weeks after plaintiff introduced the Milner certificate, but rather nearly three months later, CMOBC sought to admit the affidavit of Percival J. Patterson, Minister of Tourism, Industry and Foreign Trade, and a member of the Jamaican cabinet from 1972 to 1976. Judge Steel denied the admission of this affidavit or, in the alternative of Patterson's deposition or live testimony, stating that it was too late for this type of application. (Ct.Ex. 60). At the time CMOBC made this application, its case had long been completed, as had the case of defendant Holiday Inns and the rebuttal case of plaintiff. Any favorable action by the Court would have mandated the reopening of CMOBC's case, and further opportunity for plaintiff to rebut when all concerned, including the jury, thought the chore of taking evidence was almost completed. Given the totality of circumstances, there was no error in refusing to prolong the longest jury trial ever in the Delaware District. Moreover, the proffered Patterson affidavit did not differ drastically from the Milner certificate which it sought to counter. The Patterson affidavit stated, in pertinent part:

> The Cabinet's approval of the acquisition of the Rose Hall Holiday Inn by National Hotels and Properties Limited for US $13 million ($10 million cash and $3 million notes) in April, 1976 was in principle only, giving me authority as Minister to conclude the agreement subject to certain conditions. These conditions included finding the necessary funds and especially the foreign exchange component.

(Ct.Ex. 60 ¶ 5). There is nothing in the affidavit stating that the referenced conditions would not be satisfied.

■ When the Court rejected defendant's proffer of the Patterson affidavit or testimony, CMOBC moved to admit the affidavit of Horace Barber, Governor of the Bank of Jamaica and former Financial Secretary in the Jamaican Ministry of Finance and Planning. Plaintiff did not object, and it was admitted on February 28, 1983. (Dkt. 748, p. 4 ¶ 13). In the affidavit, Barber certified:

that the acquisition of the Rose Hall Holiday Inn Hotel by National Hotels and Properties, Ltd. at a cost of US $13 million was approved by the Government on the 26th of April, 1976. The terms of the sale were subsequently modified by the Government on the 27th of September, 1976 and the government approved the purchase from Chase Merchant Bankers Jamaica Ltd. of the stock of Rose Hall (H.I.) Ltd. for US $2.255 million and the purchase of approximately 3,000 acres of land for US $1 million.

(DXC 2099). CMOBC offered this affidavit to correct a mistake in the Milner certificate (PX 726) relating to the purchase price for the Rose Hall (H.I.) stock. In all other respects, the Barber affidavit is virtually identical to plaintiff's exhibit, the Milner certificate.

In introducing this affidavit, CMOBC necessarily waived any objection to the identical evidence contained in the Milner certificate confirming that cabinet approval had been obtained. Although this conclusion appears harsh and unfair at first glance, upon closer examination it becomes evident that CMOBC cannot now object to evidence which is identical to evidence it introduced. Even if the Court were to conclude that the Milner certificate was improperly admitted, this would constitute harmless error under Fed.R.Civ.P. 61 in light of the Barber affidavit which is identical in all material respects.

CMOBC admittedly found itself in a difficult position when the Court correctly refused to admit its proffered Patterson affidavit and testimony. CMOBC felt the need to correct the mistake in Milner's certificate relating to the purchase price. However, plaintiff's counsel, Andrew Kirkpatrick, Esq., represented in a February 26, 1983 letter to Judge Steel: "This dispute is of no consequence to us, and we are willing to agree not to argue or assert for any

purpose this particular statement in the Milner certificate. We are willing to formalize this undertaking in any reasonable way if the Court would find it helpful." It appears certain that CMOBC could have cleared up the error by means other than introducing the Barber affidavit, such as by stipulation or by an affidavit which did not confirm the approval of the cabinet. By making the tactical decision to proceed in the manner in which it did, CMOBC waived any right to object to the Milner certificate. CMOBC is not entitled to a new trial on this ground.

2. *Jury Finding of $4,500,000 in Damages Resulting From Chase Jamaica's Failure to Permit Interference Lawsuit*

By its affirmative answer to Interrogatory No. 2 and its assessment of $4.5 million in damages in Interrogatory No. 6,[56] the jury made several implicit findings of fact which CMOBC contends are contrary to the clear weight of the evidence. As a consequence, CMOBC urges that a new trial be granted. The Court will consider these challenged implicit findings of fact seriatim.

a. *The Jamaican Government Debentures*

■ The $13 million arrangement which Rollins was negotiating with the U.D.C. for the sale of the hotel was to be payable in $10,000,000 cash and $3,000,000 in long-term Jamaican government guaranteed debentures. By finding damages of $4.5 million (the difference between $13 million and $8.5 million, the actual sale price of the shares including the $6.25 million first mortgage),[57] the jury effectively concluded that the Jamaican government would have issued the proposed $3 million in debentures and that they would have been worth their face value.[58] CMOBC challenges

---

56. *See supra* p. 121.

57. See *supra* note 13.

58. The jury was instructed on this point: "you should determine whether that [$13 million]

price should be adjusted upwards, downwards, or at all by reason of testimony you have heard about the value of the $3 million in proposed debentures which were to be part of that price." (Dkt. 858, Tr. 15,534).

both of these findings as against the clear weight of the evidence.

Both Rose Hall and CMOBC presented substantial testimony about the value of the debentures and the likelihood of their issuance. CMOBC presented the testimony of two expert witnesses with excellent qualifications, G. Arthur Brown and Tony Lloyd. The substance of their testimony was that the Jamaican government would not have issued the bonds as proposed, primarily because of their terms providing the holder with a hedge against devaluation and allowing unrestricted transferability. In addition, Lloyd opined that even assuming the government issued the bonds, they would have traded only at a discount from par.

Plaintiff, on the other hand, presented testimony by Rollins, Eugene Weaver, a Rose Hall director and financial officer, Hugh Hart, Rose Hall's Jamaican counsel, and Eric Bell, a Jamaican attorney who held several impressive government posts. These witnesses highlighted the advantages of the proposed debentures which would increase their value, and also opined on the probability of their issuance by the government.

The testimony on the value of the debentures and the likelihood of issuance was conflicting and complex. However, Rose Hall presented substantial evidence from which the jury could have reasonably concluded, by a preponderance of the evidence, that the Jamaican government would have issued the debentures and that they would have been worth their $3 million face value. Therefore, this finding is not against the clear weight of the evidence and does not warrant a new trial.

b. *Consummation of the Proposed $13 Million Transaction*

CMOBC urges that if the Court finds, as it did, that defendant is not entitled to judgment notwithstanding the verdict on the issue that the proposed $13 million transaction would not have been consummated because of Chase Jamaica's "veto power," then CMOBC is entitled to a new trial because the jury's finding was con-trary to the clear weight of the evidence. As CMOBC itself notes, plaintiff introduced substantial evidence that the transaction had cabinet approval (PX 726); that it had been announced at a press conference (Dkt. 780, Tr. 477); that drafts of the sale documents had been exchanged with U.D.C.'s lawyers (Dkt. 790, Tr. 2397–2404; PX 630A–F); and that plaintiff expected the deal to close in the summer of 1976 (Dkt. 780, Tr. 443; Dkt. 782, Tr. 869–70). CMOBC contends, however, that the clear weight of the evidence indicated that the sale would not have closed at that price, regardless of Holiday Inns' alleged interference.

As examples of this evidence, CMOBC points to evidence that the government would only acquire the hotel if its revenues supported its operation, which was questionable for the Rose Hall Holiday Inn. In addition, CMOBC again refers to the testimony concerning the debentures which has been treated above. *See supra* pp. 148–149. Again the Court concludes that there was substantial evidence in the record from which the jury reasonably concluded that the $13 million sale would have been closed but for the interference. A new trial is not warranted.

c. *Lawfulness of Holiday Inns' Conduct*

In a conclusory fashion, CMOBC contends that a new trial is required because the jury's finding that Holiday Inns unlawfully interfered with plaintiff's $13 million transaction was contrary to the clear weight of the evidence. By its affirmative answer to Interrogatory No. 2, the jury necessarily concluded that Holiday Inns' conduct in meetings with Rollins, Golden and Matalon in June and July of 1976 amounted to intimidation, injurious falsehood or both. There was conflicting testimony on this issue presented by Rollins, Golden, Matalon, Brown, Lapwing (an agent of Holiday Inns), Feldman and Rose (executives of Holiday Inns). In addition, the record contains several documents relevant to this matter. *See e.g.*, PX 51, PX 179. The evidence was in conflict, but the jury could have reasonably reached the

conclusion that Holiday Inns committed unlawful interference. Consequently, a new trial is not warranted.

### 3. *New Trial Under Rule 63*

CMOBC claims that since all of the issues composing the question of whether Chase Jamaica wrongfully prevented plaintiff from suing Holiday Inns involved credibility determinations, a successor judge must, under Fed.R.Civ.P. 63, grant a new trial on the matters referenced in Interrogatory No. 2. This is so, argues CMOBC, because a successor judge who did not preside at the trial cannot determine whether the verdict was against the clear weight of the evidence when this would involve assessment of witnesses' credibility.

■ As noted in the previous sections, the record contains sharply conflicting testimony on each of these issues. The Court has determined, as to each disputed issue, that there is sufficient basis to support the jury's finding. In reaching its conclusions, the jury necessarily made credibility determinations in evaluating the conflicting testimony. The Third Circuit Court of Appeals has stated "since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Lind v. Schenley Industries, Inc.*, 278 F.2d 79, 89 (3d Cir.1960), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960) (quoting 6 J. Moore, *Moore's Federal Practice* (2d ed.) p. 3819). Although the appellate court was referring to a situation where the presiding trial judge was deciding the new trial motions, there is no reason why this principle should not equally apply to a successor judge. The jury has made the credibility determinations required and has reached conclusions which this Court finds are amply supported by the testimony and documents in the record. When this is the state of the record, there is no more reason for a successor judge to disturb the verdict than for the presiding trial judge. It is only in cases where there is something in the record which causes the successor judge to question whether he would be as able to decide the motion in the same manner as the presiding judge who saw and heard the witnesses that he should grant a new trial under Rule 63. It is not possible to conclude that the jury decided the matter was against the clear weight of the evidence or in a manner which yielded a seriously erroneous result.

The interpretation of Fed.R.Civ.P. 63 urged by CMOBC would require a successor judge to grant a new trial in every instance in which a party claims the verdict is against the clear weight of the evidence and credibility of witnesses is involved. The Court cannot agree with such a reading of a rule which empowers a successor judge to perform the duties required after a verdict is returned and provides as the sole limitation that "if such other judge is satisfied that he cannot perform those duties ... he may in his discretion grant a new trial." Fed.R.Civ.P. 63.

### 4. *Jury Instructions on the Interference Claim*

CMOBC contends that since Chase Jamaica had no duty to bring or assign a lawsuit against Holiday Inns, or sell Rose Hall (H.I.) assets instead of shares, the instructions to the contrary (Dkt. 858, Tr. 15,525–26) were erroneous and prejudicial. The Court has determined that this issue was properly submitted to the jury as part of Chase Jamaica's duty of exercising good faith in the sale of its collateral. *See supra* pp. 144–145. Therefore, the instructions were correct and the jury's findings will not be disturbed.

■ Additionally, CMOBC urges that a new trial is required because the instructions were incomplete with regard to the underlying torts of intimidation and malicious falsehood alleged against Holiday Inns. In particular, CMOBC objects to the omission of certain of its proposed instructions and the inclusion of plaintiff's allegations. The instructions as given were well balanced and entirely sufficient on the interference claim. (Dkt. 858, Tr. 15,524–34). The instructions included defendant's argu-

ments, opposing plaintiff's allegations, as well as repeated statements that plaintiff had the burden of proving its allegations by a preponderance of the evidence. Therefore, no new trial is warranted.

## V. *Liability of Defendant—Cheap Sale*

CMOBC contends that there is no evidence in the record to support the jury's conclusion that Chase Jamaica obtained $1.5 million less than the best available price for the 3000 acres of land at issue. (Interrogatory Nos. 1 and 6(a)). On this basis, CMOBC seeks judgment notwithstanding the verdict or, alternatively, a new trial. The Court will consider CMOBC's various contentions relating to this issue seriatim.

Plaintiff's main evidence as to the damages it suffered on the sale of the land was presented by the testimony of its expert Mr. R.O.P. ("Pat") McDaniel, chairman and managing director of the Jamaican real estate firm, C.D. Alexander & Co. McDaniel gave his opinion on the value of the land in a sale by either a subdivision of part of the land and sale by lots or a sale of the entire 3000 acres as a block. CMOBC argues there is an insufficiency of proof by attacking McDaniel's testimony as incompetent evidence of the best available price.

### A. *Motion for Judgment Notwithstanding the Verdict*

#### 1. *Competency of Evidence of Sale of Land by Lots*

McDaniel testified that if, in September, 1976, he were advising the owner of the 3000 acres of land on how to raise $1 million, the amount for which Chase Jamaica sold the mortgaged Rose Hall land to U.D.C., he would have advised not to sell the whole as a block in the then existing depressed market; rather, he would have suggested subdividing and selling the most saleable land in lots for agricultural and residential use. (Dkt. 802, Tr. 5021–22). If this advice were followed, McDaniel testified that the balance of the land could be developed and sold in the future in accordance with Rollins' land use plan. (PX 252). However, in order to accomplish the subdivision lot sale, McDaniel testified that 18 months to two years would be required. (Dkt. 802, Tr. 5021–22).

#### a. *Duty to Sell Land by Lots*

CMOBC contends that as a matter of law Chase Jamaica had no duty to subdivide the land and sell it in lots; rather, it had the absolute right to sell the entire collateral, provided it obtained the best available price. In support, defendant cites the Jamaican Registration of Titles Act, section 106,[59] the common law, the mortgage instrument (PX 473(D)), and the general policy against requiring subdivision.

■ After requesting memoranda from the parties (Dkts. 711, 720, 735), Judge Steel formulated the following jury instruction:

A bank exercising its power of sale may offer the mortgaged property for sale either altogether or in lots, but in deter-

---

**59.** Section 106 provides, in pertinent part:

If such default in payment, or in performance or observance of covenants, shall continue for one month after the service of such notice, or for such other period as may in such mortgage or charge be for that purpose fixed, the mortgagee or annuitant, or his transferees, may sell the land mortgaged or charged, or any part thereof, either altogether or in lots, by public auction or by private contract, and either at one or at several times and subject to such terms and conditions as may be deemed fit, and may buy in or vary or rescind any contract for sale, and resell in manner aforesaid, without being liable to the mortgagor or grantor for any loss occasioned thereby, and may make and sign such trans-

fers and do such acts and things as shall be necessary for effectuating any such sale, and no purchaser shall be found to see or inquire whether such default as aforesaid shall have been made or have happened, or have continued, or whether such notice as aforesaid shall have been served, or otherwise into the propriety of regularity of any such sale; and the Registrar upon production of a transfer made in professed exercise of the power of sale conferred by this Act or by the mortgage or charge shall not be concerned or required to make any of the inquiries aforesaid; and any persons damnified by an unauthorized or improper or irregular exercise of the power shall have his remedy only in damages against the person exercising the power.

mining which method to use, the bank must make that decision in good faith, without reckless disregard for the interests of the mortgagor, and in taking reasonable precautions, for the purpose of obtaining the best available price and avoiding unreasonable sale of excess collateral.

(Dkt. 858, Tr. 15,522–23). This instruction correctly made it the jury's province to decide whether it would have been reasonable for Chase Jamaica to have pursued a lot sale scheme. This Court sees no reason to upset that determination. Therefore, any testimony given by McDaniel relating to a program of subdivision and lot sale went to the issue of Chase Jamaica's good faith in deciding not to pursue such a plan. As such, it was competent evidence.

### b. *Timing of Sale*

To further attack McDaniel's testimony which valued the land according to a long term development plan, CMOBC contends that Chase Jamaica had the unqualified right to sell the land on the *date* it chose. On this issue, the jury was instructed as follows:

When the borrower is in default, the bank, unless it makes an agreement to the contrary, is free to exercise its power of sale for its own purposes whenever it chooses.

Specifically, the bank has no duty to delay the sale to await an improvement in the market; it may choose the time of sale in its own interests, despite the possibility, or even the likelihood, that the market will later improve.

However, in conducting the sale, the bank must take such time and make such arrangements as the circumstances may require, to sell in a way reasonably calculated to obtain the best available price for the collateral. That is, while the bank need not wait for improvement in the market, it must not by unreasonable haste omit to take reasonable precautions to obtain the best available price, but must take such time and make such arrangements as are reasonably necessary, in light of the nature of the collat-

eral and the surrounding circumstances, to obtain the best available price.

(Dkt. 858, Tr. 15,520–21). This instruction was consistent with the earlier findings on mortgagee duties under Jamaican law made by this Court:

If Rose Hall is suggesting that where there is a complex transaction a mortgagee cannot choose the date when he will exercise his power of sale, I do not agree. On the other hand, if Rose Hall is suggesting that in a situation where a complex agreement of sale is worked out by the mortgagee over a period of time, the term "date of sale" should not have reference to one single day, then I agree that the term "date of sale" would not necessarily refer to a single calendar date.

Dkt. 559, p. 8 (Magistrate's Sept. 24, 1982 Opinion), *adopted*, Dkt. 631 (Judge Steel's October 7, 1982 Opinion).

Under these controlling principles of Jamaican law, the jury was to consider McDaniel's testimony in deciding what type of sale Chase Jamaica had to conduct in order to fulfill its mortgagee duties. CMOBC's argument that McDaniel's 18-month scheme was unreasonable as opposed to Chase Jamaica's own sale which did not close for 14 months was properly left for jury determination. It is obvious McDaniel's testimony on this point was relevant and competent. At any rate, defendant's argument is an insufficient basis upon which to grant judgment notwithstanding the verdict.

### c. *Financing of the Sale*

CMOBC contends that a "fatal defect" in McDaniel's expert opinion was the erroneous assumption that Chase Jamaica would have provided or arranged financing for the sale of lots. This assumption, defendant urges, is contrary to the instruction stating "[a] bank has no duty to provide financing of the sale of collateral." (Dkt. 858, Tr. 15,522). Therefore, CMOBC concludes that McDaniel's testimony was irrelevant and incompetent to support the verdict.

McDaniel testified before the jury about the various assumptions on which his land values were based. He opined that financing was available (Dkt. 802, Tr. 5052–53) and that deposits available to Chase Jamaica would have been generated during the sales period. (Dkt. 802, Tr. 5022). He did not limit the source of financing to Chase Jamaica. The jury was left with the task of evaluating his testimony in light of the reasonableness of his assumptions. Since the jury placed a total value of $2.5 million on the land, a figure considerably below McDaniel's lot sale valuations, which totaled slightly over $20 million (PX 718A–C; PX 719A–O), it apparently discounted McDaniel's testimony. The Court finds no reason to disturb the verdict on this basis urged by defendant.

d. *Sufficiency of the $1 Million that McDaniel's Plan Would Have Produced*

CMOBC contends that since Chase Jamaica was entitled to receive the entire amount of its debt, $3,255,000, McDaniel's lot sale plan which would have produced $1 million was insufficient to justify the jury's verdict. The short answer to this claim is that the jury could have concluded from all the evidence that Chase Jamaica could have raised the remainder of funds required to pay off its loan through the sale of the hotel, as it in fact did.

e. *Chase Jamaica Being Advised to Subdivide*

CMOBC appears to argue that advice given to Chase Jamaica by its attorneys and real estate appraisers in April and May of 1976 to the effect that it should sell part of the collateral in lots (PX 32, PX 222) would no longer be operative in September of 1976 because of various events in Jamaica during the summer of 1976. CMOBC had a chance to explain or contradict these exhibits at trial, and the jury weighed all the evidence in reaching its conclusion. In

light of the relatively low value the jury placed on the land, it is apparent that the jury discounted McDaniel's lot sale valuations to a great extent. There is no reason, however, for the Court to conclude that McDaniel's testimony on lot sales was irrelevant or incompetent, or, when considered together with other land value evidence presented by plaintiff, insufficient to support the jury verdict.

2. *Competency of Evidence on Sale of Land as a Block*

McDaniel also gave his expert opinion on the value of the 3000 acres of land sold as a block. CMOBC contends that this testimony was also incompetent and irrelevant as a matter of law.

McDaniel testified that the "forced sale" or "ready market" value of the 3000 acres as a block in September 1976 was between $6.1 and $6.6 million.[60] (Dkt. 802, Tr. 5003, 5019–20). CMOBC contends that since McDaniel assumed 18 months would be required to complete the sale (Dkt. 802, Tr. 5017–20), this was not an indication of the best available price for the land in September 1976. The Court has previously treated and dismissed this claim. *See supra* p. 152.

In addition, CMOBC attacks McDaniel's valuation of the land as a block as being based on three assumptions which were no longer valid in September, 1976. The assumptions actually appeared in the 1973 appraisal by C.D. Alexander which placed an $86 million figure on the entire 5500 acres of Rose Hall land.[61] (Dkt. 802, Tr. 4940–70). McDaniel testified that because of the changed circumstances in 1976 which rendered the 1973 appraisal inapplicable, he discounted that valuation considerably to arrive at a $20 million "fair market value," and a $6.1 million to $6.6 million "forced sale value."

---

**60.** CMOBC now apparently contends that forced sale value is somehow different from the best available price standard enunciated by this Court. CMOBC did not ask McDaniel if he made such a distinction, and defendant's own land experts testified that the two terms were analogous. (Dkt. 838, Tr. 11,992, Dorchester; Dkt. 830, Tr. 10,279–80, Langford).

**61.** *See supra* p. 118.

This Court concludes that McDaniel's testimony was competent and relevant evidence on the best available price of the land.

### 3. Competency of Other Evidence on Best Available Price of the Land

In meeting its burden of proving that Chase Jamaica failed to get the best available price for the collateral, plaintiff introduced evidence tending to show that Matalon made an unsolicited proposal to place a price of $4 million before the cabinet for approval. Matalon wanted the "extra $1 million" to be paid to Rose Hall Ltd. Chase Jamaica, however, rejected this proposal almost immediately. Brown's memo to file recording the meeting with Matalon where this issue arose reads, in pertinent part, as follows:

> The Sale Agreement that he [Matalon] would like to place before the Government would be that they buy the shares in Rose Hall (H.I.) Limited and the land over which we have a first charge for $4 Million. The Extra $1 Million would be paid to Rose Hall Limited. We informed him that this was not acceptable to us .... We feel that we should, in any event, write to Urban Development Corp. offering jointly to sell the shares and land for $3 Million. Along with this letter from the Merchant Bank will be an offer to finance from the Chase Manhattan Bank.
>
> For a total of $9.2 Million, without any cash outlay, the Government are acquiring the Holiday Inn (original selling price of the Holiday Inn alone was $14 Million) and 3,500 acres of prime real estate. It is our opinion that this in itself is a very good deal for the Government and we should not include any offer of finance for paying Rose Hall Limited or development cost.

(PX 111).

CMOBC contends that Matalon's offer to place an offer of the extra $1 million before the cabinet is not legally competent evidence of the best available price for the land. One reason for this is that this extra amount would have to have been financed, presumably by Chase Jamaica or Chase Manhattan Bank (Dkt. 817, Tr. 7964–65), and as a mortgagee, Chase Jamaica had no obligation to provide or arrange financing. (Dkt. 858, Tr. 15, 522). However, CMOBC does not dispute that Chase Jamaica never explored the possibility of obtaining the additional financing from the Bank of Nova Scotia or by having the government simply give Rose Hall a note for the additional $1 million thereby making Rose Hall itself the lender. (Dkt. 817, Tr. 7966–84).

Chase Jamaica further attacks this evidence as incompetent by stating that Matalon could not assure Chase Jamaica that the cabinet would approve the higher price. Defendant contends that therefore it would have been too risky and speculative to submit the higher price to the cabinet. This issue, as well as the preceding issue about financing, was presented to the jury. The jury had the task of deciding whether Chase Jamaica acted "in good faith, without reckless disregard for the interests of the mortgagor, taking reasonable precautions to obtain the best available price...." Interrogatory No. 1, *supra* p. 121. All of CMOBC's arguments relevant to this question were presented to the jury, and the jury presumably judged plaintiff's evidence in this light. Simply because CMOBC disputed the feasibility of conducting a sale for $3 million plus the extra $1 million does not mean that this offer by the buyer is not competent evidence of the best available price.

Having held plaintiff's proffer of evidence was competent, relevant and properly admissible over defendant's stated objection, the Court concludes CMOBC is not entitled to judgment notwithstanding the verdict on the cheap sale of the land.

### B. Motion for New Trial

The Court previously concluded that CMOBC would not be entitled to judgment notwithstanding the verdict on any of the preceding grounds relating to land value. It now undertakes consideration of

CMOBC's alternative motions for a new trial on this issue.

### 1. *The Jury's Answers to Interrogatory Nos. 1(a) and 6(a) as Against the Clear Weight of the Evidence*

CMOBC contends that the clear and indeed "overwhelming" evidence establishes that Chase Jamaica obtained no less than the best available price for the 3000 acres of land. CMOBC produced two land value experts, Cecil C. Langford and John D. Dorchester, whereas plaintiff produced one land value expert, Pat McDaniel. The parties argue at length in their briefs about the superior qualifications of their own experts as contrasted with those of the opposing side's experts. (Dkt. 770, pp. 129–30; Dkt. 868, pp. 156–59). All three of the witnesses were qualified as experts, and neither party challenged this qualification. The degree of difference in training and experience was properly presented to the jury for consideration in the weighing of their opinions.

CMOBC's experts placed the best available price of the land at $975,000 (Dkt. 830, Tr. 10,339, Langford) and $300,000 (DXC 963(3) at 43–44, Dorchester). McDaniel, on the other hand, placed the "forced sale value" at $6.1 to 6.6 million. *See supra* p. 153. CMOBC makes several arguments attacking McDaniel's credibility and courtroom demeanor, and Rose Hall counters by attacking Langford's credibility and testimony. The jury apparently took all of these considerations into account in executing its duty of weighing the evidence and credibility of the witnesses. As a result it placed the best available price of the land at $2.5 million.

 The Court finds that this verdict is amply supported by the record and is not against the clear weight of the evidence. In addition to the experts' testimony, the jury was presented with evidence about the "extra $1 million," *see supra* p. 154, and with various contemporaneous documents by Chase Jamaica which set the forced sale value of the land well above the actual sales price of $1 million. These include: a June 22, 1976 memo by Brown stating that "the Government will purchase the entire property [3000 acres excluding the hotel] for approximately $1,800,000." (PX 44); a series of criticized loan [62] reports which set the forced sale value at at least $6 million (PX 14, PX 29, PX 203, PX 208); an October 4, 1976 Credit Audit placing the forced sale value at $6 million (PX 139); and an August 6, 1976 memo by Sigarreta showing his views that the land could be sold for a price in excess of $1.7 to 1.8 million. (PX 76). In addition, Matalon's September 23, 1976 letter to Patterson, the Minister of Industry, Tourism and Foreign Trade, describes the purchase of the Rose Hall (H.I.) shares and the land as the acquisition of "a most valuable asset at an enormous bargain." (PX 133).

In light of this record, the Court concludes that the jury's answers to Interrogatory Nos. 1 and 6(a) were not against the clear weight of the evidence and a new trial is not required.

### 2. *New Trial on Cheap Sale Under Fed.R.Civ.P. 63*

CMOBC contends that because the issue of the best available price for the 3000 acres of land involves questions of witness credibility, a new trial is automatically required under Rule 63 because a successor judge cannot make credibility determinations. A similar claim relating to Chase Jamaica's refusal to aid in the interference suit was rejected by this Court *supra* p. 150.

 In this matter, the jury performed its function of weighing the credibility of the witnesses and concluded that the best available price of the land was $2.5 million, a figure which is lower than that urged by plaintiff, and higher than that urged by defendant. There is nothing in the record

---

**62.** A criticized loan is one which is classified as being associated with an undue risk, doubtful collection or a loss. (PX 323, § V, pp. 1–3).

Such loans require special attention by bank officers with the requisite lending authority. *Id.*

which causes one to question the accuracy of the jury's conclusion on this issue. Even if the jury wrongfully credited the testimony of McDaniel whom CMOBC urges it successfully impeached, the record contains abundant evidence in the form of contemporaneous documents supporting the jury's verdict. *See supra* p. 155. CMOBC's new trial motion on this ground will be denied.

### 3. *Evidentiary Rulings Relating to the Cheap Sale*

CMOBC contends that certain evidentiary rulings were erroneous and a new trial is necessary to rectify these mistakes. As noted, Fed.R.Civ.P. 61 provides that any error in the admission or exclusion of evidence is harmless error and may not justify the grant of a new trial unless the admission or exclusion was "inconsistent with substantial justice." *See Warrick v. Brode,* 428 F.2d 699, 701 (3d Cir.1970); *Gilmore v. Strescon Industries, Inc.,* 66 F.R.D. 146, 152 (E.D.Pa.1975), *aff'd,* 521 F.2d 1398 (3d Cir.1975). CMOBC challenges four evidentiary rulings: first, that plaintiff's evidence of the value of the land was erroneously admitted; second, that evidence regarding a prior criminal conviction of plaintiff's appraiser was erroneously excluded; third, that cross-examination was improperly prohibited regarding the location of the water system; and fourth, that evidence regarding the extent of white sand beach was erroneously excluded. These contentions will be addressed in turn.

### a. *Evidence Regarding Land Value*

CMOBC argues that the admission of testimony by plaintiff's expert McDaniel regarding the value of the 3000 acres of land was error. This contention revolves around two premises: first, McDaniel's testimony regarding the sale by lots rather than as a block was irrelevant; and second, McDaniel's testimony was based on dubious and speculative conclusions. CMOBC argues that the introduction of these vastly inflated figures prejudiced the jury. The Court has previously addressed this issue and determined that McDaniel's testimony was competent and relevant. *See supra* p. 154. Therefore, the admission of this testimony was not erroneous and a new trial is not warranted.

### b. *Evidence Regarding the Prior Criminal Conviction of a Non-witness Appraiser*

Rose Hall relied upon opinions rendered by Charles V. Ogilvie, a land appraiser, with respect to the value of the 3000 acres.[63] In 1960, Ogilvie had been convicted and sentenced to a three-year prison term on each of four counts of fraud. At the trial, CMOBC was not permitted to introduce evidence regarding this prior conviction. *See* Court Exhibit 59 (also known as TC1059). Ogilvie was not called as a witness but McDaniel relied upon his opinion. (Dkt. 802, Tr. 4920, 4936–37, 4976, 4995).

CMOBC makes several arguments regarding Ogilvie. First, because McDaniel utilized Ogilvie's appraisals as the basis for his testimony, Ogilvie became a de facto witness even though he was not personally in the courtroom. Second, the rule relied upon by Judge Steel in excluding evidence of the conviction, Fed.R.Evid. 609,[64] applies

---

**63.** Ogilvie performed the 1973 appraisal of the Rose Hall plantation including the 3000 acres, which resulted in an appraisal value in excess of $50 million for the entire 5500 acre plantation. The appraisal itself was excluded as inadmissible hearsay. (Dkt. 802, Tr. 4969–70).

**64.** Rule 609 provides in part:
(a) General rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.
(b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for

only to live witnesses and since Ogilvie did not testify, evidence of his conviction should have been admissible under either Fed.R.Evid. 404(b)[65] or 806.[66] Third, the conviction should have been admissible to impeach plaintiff's evidence. Finally, the conviction is admissible to rebut Ogilvie's character as a respected appraiser.

These contentions merit, at best, a cursory treatment. The conviction was more than ten years old and thus it comes within the ambit of Fed.R.Evid. 609(b). CMOBC cannot allege that Ogilvie was a de facto witness and then contend that Rule 609 does not apply because he was not a live witness. Finally, the misrepresentation CMOBC conjures up with such zeal relates to a statement that Ogilvie was "actively" engaged in appraisals since 1946. Since he was incarcerated in the 1960's, contends CMOBC, he could not be actively engaged in the business as stated. At best, this misstatement is benign. Finally, just as this Court has rejected CMOBC's contentions regarding McDaniel's testimony of land value, the Court views the failure to admit evidence of Ogilvie's conviction in the same manner. Judge Steel's exclusion of the evidence of the prior conviction is, at most, harmless error. The harmless error aspect is demonstrated where, as here, plaintiff's valuation must be regarded as vastly inflated when compared to the actual jury verdict.

### c. Prohibition of Question on Cross-examination Regarding the Location of the Water System in Relation to the Boundaries of the Property

At the trial and in its complaint, Rose Hall argued that the value of the 3000 acres was enhanced by approximately $3.5 million because of improvements to the water system. Rose Hall presented Winston Dear, a Jamaican land surveyor, to authenticate the accuracy of a survey of the 3000 acre tract. CMOBC sought to cross-examine Dear regarding the relationship of the water system to the entire 5500 acre tract. This cross-examination was denied on the basis that it exceeded the scope of Dear's direct testimony.[67] CMOBC now argues that this was reversible error because there is doubt that the primary source of water for the 3000 acre tract was within the tract, thereby decreasing its value.

Dear was not asked a single question about any aspect of the water system during his direct examination. Therefore, CMOBC's line of questions was clearly beyond the scope of direct examination. CMOBC properly could have pursued its doubts at other points during the trial.

that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

**65.** Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**66.** Rule 806 provides:

When a hearsay statement, or a statement defined in Rule 801(d)(2), (C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with his hearsay statement, is not subject to any requirement that he may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as if under cross-examination.

**67.** Fed.R.Evid. 611(b) provides:

Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

Specifically, CMOBC's expert Dorchester could have testified on direct examination regarding his inspection of the property as compared to Dear's survey. CMOBC could have cross-examined Weitzel on the subject because he testified as to the location of water sources on direct examination. (Dkt. 797, Tr. 3980). Furthermore, CMOBC could have tendered any witness it desired on the subject. Having failed to seize the proper opportunities to pursue this line of inquiry, CMOBC cannot be permitted to cry foul at this late stage. Judge Steel's prohibition of questioning on the issue during cross-examination of Dear was neither improper nor an abuse of discretion.

### d. *Evidence Regarding the Extent of White Sand Beach*

The value of the 3000 acres of land was partially contingent upon the extent of beach front property. Of the 2½ miles of sea frontage, Rose Hall claimed most was white sand beach. CMOBC's expert witness, Langford, testified that only approximately one quarter mile was sand beach and the rest was rocky or swampy and therefore unsuitable for hotel and resort development. (Dkt. 830, Tr. 10,287). CMOBC attempted to allow Langford to testify regarding the genesis of this quarter mile figure as coming from a survey performed by Dear at Langford's request.[68] Langford sought to testify that Dear informed him by telephone as to the extent of sand beach. This testimony was excluded as hearsay.

■■■ CMOBC concedes the testimony was hearsay, but argues that it was admissible because an expert may base his opinion on inadmissible evidence. Fed.R.Evid. 703.[69] This contention, however, misses the mark. While an expert witness may base his opinion on such evidence, this does not magically render the hearsay evidence admissible. Langford's expert opinion as to the value of the land was admitted and this was all CMOBC was entitled to. Langford received a surveyor's report from Dear which was not tendered either to Rose Hall or to the Court. As such, the hearsay telephone conversation was not admissible.[70]

In summary most of CMOBC's contentions regarding the evidence of the value of the land are incorrect. To the extent defendant's contentions are correct, the resultant error cannot constitute prejudicial error. At most some harmless errors were committed which do not justify the grant of a new trial.

### 4. *Jury Instructions as to the Value of the Land*

CMOBC argues that the jury received erroneous instructions regarding the value of the land. These instructions so prejudiced CMOBC, it is argued, that a new trial must be granted. CMOBC specifically rais-

---

**68.** Langford apparently paid Dear $400.00 for professional services. Court Ex. 45. This bill was excluded from evidence since it only showed that Dear had performed services rather than the results of those services.

**69.** Rule 703 provides:
 The facts or dates in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or dates need not be admissible in evidence.

**70.** Fed.R.Evid. 705 permits inquiry into the facts or opinion underlying an expert's opinion on cross-examination. The rule also permits the court to require disclosure of such facts and dates prior to the rendering of an opinion. Neither Rule 703 nor 705 address the specific question at issue: whether such inadmissible evidence may be brought out on direct examination. Since the Rules do not specifically allow for such admissibility, the Court declines to find the exclusion of hearsay was erroneous. *See Bryan v. John Bean Div.*, 566 F.2d 541, 546 (5th Cir.1978); P. Rothstein, *Federal Rules of Evidence* 289–96 (2d ed. 1979). But *see O'Gee v. Dobb Houses, Inc.*, 570 F.2d 1084 (2d Cir.1978) (implies admission of such underlying inadmissible facts proper); Fed.R.Evid. 705 advisory committee note ("While the rule allows counsel to make disclosure of the underlying fact or data as preliminary to the giving of an expert opinion, if he chooses, the instances in which he is required to do so are reduced."). Even if the exclusion was erroneous, the Court finds the error would not warrant a new trial. *See Fed. R.Civ.P. 61.*

es four objections to the instructions:[71] first, the instructions failed to advise the jury that fair market value was irrelevant; second, the instructions incorrectly defined best available price; third, the instructions misstated Jamaican law as to the time of sale; and fourth, the instructions failed to adequately explain the significance of Rollins's failure to personally guarantee the loan.

■ As to fair market value, CMOBC argues that the jury should have been instructed to disregard any argument or evidence regarding long-term fair market value. While the Court seriously doubts the validity of Rose Hall's theory of so-called fair market value, *see infra* p. 175, the plaintiff-favoring standard adopted by the Court permitting such evidence and argument was, at best, harmless error. The jury implicitly rejected Rose Hall's exaggerated claims and novel fair market value theory by returning a damage figure of $1.5 million which was low relative to plaintiff's valuation.

■ CMOBC argues that "best available price" should have been defined as "the highest price the mortgagee actually could have obtained on the date of sale assuming it acted properly in selling the collateral." *See* Dkt. 631 (Judge Steel's Oct. 7, 1982 Opinion); Dkt. 667 (Judge Steel's Oct. 13, 1982 Order).[72] Any difference between what CMOBC proposes and what the jury actually was instructed is semantic and insignificant.

With regard to the instruction concerning when a mortgagee may exercise its power of sale, CMOBC contends the Court misstated Jamaican law. CMOBC argues that as long as a mortgagee acts in good

faith and takes reasonable precautions to obtain the best available price, it may exercise its power of sale at any time.[73] The instruction as given embodies CMOBC's position and accurately paraphrases Jamaican law. *See Bank of Cypress v. Gill,* [1979] 2 Lloyd's Rep. 508, 511; *Cuckmere Brick Co. v. Mutual Finance, Ltd.,* [1971] 1 Ch. 947; *see also* Dkt. 559, pp. 7–8 (Magistrate's Sept. 24, 1982 Opinion), *adopted,* Dkt. 631 (Judge Steel's Oct. 7, 1982 Opinion).

Finally, CMOBC argues that the jury should have been instructed that it is presumed Chase Jamaica received the best available price and plaintiff had a duty to mitigate damages by having Rollins personally guarantee the loan so as to cure the default. This Court previously rejected this position, *Id.* at 118–119, and the issue need not be revisited.

In summary, CMOBC's contentions regarding the instructions relating to the value of the land do not warrant the grant of a new trial.

### 5. *CMOBC's Miscellaneous Grounds for a New Trial*

In a potpourri of allegations, CMOBC raises other grounds which it asserts warrant the grant of a new trial. These fall within three categories: first, that the Court admitted too much post-September 1976 evidence regarding land value; second, that the Court failed to pose two special interrogatories to the jury; and third, the Court made a plethora of erroneous evidentiary rulings.

■ As to the first contention, that the Court allowed too much post-September 1976 land value evidence, no error is evi-

---

**71.** CMOBC also alleges that the Court erroneously omitted several instructions as proposed by CMOBC. Arguing that these omissions caused prejudicial error, CMOBC refers to its objections to the instructions (Dkt. 751) for elucidation. CMOBC's objections cover eleven pages of minutiae which, in the absence of direction from CMOBC, the Court has examined. Judge Steel reviewed these objections and drafted his charge accordingly. The Court perceives no error and therefore omissions in Judge

Steel's instructions will not be the basis for the grant of a new trial.

**72.** The jury was instructed that "best available price" means "the highest price that might have been obtained if the bank had acted properly in selling the collateral." (Dkt. 858, Tr. 15,520).

**73.** For further discussion and the text of the jury instruction, *see supra* p. 152.

dent. CMOBC argues that while the Court could permit the introduction of some evidence of post-September 1976 value, it permitted too much. The Court perceives no need to disturb this discretionary decision by Judge Steel. In any event, the error, if any, was harmless.

CMOBC's second contention involves the failure of the Court to include two special interrogatories on CMOBC's affirmative defenses.[74] The first interrogatory related to Rose Hall's ability to prevent the sale of the shares and its choosing not to do so. This relates to Chase Jamaica's willingness to forego its foreclosure remedy if John Rollins were to personally guarantee the loan and cure the default. Rose Hall enjoys a separate status from that of John Rollins. Nonetheless, Judge Steel instructed the jury that Rollins's failure to guarantee the loan, if he were in a position to do so, could be considered in determining the best available price for the land. (Dkt. 858, Tr. 15,523). This obviated the need for a separate interrogatory on this issue. The second interrogatory related to a laches defense. It asked whether Rose Hall unreasonably delayed the filing of this lawsuit so as to unduly prejudice CMOBC's ability to defend itself against these claims.[75] This Court has previously rejected CMOBC's laches defense and this ruling will not be disturbed. 494 F.Supp. at 1158. Any allegation that the witnesses' memories would be unduly dimmed by the passage of time has no bearing in a case timely filed under the applicable statute of limitations.

Finally, CMOBC argues that several evidentiary rulings were erroneous and require a new trial to rectify the resulting prejudice.[76] Some of these contentions are clearly specious—such as that relating to denial of permission to read to the jury newspaper articles that had been admitted on the condition they would not be read. None of the alleged errors, taken individually or collectively, affect substantial rights as to warrant a new trial.

Pursuant to Fed.R.Civ.P. 61 and Fed.R. Evid. 103(a), none of CMOBC's contentions separately or collectively transcends the level of harmless error. As such, a new trial is not warranted and CMOBC's motion for new trial will be denied.

## VI. *Rose Hall's Motion for Judgment Notwithstanding the Verdict, or, in the Alternative, for New Trial*

Having considered all of CMOBC's motions and granted the motion for judgment notwithstanding the verdict on the only issue upon which the jury found CMOBC liable—the fraud issue—the Court now turns to those issues raised by Rose Hall in its post-trial motion. Rose Hall argues that CMOBC "controlled" Chase Jamaica's action with regard to the allegedly "cheap" sale of the collateral and the loss of the so-called interference claim against Holiday Inns.[77] This section of the opinion will consider three distinct aspects of Rose

---

**74.** The two interrogatories were presented to Judge Steel by letter dated March 3, 1983 and in one of CMOBC's pretrial submissions. (Dkt. 525, ¶¶ 13, 14). CMOBC objected to the omissions relating to its affirmative defenses. (Dkt. 856, Tr. 15,445–46).

**75.** At a pretrial conference, the Court stated that CMOBC's laches defense would be presented to the jury. (Dkt. 579 at 70–71). It is unexplained as to why the Court made that ruling in the first instance in light of its prior opinion.

**76.** The rulings concern: first, the exclusion of Court Ex. 1 (Department of State cable describing conditions in Jamaica); second, exclusion of the deLisser affidavit; third, admission of Nunes affidavit (PX 685); fourth, admission of hindsight testimony on valuation; fifth, admission of the Robinson testimony as an expert legal witness; sixth, exclusion of the Patrikis letter (Court Ex. 38 relating to the Edge Act); seventh, exclusion of CMOBC's expert's report regarding valuation; eighth, denial of right to read hundreds of previously admitted newspaper articles to the jury; ninth, restriction of cross-examination of plaintiff's witness regarding replacement costs; tenth, refusal to give curative instructions that two slides showed beach that was not part of the 3000 acres; eleventh, exclusion of approximately eleven CMOBC exhibits; and twelfth, admission of two of plaintiff's exhibits.

**77.** Interrogatory Nos. 1, 2, 3, *supra* p. 118.

Hall's arguments: first, that CMOBC's liability for Chase Jamaica's actions is established as a matter of law by certain provisions of the Edge Act, 12 U.S.C. § 611–632, which mandate control; second, that under the Edge Act, CMOBC is presumed to have controlled Chase Jamaica and this presumption was not rebutted; and third, that independent of the Edge Act, sufficient evidence was adduced to establish that CMOBC controlled Chase Jamaica's actions. Rose Hall raises two conditional arguments regarding issues that should be considered in any grant of a new trial. These arguments will be discussed in the final portion of this section.

### A. Control as a Matter of Law: Rose Hall's Edge Act Theory

In 1919, Congress amended the Federal Reserve Act to allow national banks to establish subsidiaries to engage in interna-

tional banking and finance. These subsidiaries were to be federally chartered and became known as "Edge Act corporations," named after the drafter and proponent of the legislation, Senator Walter Edge. CMOBC, a wholly owned subsidiary of Chase Manhattan Bank, N.A., is a federally chartered Edge Act corporation and has designated Newark, Delaware as its home office.[78]

Under the terms of the statute, Edge Act corporations may directly engage in foreign banking or finance operations or they may establish foreign branches, agencies or subsidiaries to carry on such business. 12 U.S.C. § 615. In effect, Edge Act corporations may become a type of holding company for entities engaging in international and foreign banking. Chase Jamaica, a wholly owned subsidiary organized under Jamaican law, is such an entity.[79]

**78.** It is important to put Edge Act corporations into the proper historical perspective. Prior to 1913, American banks generally were prohibited from engaging in activities outside the United States. In 1913, Congress enacted the National Banking Act which amended section 25 of the Federal Reserve Act. Act of Dec. 23, 1913, § 25, 38 Stat. 251, 273 (1913), 12 U.S.C. §§ 601–604. This legislation granted national banks the power to establish foreign branches, to engage in certain transactions arising out of foreign trade, and to act as fiscal agents of the United States, if required. In 1916, the National Banking Act was amended to authorize national banks to invest in the stock of a bank or corporation chartered under either federal or state law and "principally engaged in international or foreign banking ... either directly or indirectly through the agency, ownership, or control of local institutions in foreign countries." Act of Sept. 7, 1916, 36 Stat. 752, 755–56 (1916), 12 U.S.C. § 601. These corporations could be formed only under state law and approval of the Federal Reserve Board of Governors was required for national banks to acquire stock in these state-chartered corporations. As such these became known as "agreement corporations."

Few agreement corporations were formed and, in an effort to stimulate and facilitate trade with Europe after the First World War, Congress temporarily amended the Federal Reserve Act by adding section 25a to provide for investment in either banking or financing operations. Act of September 17, 1919, 41 Stat. 285–86 (1919), 12 U.S.C. § 601. Later in 1919, Congress promulgated the Edge Act which granted permanent authority to national banks to participate in banking or financing corporations. The

Edge Act brought these financing and banking corporations under more direct supervision of the Federal Reserve Board of Governors by authorizing their incorporation under federal charter.

Under these two legislative schemes—the National Banking Act and the Edge Act—two types of corporations have evolved: first, state chartered agreement corporations; and second, federally chartered Edge Act corporations.

For a further discussion of the Edge Act and its interplay with the National Banking Act, see J. Baker & M. Bradford, *American Banks Abroad: Edge Act Companies and Multinational Banking* (1974); Cobb, *A Shot in the Arm for Edge Act Corporations,* 97 Bank.L.J. 236 (1979); Kelly, *Edge Act Corporations After the International Banking Act and New Regulation K: Implications for Foreign and Regional or Smaller Banks,* 20 Va.J.Int'l L. 37 (1979); McGuire, *The Edge Act: Its Place in the Evolution of International Banking in the United States,* 3 Law. of the Am. 427 (1971); *Note: A Constitutional and Statutory Analysis of State Taxation of Edge Act Corporate Branches,* 51 Ford.L.R. 991 (1983); Wiley, *Edge Act Corporations—Catalysts for International Trade and Investment,* 16 Bus.Law. 1014 (1961).

**79.** CMOBC conducts international business through various entities including subsidiaries, affiliates, and branches. Branches are offices of the Edge Act corporation located outside the United States, whereas affiliates are direct or indirect subsidiaries in which the Edge Act corporation has less than a controlling interest. 12 C.F.R. § 211.3(a) & (g). Similarly, subsidiaries

Rose Hall focuses upon three provisions of the Edge Act to argue that CMOBC, as a matter of law, controlled the actions of Chase Jamaica. As such, Rose Hall asserts that it need not establish the predicates for conventional disregard of corporate entities as between Chase Jamaica and CMOBC because the statute has already done so. First, section 611 provides that corporations may "be organized for the purpose of engaging in international banking or foreign banking ..., either directly or through the agency, ownership or *control* of local institutions in foreign countries." 12 U.S.C. § 611 (emphasis added).

Second, section 615 allows an Edge Act corporation, with the consent of the Federal Reserve Board of Governors, to: first, "establish and maintain for the transaction of its business branches in foreign countries," 12 U.S.C. § 615(b); and, second, to purchase and hold stock ... in any corporation organized under the [Edge Act] or under the laws of any foreign country. 12 U.S.C. § 615(c). Chase Jamaica is such a local institution within the purview of section 615(c). Thus, an Edge Act corporation need not utilize an instrumentality to engage in foreign banking; rather, it may also directly engage in such transactions. *See* 12 U.S.C. §§ 611, 615(a).

Finally, the jurisdictional section of the Edge Act, which was added in 1933, provides:

[A]ll suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking .... either directly or through the agency, ownership, or con-

trol of branches or local institutions ... in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits.

12 U.S.C. § 632.

Judge Steel, in ruling on CMOBC's motion for summary judgment, stated by way of dicta that if the Edge Act corporation established a foreign branch or agency, it would be liable for the actions of either entity. *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 494 F.Supp. 1139, 1154 (D.Del.1980). CMOBC apparently concurred with this conclusion. *Id.* at 1154 n. 19. The opinion went on to address the question of Edge Act corporation liability for actions of subsidiaries and stated: "If an Edge Act corporation should do business in a foreign country through the acquisition of stock in a 'local institution' control of the Edge Act corporation over the local institution is a mandated prerequisite to its organization." *Id.* at 1154–55. Rose Hall misconstrues this statement by characterizing it as a holding that the Edge Act, as a matter of law, renders the Edge Act corporation liable for its subsidiary's actions under all circumstances. In actuality, the Court deferred a holding on this question and was simply establishing the predicate for the holding addressed in the next section of its opinion: that the Edge Act erects a presumption of control by the Edge Act parent of major actions taken by the subsidiary. *See infra* pp. 166–169.

Despite an exhaustive search through the legislative histories of the various parcels of legislation making up the Edge Act and the National Banking Act,[80] a review

---

are organizations which are more than 50 percent owned by the Edge Act corporation or "otherwise capable of being controlled by the investor or an affiliate of the investor." *Id.*, at § 211.3(p).

**80.** The language "directly or through the agency ownership or control of local institutions in foreign countries" which appears in sections 611 and 632 of the Edge Act had its genesis in the 1916 amendment to the National Banking Act. *See supra* note 78. Under the National Banking

Act, courts have held that a parent bank is not liable for the actions of its branches because the deposits of branches must be kept separate from those of the parent pursuant to statute. *Pan American Bank & Trust Co. v. National City Bank*, 6 F.2d 762 (2d Cir.1925), *cert. denied*, 269 U.S. 554, 46 S.Ct. 18, 70 L.Ed. 408 (1925); *In re Harris*, 27 F.Supp. 480 (S.D.N.Y.1939). Judge Steel considered these cases inapplicable for two reasons: first, the National Banking Act contains specific statutory provisions which are not duplicated in the Edge Act; and second,

of the handful of cases which even mentions the Edge Act, and a search for analogous statutory schemes, the Court has failed to uncover a kernel of support for plaintiff's novel theory. In its exhaustive briefing of this issue, the plaintiff basically relies on four arguments to support its theory: first, the aforementioned statutory language; second, a prophylactic statement that "[e]arlier in this case we made a complete study of the legislative history of relevant sections of the Federal Reserve Act governing international and foreign banking (including, most importantly, the Edge Act), and satisfied ourselves that what legislative history there is supports our construction of the statute and particularly 12 U.S.C. § 632;" [81] third, a refutation of CMOBC's citations to the legislative history; and fourth, a generalized argument based upon perceived policies of the Edge Act. These arguments will be treated in reverse order.

Rose Hall argues that the Edge Act must mandate control because the United States has a strong interest in ensuring that foreign subsidiaries of Edge Act corporations engage in proper banking procedures in order to maintain the reputation of American banks abroad. Despite this laudatory goal, neither the statute, the legislative history, nor the structure of the international banking system supports plaintiff's position. Banking regulation is more pervasive in the United States than in most other countries. *See* Carswell, *Influence of International Banking on Bank Regulations in the United States*, 3 J. of Comp.Corp. L. & Sec.Reg. 363 (1981). Exportation of United States law and regulation to foreign subsidiaries could place those subsidiaries at a competitive disadvantage. Such an effect would directly contravene the purposes of the Edge Act.[82]

Additionally, Congress expressly disavowed attempts to export United States law to foreign subsidiaries. During hearings on the bill, Federal Reserve Governor William P. G. Harding, in addressing whether Edge Act corporations should be permitted to receive deposits in the United States, noted:

> What they can do in foreign countries, of course, depends upon the laws or regulations of foreign countries. A foreign country may impose some limitations upon them which would make it unprofitable to receive deposits there, but I think we ought to have them on the same footing as every other foreign corporation with which they come in competition.

*Amendment to Federal Reserve Act: Hearing Before the Committees on Banking and Currency of the House of Representatives on S. 2472*, 66th Cong., 1st Sess. 21 (1919) [hereinafter *House Hearings*]. Plaintiff argues that this statement should be confined to the ability to receive foreign deposits and portends nothing more. (Letter from Paul P. Welsh, Esq. to Hon. Murray M. Schwartz, July 11, 1983, pp. 2–3). Whether the local regulation noted above relates to deposits or any other aspect of banking regulation, Congress clearly intended that local regulation would govern the actions of Edge Act corporations and their subsidiaries abroad.

Rose Hall also argues that the United States has a strong interest in ensuring proper banking operations when either Edge Act corporations or foreign subsidiaries operate in nations where regulation is lax. Such an argument in favor of the export of United States law represents not only a form of legal imperialism but also embodies the essence of sanctimonious chauvinism. In effect, plaintiff argues "we

---

neither case involved the issue of whether the parent bank was required to control its wholly owned foreign subsidiaries.

**81.** Letter from Paul P. Welsh, Esq. to Hon. Murray M. Schwartz, July 11, 1983, p. 1.

**82.** In 1978, Congress promulgated the International Banking Act of 1978 which, in part,

amended the Edge Act and added that the congressional purpose of the Edge Act is "to provide for the establishment of international banking and financial corporations operating under federal supervision with powers sufficiently broad to enable them to compete effectively with similar foreign owned institutions in the United States and abroad." 12 U.S.C. § 611a.

must regulate for the world because the world is too weak to do what is necessary." While admittedly some host countries do not take their regulatory responsibilities seriously, the correct answer to such a situation is not the extraterritorial application of United States law but rather cooperation between home and host country regulatory authorities. As one commentator has recently suggested:

A few years ago it was quite normal to think that the authority which supervised a parent bank was entirely responsible for supervising all its direct activities abroad—lending directly abroad, and so on. To a certain extent, it also supervised foreign branches, although there were some exceptions, because branches were already being supervised in the host countries. It was admitted, however, that subsidiaries were the concern of the local authorities only, and not the concern of the parent.

It is only a relatively recent development to admit—and quite rightly, of course—that economically a subsidiary is very similar to a branch. It has not made sense for the parent's authority to supervise a branch and to forget about the subsidiary.

* * * * * *

Surely, the principle of supervision of these entities by the parent's authority is not universally acknowledged today. In some countries there is still a lack of legal basis for consolidated worldwide supervision by its parent['s authority] . . . . But in more and more countries, the legal basis exists and the will of the supervisory body is also present.

There are, of course, technical difficulties in supervising foreign operations.

The host country also provides supervision—local supervision—for the branch or subsidiary. Certainly, the aim is not just to have additional competitive, and excessive supervision of the same banking operation. Rather, the idea is to develop rational cooperation between two institutions to verify the conditions of their subsidiaries. I think that submission to the supervisory authority of the parent country is necessary in order to have an overall view of the whole banking group. Being able to see it in a comprehensive form, the parent [authority] can apply at least some control to the whole of the banking group.

Hirsch, *Supervising Multinational Banking Organizations: Responsibilities of the Home Country*, 3 J. of Comp.Corp.L. & Sec.Reg. 238, 240 (1983). It should be noted that while subsidiaries and branches may be economically very similar, they already enjoy a separate legal status that forms the foundation of corporate law.

Regulation, however, is entirely distinct from parental control, as a matter of law, of a subsidiary's actions. In fact, Regulation K of the Federal Reserve Board, which applies to Edge Act corporations, provides for supervision by the Edge Act corporation of foreign branches and subsidiaries to ensure conformity with "high standards of banking and financial prudence." 12 C.F.R. § 211.7(a).[83] Such supervision, however, is not tantamount to control. It simply serves an informational and regulatory purpose to ensure the financial health of the Edge Act corporation.

Rose Hall has failed to adduce one iota of legislative history in support of its assertion that the Edge Act mandates control

---

**83.** The relevant portion of the regulation reads:

(a) *Supervision.* (1) Investors shall supervise and administer their foreign branches and subsidiaries in such a manner as to ensure that their operations conform to high standards of banking and financial prudence. Effective systems of records, controls, and reports shall be maintained to keep management informed of their activities and condition. Such systems should provide, in particular, information on risk assets, liquidity

management, and operations of controls and conformance to management policies. Reports on risk assets should be sufficient to permit an appraisal of credit quality and assessment of exposure to loss, and for this purpose provide provide [sic] full information on the condition of material borrowers. Reports on the operations of controls should include the internal and external audits of the branch or subsidiary.

over *all* actions of foreign subsidiaries, thereby establishing the responsibility of CMOBC for the actions of Chase Jamaica. CMOBC has been placed in the difficult position of demonstrating a negative—that the Edge Act does not mandate control. In support of its difficult task of demonstrating an unarticulated negative congressional purpose, CMOBC has cited several passages of the legislative history. Plaintiff has been content to level salvos against these legislative constructions as if it did not have the burden of conclusively establishing some rational basis for its novel theory. On the whole, the legislative history is unhelpful. In addition to the statement by Governor Harding, *supra* p. 163, there are few instances where branches and subsidiaries are even mentioned.[84] The totality of the legislative history reflects a concern that the acquired or formed "local institutions" be engaged in banking rather than some commercial operations that would compete with domestic concerns. Similarly, Congress recognized and sought to preserve the fundamental legal distinction between branches and wholly owned subsidiaries that, in the former case, the entity is part of the parent bank while the latter reflects separate and distinct corporate entities even though the subsidiary may be controlled through stock ownership and thereby voting power. The legislative history fails to provide any indication that subsidiaries of Edge Act corporations should be treated any differently than subsidiaries of any other corporation. As such, there is no indication that Congress intended to, in effect, automatically disregard the corporate status of Edge Act corporations and their foreign subsidiaries. Rather, by recognizing the possibility of establishing foreign subsidiaries, Congress

---

**84.** The following constitute some of the salient points in the legislative history. Rep. Platt stated during the debate on the Edge Act:

> The Federal Reserve Act, in section 25, first gave our national banks a chance to compete with something approaching equal terms by providing that banks with a capital and surplus of a million dollars or more might establish foreign branches. When a bank establishes a branch, however, it risks all of its capital in that branch—the branch is part of itself—and very few banks felt strong enough to do this.

*Congressional Record,* House 7855 (Nov. 1, 1919). Plaintiff argues that this simply reflects an intent to insulate the parent bank, here Chase Manhattan Bank, N.A., from liability of its Edge Act subsidiary's, here CMOBC's, actions and does not reflect an intent to protect the Edge Act corporation from the actions of its subsidiaries. This position could well be correct, but does not advance the inquiry before the Court.

During the Hearings on the Edge Act the following colloquies occurred:

> Mr. Wingo. I notice that you provide that these corporations shall engage in these banking or other financial operations either directly or through the agency, ownership, or control of local institutions in foreign countries, or in such dependencies or insular provisions as provided by this section. Is it your idea that the local institution will be limited to banking institutions, or would they include—
> Mr. Harding. No, limited to banking institutions.

> Mr. Wingo. Do you catch what I mean, that we could either make a foreign bank our agency, or we could control it through a majority of its stock, or we could own it outright? Would it be a banking institution over there, or a commercial institution?
> Mr. Harding. Let me explain that to you. Some banks have established their own branches in foreign countries where they own the whole thing. Under their charter they can establish branches in foreign countries, as they have done in Venezuela, for instance, and the United States of Columbia. They could establish a bank at Bogata, or Caracas, and that bank will be a separate, local organization; it will not be a branch. It will be a subsidiary rather than a branch having its own capital stock, and the parent bank will own a controlling interest in that bank.

*House Hearings, supra* p. 163, at 38. Similarly:
> Mr. Phelan. Permission apparently is given there to these corporations to hold stock in other similar corporations. Is that correct?
> Mr. Strauss. Yes.
> Mr. Phelan. What is the purpose of that?
> Mr. Strauss. In many cases it may be necessary for them to organize local corporations in other countries. Some of our banks operating in foreign countries now found it expedient to organize separate banks, one in Peru, one in Nicaragua, the parent bank in this country acting as a holding company in respect to the shares of the bank in that particular country. They want local directors; they want to make the institution, as far as possible, take on a local color.

*Id.* at 64.

implicitly recognized the attendant legal distinction between parent and subsidiary.

 Having dispelled the majority of plaintiff's arguments, only the language of the statute remains. The arguments as to each of the three statutory provisions are easily dispelled. First, section 611, with its "directly or through the agency ownership or control of local institutions in foreign countries" language, simply reflects the aforementioned recognition of the subsidiary as an independent corporate entity subject to its parent's control through ownership. It does not render the subsidiary part of the parent in the same manner as a branch. Second, section 615(c) which recognizes the power to purchase the stock of foreign corporations, simply allows the Edge Act corporation to establish subsidiaries—it does not remove the legal distinction between the corporate entities.[85] Finally, section 632, see supra p. 162, is simply a jurisdictional provision; it does not, by its own terms, disregard the separate corporate status of CMOBC and Chase Jamaica. Only if the circumstances justify ignoring corporate entities, a subject addressed infra, can liability be imposed. Section 632 simply provides Rose Hall a forum to determine if the circumstances warrant a finding of whether the separate corporate status of CMOBC and Chase Jamaica should be disregarded.

 In summary, the Edge Act does not impose liability on CMOBC for Chase Jamaica's actions as a matter of law. The structure of the Edge Act allows Edge Act corporations to transact business through foreign subsidiaries—a prerogative exercised by CMOBC. The Court now turns to the factual question of whether CMOBC did, in fact, control Chase Jamaica's actions

with respect to the sale of the land and the loss of the interference claim.

### B. *The Presumption of Control Under the Edge Act*

In denying CMOBC's motion for summary judgment which alleged the unavailability of a cause of action against CMOBC based upon the Edge Act, Judge Steel found that the Edge Act erected a presumption of control by CMOBC of major actions taken by Chase Jamaica. *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.*, 494 F.Supp. at 1155. Further, the Court found that the loan to Rose Hall and subsequent foreclosure and sale could constitute major actions that would be subject to the control of CMOBC. *Id.* Rose Hall argues in its motion for judgment notwithstanding the verdict, or, in the alternative, for new trial, that: first, the presumption cannot be rebutted because it is conclusively established; and second, that CMOBC failed to rebut this presumption of control, *i.e.*, there was a failure of proof to support the jury's finding in answer to Interrogatory No. 3,[86] that CMOBC did not control either the sale of the land or the loss of the interference claim pursuant to the Edge Act theory. On its part, CMOBC tenders several arguments: first, that Judge Steel's opinion was incorrect because the Edge Act presumes only voting control of subsidiaries; second, that Judge Steel's instructions to the jury were erroneous on this question; and third, that no evidence supports overturning the jury's determination of no control.

Judge Steel did not adopt plaintiff's argument that the Edge Act erects an irrebuttable presumption of mandated control;[87] instead he found that the Edge Act erects a rebuttable presumption of mandat-

---

85. CMOBC argues that section 615(c) limits equity participation in such a foreign corporation to ten percent of the Edge Act corporation's capital and surplus (fifteen percent if the foreign corporation is engaged in banking as opposed to financing) and thus exhibits an intent to limit the Edge Act parent's liability. Since the Edge Act corporation could own one hundred percent of the foreign subsidiary as long as

the investment did not exceed the ten or fifteen percent maximum of its own capital and surplus, no such intent is evident. Section 615(c) seeks only to diversify risks, not limit liability.

86. *See supra* p. 121.

87. This Court has also rejected this argument. *See supra* pp. 161–166.

ed control. Since the jury found no control, the Court need not address the correctness of Judge Steel's ruling unless the Court concludes that a reasonable jury could not have found that the presumption had been rebutted on the basis of the evidence presented at the trial.[88] With regard to plaintiff's new trial motion, the Court must determine if the verdict was against the clear weight of the evidence, even if judgment notwithstanding the verdict could not be entered. *See supra* pp. 124–125.

Rose Hall's principal argument is that control under the Edge Act is conclusively presumed and CMOBC may not rebut the presumption because it may not argue that it, in effect, violated the Edge Act by failing to control Chase Jamaica.[89] Plaintiff's

**88.** As has been previously noted, this Court, sitting as a successor judge, may review the rulings of Judge Steel and reverse those rulings if erroneous and material. *See supra* pp. 125–126. Judge Steel found that the Edge Act mandated control of foreign subsidiaries in major policy decisions and actions. Thus, reasoned Judge Steel, the Edge Act corporation, CMOBC, was legally required to control the major actions of the foreign subsidiary, Chase Jamaica. 494 F.Supp. at 1154–56. Judge Steel recognized that his ruling might have to be revisited. (Dkt. 819, Tr. 8372, 8383, 8387–88). It is perhaps helpful to view the issue of control under the Edge Act as a continuum with plaintiff's irrebuttable presumption of mandated control and CMOBC's contention of ordinary voting control at opposite ends. Given the supervision requirements of Regulation K, promulgated under the Edge Act, which impose supervision requirements greater than those imposed by ordinary voting control, CMOBC's position would appear untenable. Both Judge Steel and this Court have rejected Rose Hall's equally extreme position. Nonetheless, at least three alternative positions along the continuum are evident. One position is embodied in Judge Steel's construction that the Edge Act legally requires control of major actions. The presumption that the Edge Act corporation complied with this legal requirement may be rebutted if the action was merely within the normal day-to-day operation of the subsidiary and therefore outside the realm of major decisions of policy and actions taken to implement them or that the Edge Act corporation violated the law. Since the transactions at issue here are undoubtedly "major actions," the jury effectively found that CMOBC violated the Edge Act by not exercising the mandated control. A second construction raises a presumption that the Edge Act corporation controlled the major actions of its subsidiary but is not legally obligated to do so. A third position is that under Regulation K the Edge Act corporation is only required to supervise its subsidiaries and that a plaintiff may prove, without the benefit of a presumption, that the Edge Act corporation in fact controlled the specific actions of its subsidiary. Obviously, the first construction imposes a more onerous burden upon the defendant than either the second or third. In this sense, Judge Steel utilized a plaintiff-favoring interpretation of the Edge Act and, despite this, the jury found that CMOBC did not

control the actions of Chase Jamaica. In light of the jury's verdict, the Court need not decide which, if any, of the various positions along the continuum of control is the proper interpretation of the statute because the interpretation, even if erroneous, is not material. Nonetheless, Congress has specifically devised statutory schemes embracing the second interpretation which raises a rebuttable presumption of control. The anti-boycott provisions of the Export Administration Act provide explicitly for such a presumption. *See* 50 U.S.C. § 2407 (prohibits U.S. persons from complying with restrictive trade boycotts); 50 U.S.C. § 2415 (U.S. person defined as including "any foreign subsidiary or affiliate ... of any domestic concern which is controlled in fact by such domestic concern as determined under regulation of the President."); 15 C.F.R. § 369.1(c) (defines "controlled in fact" as presumed, subject to rebuttal, when parent owns more than 50 percent of the securities, or a lesser percentage if the same constitutes de facto control, or otherwise controls the day-to-day operations of the subsidiary); *see also* 15 U.S.C. § 78g(f)(2)(C) (foreign persons controlled by U.S. person for purposes of margin requirements includes subsidiaries where the parent holds more than fifty percent of the voting shares). The Edge Act, albeit drafted at an earlier time, does not expressly provide for such a presumption. Regulation K avoids any requirement other than that of supervision. As such, it is arguable the most appropriate interpretation would appear to be the third interpretation—that the Edge Act requires the Edge Act corporation to supervise its foreign subsidiaries but that a plaintiff bears the burden of demonstrating that control of specific actions actually occurred. This construction is analogous to the issue of control independent of the Edge Act discussed *infra*.

**89.** Judge Steel gave the following instruction to the jury on this point:

CMOBC is a federally ·chartered banking corporation, of a type called an "Edge Act Corporation." It has the power to engage in international or foreign banking or financial operations directly or through the agency, ownership or control of local institutions in foreign countries.

When an Edge Act Corporation like CMOBC does business in a foreign country through

attempt to erect a Catch-22 situation where CMOBC must argue that it violated the Edge Act in order to rebut the presumption and that it is estopped from so arguing, suffers from two flaws: first, plaintiff's argument effectively transforms the rebuttable presumption into an irrebuttable presumption;[90] and second, there is no rational basis for estopping CMOBC from making this argument.[91]

■ Rose Hall also appears to argue that it adduced sufficient evidence at trial to support a finding of control,[92] based solely upon "CMOBC's binding admissions, in its own documents and the testimony of its directors and other witnesses." (Dkt. 771, p. 14). As such, under any construction of Fed.R.Civ.P. 63, a new trial is not mandated because weighing of credibility is not involved. Rather, this Court need only assess the evidence to determine if either judgment notwithstanding the verdict or a new trial should be granted. Moreover, even if the credibility of witnesses were

involved, it would not require automatic grant of a new trial. *See supra* p. 125.

CMOBC presented overwhelming and uncontradicted evidence that it exercised no control over the administration or collection of the Rose Hall loan and that it did not participate in any fashion in the Jamaican action.[93] In the face of this evidence, Rose Hall relies solely upon two Chase Manhattan Bank, N.A. manuals—the Credit Policy Guide (PX–323) and the Organization & Policy Guide (PX–324)—to support the presumption that CMOBC, or some other Chase entity, controlled the actions of Chase Jamaica.[94] Rose Hall submitted a detailed fourteen-page single-spaced memorandum describing the various portions of the Manuals dealing with control of subsidiary operations. *See* Letter from Paul P. Welsh, Esq. to Hon. Edwin D. Steel, Jr. (Nov. 30, 1982) (attached as Appendix B to Dkt. 772).[95] These manuals simply reinforce and reflect compliance with Regula-

ownership in a local institution such as Chase Jamaica, control of the Edge Act Corporation over the local institution is mandated by federal law. This control extends to major policy decisions and actions.

If you find from the evidence that Chase Jamaica's sale of the Rose Hall land and the Rose Hall (H.I.) shares was made pursuant to such a major policy decision, then it is presumed that such decision was controlled by CMOBC. Although the presumption is not evidence, it shifts the burden of proof so that, as to this issue, CMOBC has the burden of showing by a preponderance of the evidence that Chase Jamaica acted independently with respect to such decision.
Dkt. 858, Tr. 15,537–38.

**90.** Such a transformation directly contravenes this Court's rejection of the theory that the Edge Act imposes control as a matter of law. *See supra* pp. 161–166; *See also* 494 F.Supp. at 1155.

**91.** Plaintiff cites several cases concerning this estoppel argument which basically represent an exposition of the equitable doctrine of "clean hands." These cases, however, are inapposite because it is Rose Hall, not CMOBC, that has invoked the equitable powers of this Court.

**92.** As plaintiff apparently concedes, the evidence must be viewed in the light most favorable to the non-moving party in disposing of motions for a new trial or judgment notwith-

standing the verdict. (Dkt. 772, p. 1, ¶ 3); *see also Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).

**93.** *See* Dkt. 809, Tr. 6460–61, 6560, 6573–74 (Giberga testimony); Dkt. 811, Tr. 6818–19, 6871 (Brown testimony); Dkt. 813, Tr. 7236, 7293, 7315, 7343–44 (Brown testimony); Dkt. 819, Tr. 8364–65 (Leonard testimony); Dkt. 821, Tr. 8654 (Judah testimony); Dkt. 823, Tr. 9037 (Hill testimony); Dkt. 834, Tr. 11,220, 11,223 (Sigarreta testimony); Dkt. 836, Tr. 11,524–27 (Mason testimony).

**94.** Rose Hall relies upon the testimony of Francis X. Stankard, CMOBC's Chief Executive Officer, for the point that all Chase subsidiaries, including Chase Jamaica, were expected to act in accordance with the manuals. (Dkt. 834, Tr. 11,125–26). Mr. Stankard also testified, however, that these manuals were only general policy statements and were neither intended nor sufficient to govern day-to-day operations. (Dkt. 834, Tr. 11,166).

**95.** CMOBC objected to the admission of the manuals as irrelevant pursuant to Fed.R.Evid. 401, 402. *See* Letter from Charles S. Crompton, Jr., Esq. to Hon. Edwin D. Steel, Jr. (Nov. 15, 1982). Plaintiff's November 30 letter responded to these relevancy objections and Judge Steel admitted the manuals.

tion K.[96] *See* Dkt. 795, Tr. 3359 (Leonard testifying that manuals used to comply with Regulation K). The manuals do not, in and of themselves, support a finding that CMOBC controlled the particular actions at issue. The jury found that CMOBC effectively rebutted the presumption of control and *no* evidence contradicts CMOBC's evidence that it did not control Chase Jamaica's specific actions. Consequently, neither plaintiff's motion for judgment notwithstanding the verdict nor for a new trial will be granted on this ground.

### C. *Control Independent of the Edge Act*

As noted, in Interrogatory No. 3 the jury was asked to determine whether CMOBC controlled Chase Jamaica's major decisions and acts relating to the sale of the Rose Hall land and shares and the loss of the alleged interference claim. Control could be premised either upon the previously discussed Edge Act theory or, upon an alternative theory of liability, independent of the Edge Act. Judge Steel gave the following instructions to the jury relating to control independent of the Edge Act:

As I have mentioned, CMOBC owns all the stock of Chase Jamaica. Chase Manhattan Bank, N.A. owns all the stock of CMOBC, and also owns all the stock of Chase Manhattan Overseas Corporation ("CMOC"). The Chase Manhattan Corporation owns all the stock of Chase Manhattan Bank, N.A.

Each of these corporations is separately chartered. In the eyes of the law, a corporation is an individual person, with its own property, liabilities, rights and duties that are distinct from those of its shareholders.

One corporation's mere ownership of all the stock of another does not in itself subject the owning or parent corporation to liability for wrongs of the owned or subsidiary corporation. However, under certain circumstances, an owning or parent corporation can be held responsible for wrongs of its subsidiary.

Rose Hall contends that such circumstances exist here. With one exception I will point out, Rose Hall has the burden of showing the existence of such circumstances by the preponderance of the evidence.

A parent corporation may, without thereby being responsible for the actions of its subsidiary, exercise its power of stock ownership to elect, as directors of its subsidiary, persons identified with the parent who may be expected to exercise their powers as directors to run the subsidiary.

However, the parent must respect the subsidiary's corporate offices and structure, and must permit its decision-making to be done in a proper and regular way under the subsidiary's charter and bylaws. In Jamaica, Chase Jamaica's charter and bylaws are called its Memorandum and Articles of Association.

A parent corporation may be liable for the wrongs of its subsidiary if it controls the subsidiary in the commission of those wrongs or if it causes that subsidiary to be controlled from outside itself, as to major policy decisions and actions as to those wrongs, and without regard to the subsidiary's corporate offices and structure.

This outside control must amount to complete domination of the subsidiary's major policy decisions and actions so that the subsidiary at the time had no separate mind, will, or existence of its own.

For purposes of this principle, it would not matter whether CMOBC exercised control over Chase Jamaica directly by CMOBC itself, or indirectly by Chase Manhattan Bank, N.A. and/or CMOC. In either event, if you find that CMOBC

---

**96.** Section 211.7(a) of Regulation K, *see supra* note 83, requires Edge Act corporations to supervise their subsidiaries and to ensure compliance with sound banking policies. Regulation K specifically requires the Edge Act corporation to develop systems to provide "information on ... conformance to management policies." 12 C.F.R. § 211.7(a). It should be noted that the requirement is for *information* regarding compliance with policy rather than control to ensure compliance.

controlled Chase Jamaica in a way that disregarded the subsidiary's corporate offices and structure, and that Chase Jamaica's major policy decisions and actions involved in this lawsuit were thus taken in disregard of Chase Jamaica's corporate offices and structure, then you should find CMOBC liable for the wrongs of Chase Jamaica.

(Dkt. 858, Tr. 15, 535–37).

The jury responded negatively to the question of control independent of the Edge Act and plaintiff seeks judgment notwithstanding the verdict or, in the alternative, a new trial on the basis that the evidence does not support the jury's verdict.

As with many of Rose Hall's contentions, its theories are not readily subject to discernment. Invocation of talismanic "equitable" principles appear to form the basic thrust of plaintiff's arguments. Nonetheless, the theories appear to break down into two general categories: first, an "indirect control" theory based upon the chain of command among the various Chase entities; and second, an "indirect control" theory based upon a formalistic argument that Chase Jamaica, through its managing director [97] Brown, could not have acted independently and since there is no evidence of action by the Chase Jamaica board, the action must, somehow, be attributed to CMOBC.

■ As to the first argument, the Court has previously discussed the lack of evidence supporting a finding that CMOBC controlled Chase Jamaica's specific actions at issue here in relation to the Edge Act theory. *See supra* pp. 167–169. These facts are equally applicable to the question of control independent of the Edge Act. This, however, does not end the inquiry because the jury was instructed that "it would not matter whether CMOBC exercised control over Chase Jamaica directly by CMOBC itself, or indirectly by Chase Manhattan Bank, N.A. and/or CMOC." (Dkt. 858, Tr. 15,537). This language is based upon the theory that CMOBC delegated, or deputized, its control of Chase Jamaica to either CMOC or Chase Manhattan Bank, N.A.[98] The jury responded negatively to Interrogatory No. 3 and implicitly found control by neither CMOBC nor Chase Manhattan Bank, N.A. nor CMOC. Rose Hall argues that CMOBC was simply a vehicle through which Chase Manhattan Bank engaged in international banking and that CMOBC in fact had no control function of its own. At least part of this contention is true—CMOBC is an Edge Act corporation established by its parent to engage in foreign banking. It does not necessarily follow, however, that even if CMOBC had no separate control function it is liable for Chase Jamaica's actions on the basis of an indirect control theory.

Rose Hall effectively argues that Chase Manhattan Bank controlled all of Chase Jamaica's actions and that CMOBC should thus be liable. This around the horn logic is novel at best. Adoption of this conten-

---

97. Under Jamaican law, a managing director is analogous to a chief executive officer in American parlance. The Articles of Association of Chase Jamaica provide that the directors of Chase Jamaica may appoint a managing director and "may entrust to and confer upon [him] any of the powers exercisable by them upon such terms and conditions and with such restrictions as they may think fit." PX 5, ¶ 109 at 33.

98. The genesis of the indirect control language is somewhat sketchy. It was included in the Proposed Pre-Trial Order (Dkt. 664, p. IV–7), and the Proposed Jury Instructions of Plaintiff Rose Hall Ltd. (Dkt. 764, pp. 47–48). This issue was discussed at the Third Pretrial Conference where Judge Steel recognized plaintiff's deputi-

zation theory but similarly recognized that CMOBC must have ultimately controlled the specific actions of Chase Jamaica. Judge Steel stated: "In substance there can be no liability on the part of [CMOBC] unless [CMOBC] controlled. Now, that control can be exercised by delegation to third parties, by either persons or corporations...." (Dkt. 579, p. 126). It should be remembered that plaintiff had to prove that CMOBC controlled the specific actions at issue, a finding of mere general control would be insufficient and the jury was so instructed. *See supra* note 46; *see also* 1 *Fletcher Cyclopedia of Corporations* § 43 (Perm.Ed.) (1982 Pocket Part) pp. 65–66 (control of specific transaction required to hold parent corporation liable for the actions of a subsidiary).

tion would allow a plaintiff to sue any member of a corporate family for the actions of another member of the corporate family. The Court need not pass on this contention because Rose Hall has failed to meet its burden of proving that Chase Jamaica was controlled from outside itself with respect to the specific actions and decisions involved herein.

Plaintiff relies on the manuals, PX 323 and PX 324, to establish that control of Chase Jamaica's actions existed outside Chase Jamaica. It is clear that the subsidiaries were expected to conform to the structure of the manuals regarding the administration of loans. As an example, any material change in the creditor status required prior approval of an officer with proper lending authority.[99] Morley, Conigliaro and Giberga, all officers of Chase Jamaica, had the requisite authority to approve Brown's actions with regard to the Rose Hall collateral. Although these individuals held offices in other Chase entities as well, the jury could and obviously did reasonably conclude that they were acting in their capacities as Chase Jamaica board and executive committee members. *See infra* p. 172. Plaintiff, therefore, failed to prove that Chase Manhattan Bank or any other Chase entity controlled Chase Jamaica in these specific matters. *A fortiori*, plaintiff has failed to prove that CMOBC indirectly controlled Chase Jamaica's specific actions at issue.

The record contains substantial evidence of general control of Chase Jamaica by various Chase entities. *See e.g.*, PX 332, PX 333, PX 365. At first blush this evidence would appear damning. It must be kept in mind, however, that this is only evidence of general control and bears no relation to the required showing of specific control of the actions at issue. Interrogatory No. 3, however, referred specifically to control of Chase Jamaica's sale of the collateral and the prevention of the interference lawsuit. *See supra* note 46. Plaintiff has failed to point the Court to any evidence of outside control of Chase Jamaica in the specific actions at issue which would warrant setting aside the jury verdict.[100]

The second argument raised by Rose Hall focuses upon the alleged non-observance of corporate formalities thereby indicating that Chase Jamaica's actions must be attributed to CMOBC. Rose Hall strenuously argues that Brown, Chase Jamaica's Managing Director, had no lending authority at the time of the sale of the Rose Hall land and shares. *See* PX 333. Thus, Brown was subject to control outside Chase Jamaica because he had to report to Giberga and others. The people to whom Brown reported—Giberga, Morley and Conigliaro—were, however, all members of the Board of Directors of Chase Jamaica.[101] While it is true that these individuals held titles in other Chase entities, this fact, in and of itself, does not support plaintiff's argu-

99. Material change includes foreclosure. PX 323, § IV.

100. Rose Hall made the argument to the jury that Chase Manhattan Bank controlled all of these banking entities and that their subsidiary status was ignored. (Dkt. 853, Tr. 14,896–900; Dkt. 856, 15,386–87). The jury, however, rejected this contention and the jury's verdict is neither against the clear weight of the evidence nor wholly unsupported by the evidence. It is not this Court's province to invade the jury's function and overturn its conclusion based upon the evidence before it.

101. Plaintiff argues that Sigarreta, a director of CMOC, who at the time was not on the Board of Chase Jamaica, was a supervisor to whom Brown reported. The evidence indicates, how-

ever, that Sigarreta was an assistant to Giberga in his capacity with CMOC, and provided services as an adviser to Chase Jamaica pursuant to a written agreement between CMOC and Chase Jamaica. (Dkt. 809, Tr. 6451–55). The jury reasonably could have found that Sigarreta was acting in his capacity as an advisor to Chase Jamaica. Furthermore, the uncontradicted testimony of Sigarreta states that he became a member of the Chase Jamaica board in October of 1976. (Dkt. 834, Tr. 11,208). Plaintiff also argues that since the Rose Hall loan was a criticized loan, *see supra* note 62, more stringent controls were placed upon review and administration of the loan. This argument misses the point, however, because, as plaintiff admits, Morley and perhaps Sigarreta had the requisite authority to review criticized loans. (Dkt. 772, p. A–17).

ment that CMOBC exercised control through those entities.

■■■ Rose Hall also argues that any consultations with members of the Chase Jamaica Board are not reflected in the minutes of Chase Jamaica and are therefore the actions of some other entity. CMOBC counters this argument by saying that the failure to keep minutes does not support the premise that the act did not occur; rather, the requirement of corporate minutes represents simply an evidentiary means to establish the evidence of corporate actions. CMOBC, however, misses the mark with this argument. The failure to keep minutes might constitute one indicia of support for a finding that corporate formalities were not observed and thus might provide some support for disregarding separate corporate entities, but this does not support a finding that Chase Jamaica's actions were controlled by CMOBC. Furthermore, Brown, Giberga, Morley and Conigliaro constituted the executive committee of Chase Jamaica and under the Articles of Association could exercise all of the Board's powers. *See* PX 5, ¶¶ 102–104 at 32; PX 365. While sufficient evidence exists to support a finding of indirect general control, the evidence does not support a finding of indirect specific control.[102] The verdict is not against the clear weight of the evidence and will not be disturbed.

In summary, plaintiff's motion for judgment notwithstanding the verdict or, in the alternative, new trial, must be denied in all respects. The Edge Act does not require a finding of control as a matter of law. Similarly, the evidence does not warrant overturning the jury's verdict that CMOBC suc-

cessfully rebutted the Edge Act presumption of control and that plaintiff failed to establish control independent of the Edge Act. Plaintiff, by failing to adduce any evidence of CMOBC's control of the specific actions taken by Chase Jamaica with respect to the Rose Hall collateral and the prevention of the interference claim, can satisfy neither the standard for judgment notwithstanding the verdict nor the standard for new trial.

## VII. *Rose Hall's Conditional New Trial Issues*

Rose Hall also argues that if a new trial is granted for any reason, two issues should be reconsidered and included in such a new trial. These issues are: first, Rose Hall's motion to amend the complaint to allege certain Jamaican law torts against Holiday Inns should be granted; and second, the amount of damages for the sale of the 3000 acres of land should be reassessed. These arguments are only conditional because they are premised on a grant of a new trial.[103] The Court has declined to grant a new trial, except in the event its grant of judgment notwithstanding the verdict is reversed, in which case there is a grant of new trial limited to the theory encompassed by Interrogatory No. 4. Nonetheless, in the hope of obtaining appellate court guidance should there be a reversal and in keeping with the spirit of Fed.R.Civ.P. 50(c), the Court will consider Rose Hall's contentions.

### A. *Rose Hall's Amendment to Allege Certain Jamaican Tort Claims Against Holiday Inns*

■■■ The original April 11, 1979 complaint in this action alleged liability on the

---

**102.** Plaintiff once again retreats to the manuals to support its general allegation. The same response is once again relevant. The manuals are simply generalized statements of policy and do not, in and of themselves and in the face of the testimony of CMOBC witnesses, justify overturning the jury's response to Interrogatory No. 3 that CMOBC did *not* directly or indirectly control Chase Jamaica's actions. Rose Hall also alleges that Chase Jamaica had no local lending authority of its own but rather all decisions had to be cleared with CMOC or Chase Manhattan Bank. This contention is supported by docu-

mentary evidence. (PX 332; PX 333). Nonetheless, the required approvals were obtained from Morley, Giberga and Conigliaro—all board and executive committee members of Chase Jamaica—and the jury could have, and obviously did decide that they were acting in their capacity as Chase Jamaica directors rather than in their capacities with other Chase entities. The Court will not disturb this jury finding.

**103.** Dkt. 772 at p. 22 and 31–32; Dkt. 775; Dkt. 869.

part of Holiday Inns premised upon three theories all involving conspiracy. Certain of these claims were considered barred on the basis of *res judicata* by the Georgia judgment. *See Rose Hall Ltd. v. Chase Manhattan Overseas Banking Corp.*, 494 F.Supp. 1139 (D.Del.1980), *modified*, 494 F.Supp. 1158 (D.Del.1980). Rose Hall amended its complaint on July 1, 1980 to conform with Judge Steel's ruling and to specifically allege a conspiracy between Chase Jamaica and Holiday Inns regarding the sale of the Rose Hall (H.I.) stock and the 3000 acres of land.[104]

Massive discovery proceeded and on October 9, 1981, Rose Hall moved to set the case for trial. (Dkt. 182). The Court denied this motion and set a March 31, 1982 discovery cut-off date. (Dkt. 197). After having moved for trial and after discovery was virtually complete, Rose Hall filed a Motion to Amend the complaint on January 11, 1982. (Dkt. 233). The amendment sought to assert Jamaican tort claims against Holiday Inns' alleging malicious falsehood, intimidation, and inducing another to commit an actionable wrong. *Id.*[105] The motion was denied from the bench (Dkt. 252), but *sua sponte* the Court granted reargument. (Dkt. 255). After a deluge of briefs and appendices,[106] Judge Steel denied leave to amend. *Rose Hall Ltd. v. Chase Manhattan Banking Corp.*, 93 F.R.D. 858 (D.Del.1982). (Dkt. 354, 381).

Plaintiff litigated its conspiracy theory against Holiday Inns and, having lost on that ground, it now seeks to resurrect its Jamaican tort claims. Rose Hall does not challenge the jury's verdict on the conspiracy claim in either its motion for judgment notwithstanding the verdict or new trial. Nor has Rose Hall provided any new argument not presented in the voluminous

briefs in support of the motion to amend. As such, this Court finds that Judge Steel properly denied the motion to amend and that ruling will not be disturbed. Since no new arguments have been presented, only a brief recitation of the basis for the denial of the motion is warranted.

It is axiomatic that motions to amend pursuant to Fed.R.Civ.P. 15(a) should be freely granted "when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). It is equally clear, however, that an amendment should be denied when the other party suffers undue prejudice or when there has been "bad faith or dilatory motives, truly undue or unexplained delay." *Heyl v. Patterson International, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir.1981).

Judge Steel found that an actual showing of bad faith was unnecessary in this case because the long delay in asserting the Jamaican tort claim was unexplained. 93 F.R.D. at 865. Judge Steel stated:

> In the instant case it is not necessary for the Court to find that plaintiff has acted in bad faith in seeking the amendment. It is clear that plaintiff has provided no satisfactory explanation for its long delay in filing its motion to amend. Undue delay which is not satisfactorily explained is equivalent to bad faith.

*Id.*

Rose Hall asserts that delay alone cannot support the denial of a motion for leave to amend. *Deakyne v. Commissioners of Lewis*, 416 F.2d 290, 300 n. 19 (3d Cir.1969). Plaintiff, however, misperceives the thrust of *Deakyne* and its application to this case. As Judge Steel found, this case was not one of simple delay. The delay was coupled with the clear and uncontroverted fact

---

**104.** The conspiracy claims in the Amended Complaint involved: first, Count I, conspiracy regarding the "cheap sale"; second, Count II, an admitted restatement of Count I (*see* Dkt. 44); and third, Counts IV and V, conspiracy to ensure Holiday Inns was not sued by Rose Hall (H.I.). (Dkt. 56). The conspiracy aspects of the case were submitted to the jury in Interrogatory No. 5. The jury answered Interrogatory No. 5

negatively thereby exonerating Holiday Inns from any liability.

**105.** These claims will be collectively referred to as "Jamaican torts."

**106.** *See* Dkt. 244, 247, 271, 271A, 282–287, 291–293, 318, 328.

of plaintiff's knowledge of the existence of a cause of action for the Jamaican torts and all of the facts underlying such a cause of action.[107] In light of the unexplained delay, the onerous burden placed upon Holiday Inns by a grant of plaintiff's motion justified the denial of leave to amend. This Court adopts Judge Steel's reasoning and reaffirms the holding that the unexplained delay [108] in filing the Jamaican tort claims is tantamount to bad faith and leave to amend properly was denied.[109]

### B. *Rose Hall's Dissatisfaction With the Jury Instruction Relating to Damages for the Sale of the 3000 Acres of Land*

Rose Hall contends that if a new trial is granted for any reason, the jury should be instructed differently as to amount of damages for the sale of the 3000 acres of land. Judge Steel gave the following instruction to the jury:

> If you have answered "Yes" to Question 1., the measure of damages is the difference between the actual price realized and what the best available price would have been if Chase Jamaica had acted in good faith without reckless disregard for the interests of Rose Hall, Ltd., taking reasonable precaution to obtain the best available price and to avoid unreasonable sale of excess collateral.

This is so regardless of what your answer is to question [3, 4 or] 5.

(Dkt. 858, Tr. 15,548–49). Judge Steel also instructed the jury that "In exercising its power of sale, a bank owes a duty to its borrower to act in good faith, and not in reckless disregard of the borrower's interests, and to take reasonable precautions to obtain the best available price for the collateral on the date of sale." (Dkt. 858, Tr. 15,519). Judge Steel defined best available price for the jury as "the highest price that might have been obtained if the bank had acted properly in selling the collateral." (Dkt. 858, Tr. 15,520). Finally, Judge Steel explained to the jury that the bank need not wait for an improvement in the market before selling the collateral of a loan in default; rather, the bank remains free to choose the time of sale in its own interest. (Dkt. 858, Tr. 15,520).

Rose Hall argues that these instructions were erroneous for two related but distinct reasons: first, the instructions apply best available price to a "forced sale" of what Rose Hall terms excess collateral; and second, the construction of best available price fails to adequately consider what plaintiff charitably characterizes as the land's fair market value.

The simple answer to these contentions is that Judge Steel has previously considered and rejected Rose Hall's request. The Magistrate's opinion on Jamaican

---

**107.** Plaintiff had been apprised of the existence of a Jamaican cause of action by its Jamaican attorney, Richard Mahfood, as early as August 26, 1979. (Dkt. 271A, pp. 11–10). The facts underlying the Jamaican tort claims are identical to those underlying the conspiracy claims which were presented in the original and first amended complaint.

**108.** Before Judge Steel, plaintiff attempted to explain the delay in asserting the Jamaican tort claims as caused by an addition of counsel within plaintiff's firm and new counsel's desire to review Jamaican law. Judge Steel rejected this explanation because the pleading could and should have included the claim based upon the Mahfood memorandum which would have satisfied the Fed.R.Civ.P. 11 good faith requirement. 93 F.R.D. at 864. Plaintiff also resurrects the argument that it was not until October 10, 1980 when defendants produced the Lapwing memo-

randum (PX 109)—allegedly supporting a finding that Holiday Inns coerced Chase Jamaica into selling the collateral—and some subsequent events that plaintiff discovered support for this alternative theory of liability. As Judge Steel correctly noted, "This, of course, provides an explanation why the motion to amend was filed when it was. It is no explanation why the amendment was not filed shortly after the first amended complaint had been filed on July 1, 1980." 93 F.R.D. at 865.

**109.** In light of this holding, the Court need not address Holiday Inns' contentions regarding the plaintiff's bad faith or the prejudice that would be occasioned by the amendment if granted, in the form of substantial and unnecessary additional discovery, some of which would undoubtedly have to take place in Jamaica, delay-induced memory loss and the erection of wholly separate defenses.

law[110] dated September 24, 1982, and adopted by Judge Steel embraces the following statement of the law:

> Where a mortgagee has breached its duty in selling mortgaged property, the appropriate measure of damages is not the replacement value of the property but is the difference between the best available price and the actual sale price.

Dkt. 559 at 3, *adopted*, Dkt. 631. The Court perceives no rational basis to deviate from this holding.

■ Rose Hall argues that the best available price represents a forced sale price that, at best, can be applied only to a sale which does not encompass excess collateral. In other words, Rose Hall contends that even if the best available price standard would apply to a sale of the proper amount of collateral, a so-called fair market value should apply to a sale of any excess collateral. This exercise in semantics leads nowhere. Selling too much collateral has the same legal and economic effect as selling the correct amount of collateral at too low a price. Since Judge Steel expressly charged the jury on sale of excess collateral, there is no error.

■ Without citation to authority,[111] plaintiff argues that fair market value, based upon an optimistic and speculative subdivision plan encompassing 15 year projections, constitutes the proper measure of damages. Plaintiff, through its witness "Pat" McDaniel, sought to demonstrate a future value in excess of $20 million (Dkt. 803, Tr. 5084–86, 5090, 5115; PX 719(A)), and relied heavily on this opinion in its closing argument. (Dkt. 853, Tr. 14,995–97; Dkt. 856, Tr. 15,359–60). In reality

plaintiff's "fair market value" construction simply represents a speculative future value. It bears little, if any, relationship to the current fair market value—the price a property will bring in an open market.[112] Therefore, plaintiff's contentions are not only irrelevant, they are incorrect.

For the foregoing reasons, both plaintiff's motion for judgment notwithstanding the verdict or, in the alternative, new trial, and its conditional motions for new trial will be denied in all respects. The Court now moves to a discussion of costs.

### VIII. *Costs*

In the Judgment Opinion, this Court deferred the taxation of costs until disposition of all motions for judgment notwithstanding the verdict. Presently, the Court undertakes consideration of this issue which was previously briefed by the parties.[113]

Fed.R.Civ.P. 54(d) provides, in pertinent part, that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." *See also* Local Rule 6.1 A(1). Local Rule 6.1 C provides that "[t]he determination of the prevailing party shall be within the discretion of the Court...."

This Court has entered judgment in favor of Holiday Inns against Rose Hall on all claims. (Dkt. 773). Plaintiff, however, objects to the award of costs to this prevailing party because it claims that the jury has found Holiday Inns to be a "wrongdoer" even though no judgment could be entered against it in this case. By its affirmative response to Interrogatory No. 2 and its assessment of corresponding dam-

---

**110.** There is no dispute that Jamaican law governs the assessment of damages.

**111.** Rose Hall failed to cite a single authority to support its contentions. It did append a self-serving interoffice memorandum which discusses Jamaican and American trust and eminent domain law. *See* Nov. 21, 1982 Memorandum, Dkt. 772, App. D. These principles are irrelevant to the issue at hand.

**112.** Actual fair market value reflects anticipated future, fully developed value. It does not, how-

ever, equate the two concepts. Plaintiff's strained definition of fair market value fails to consider development costs, carrying charges and the vicissitudes of Jamaican economics.

**113.** The parties' main arguments relating to costs are set forth in Dkts. 758, 762; an April 28, 1983 letter to the Court from Paul P. Welsh, Esq.; an April 29, 1983 letter to the Court from Charles S. Crompton, Jr., Esq.; and a May 3, 1983 letter to the Court from Peter Q. Bassett, Esq.

ages of $4,500,000 in Interrogatory No. 6, the jury necessarily found that Holiday Inns interfered with the proposed $13 million sale of the hotel to the U.D.C. In this action, however, Holiday Inns could not be sued directly for the interference;[114] rather, it was sued only on a conspiracy theory of liability, which the jury rejected in Interrogatory Nos. 5(A), (B) and (C).

Plaintiff contends that an award of costs to Holiday Inns which "stands before the Court, with hands the jury has found to be dirty" would be greatly unjust and erroneous. Letter from Paul P. Welsh, Esq. to Hon. Edwin D. Steel, Jr. (April 28, 1983). Secondly, plaintiff urges that if costs are awarded to Holiday Inns, they should be awarded only against CMOBC. This Court cannot accept plaintiff's contentions. In this action, the claims against Holiday Inns were tried only on a theory of conspiring with Chase Jamaica in 1) the cheap sale of the land and shares of Rose Hall (H.I.) referenced in Interrogatory Nos. 1 and 5(A), (B), and 2) the wrongful prevention of plaintiff's interference suit against Holiday Inns, referenced in Interrogatory Nos. 2 and 5(C). Holiday Inns prevailed on all claims asserted against it in this action. Even though the jury verdict indicates that Rose Hall (H.I.), a nonparty to this action, would have prevailed in an interference lawsuit against Holiday Inns, if it were able to bring one, this is an insufficient basis for denying costs to Holiday Inns in the present action. This is particularly true because the jury has determined that Holiday Inns in no way conspired with Chase Jamaica in the prevention of that interference lawsuit. (Interrogatory No. 5(C)).

Rose Hall's second contention, that any costs awarded to Holiday Inns should be taxed against CMOBC, loses its force when viewed in the current posture of the case. This Court will enter judgment not-

withstanding the verdict for CMOBC on the fraud on the Jamaican court issue, referenced in Interrogatory No. 4. Consequently, CMOBC cannot be held liable for any wrongs committed by Chase Jamaica and corresponding damages assessed by the jury. Therefore, CMOBC is a prevailing party, entitled to costs against Rose Hall. There is no reason to tax costs in favor of one prevailing defendant, Holiday Inns, against another prevailing defendant, CMOBC.

For these reasons, Holiday Inns' and CMOBC's costs will be taxed against the plaintiff.

## IX. Conclusion

The Court concludes that CMOBC's motion for judgment notwithstanding the verdict must be granted with respect to the claim that the Jamaican court was deceived by Chase Jamaica, as a result of control by CMOBC. With one exception, all other grounds for judgment notwithstanding the verdict or new trial brought by either party have been rejected. Only if this Court is reversed on its grant of the judgment notwithstanding the verdict as to the deceit on the Jamaican court issue is defendant entitled to a new trial. In that event, unless otherwise instructed by the appellate court, the trial would be limited to Rose Hall, Ltd. and CMOBC as the parties and Interrogatory No. 4 as the subject matter.

---

**114.** Rose Hall sued Holiday Inns in Georgia for wrongful interference with the $13 million sale negotiations on September 30, 1976. The Georgia court held, without determining the merits of the interference claim, that such a suit could only be brought by Rose Hall (H.I.). *Rose Hall Ltd. v. Holiday Inns, Inc.,* C.A. No. C227–30 (Ga.Super.Ct., Fulton Cty., filed Sept. 30, 1976), *aff'd,* 146 Ga.App. 709, 247 S.E.2d 173, *cert. denied,* No. 55491 (Ga. Oct. 3, 1978).